1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

————————————————————

TRYG INSURANCE, *et al*,

      Plaintiffs,           CIVIL ACTION NUMBER:

       -vs-              3:15-cv-05343-MAS-TJB

C.H. ROBINSON WORLDWIDE, INC.
*et al*,                 BENCH TRIAL

      Defendants.
————————————————————
     Clarkson S. Fisher United States Courthouse
     402 East State Street
     Trenton, New Jersey 08608
     May 4, 2017

**B E F O R E:**     HONORABLE MICHAEL A. SHIPP
               UNITED STATES DISTRICT JUDGE


**A P P E A R A N C E S:**

KENNEDY, LILLIS, SCHMIDT & ENGLISH, ESQS.
BY:  JOHN LILLIS, ESQUIRE
On behalf of the Plaintiffs.

KENNETH A. OLSEN, ESQ.
On behalf of the Defendants.

BARRY N. GUTTERMAN & ASSOCIATES, P.C.
On behalf of the Defendants.


Certified as True and Correct as required by Title 28,
U.S.C., Section 753
    /S/ Cathy J. Ford, CCR, CRR, RPR

2

I N D E X

WITNESS                                              PAGE

 METTE DELEURAN

 DIRECT EXAMINATION BY MR. LILLIS              9
 CROSS EXAMINATION BY MR. GUTTERMAN           13

 MICHAEL BASTHOLM

 DIRECT EXAMINATION BY MR. LILLIS             17
 CROSS EXAMINATION BY MR. GUTTERMAN           31

 CHRISTOPHER MCLOUGHLIN

 DIRECT EXAMINATION BY MR. GUTTERMAN          50
 CROSS EXAMINATION BY MR. LILLIS              71
 REDIRECT EXAMINATION BY MR. GUTTERMAN        79
 CONT'D RECROSS EXAMINATION BY MR. LILLIS     80


                    E X H I B I T S

NUMBER          DESCRIPTION              IDEN.   EVID.

 Plaintiff's Exhibit A, B, C, D, E, and F        21

*United States District Court*
*Trenton, New Jersey*

3

1              THE DEPUTY COURT CLERK:  All rise.

2              (Open court begins at 9:59 a.m.)

3              THE COURT:  Please be seated.  Good morning.

4              COUNSELS:  Good morning, your Honor.

5              THE COURT:  We are here and we are going to be

6    on the record in the matter of Tryg Insurance *et al.*

7    v. C.H. Robinson Worldwide *et al.,* Docket Number

8    15-5343.

9              May I have appearances of counsel, please.

10             MR. LILLIS:  Good morning, your Honor.  John

11   Lillis for the Plaintiffs.

12             THE COURT:  Good morning.

13             MR. GUTTERMAN:  Good morning, your Honor.

14   Barry Gutterman on behalf of C.H. Robinson Worldwide.

15             MR. OLSEN:  Good morning, your Honor.  Kenneth

16   Olsen, local counsel for C.H. Robinson.

17             THE COURT:  Good morning.  And, sir, you're

18   not entering an appearance but I always like to know

19   who's sitting at the table.

20             MR. MCLOUGHLIN:  Yes.  Chris McLoughlin, C.H.

21   Robinson.

22             THE COURT:  Wonderful.  Thank you.  And

23   welcome.

24             The underlying action arises from a breach of

25   contract claim asserted by Plaintiffs against

4

1    Defendants for damage to miniature chocolate liquor

2    bottles.  The parties have stipulated to damages.  The

3    parties dispute, however, whether Defendant is a

4    broker or a carrier under Carmack Amendment.  This

5    one-day trial, therefore, will focus in and address

6    the crux of the issue of whether the Defendant is a

7    broker or carrier for purposes of liability under the

8    Carmack Amendment.

9         So with that, I'm inclined to just let you

10   know that in this kind of matter I relax the rules of

11   evidence.  So, I mean, to the extent that you have

12   objections I'm fine with you making them, but you

13   certainly don't need make them just for the sake of

14   making them.  And I'm going conduct this in an

15   informal matter, but we will still follow the normal

16   protocol.  I take it you folks have already agreed

17   that you're doing to do opening statements.  We'll

18   then let Plaintiffs put on its case.  We'll let

19   Defendants cross-examine the witnesses as they see

20   fit.  I understand there are only really two live

21   witnesses, correct?  Then after Defendants put on its

22   case, we are not doing closing statements, correct?

23        MR. LILLIS:  That's correct, your Honor.  In

24   fact, I'm not sure we even need opening statements --

25        THE COURT:  It's completely up to you.

1            MR. OLSEN:  The trial briefs that we

2    submitted --

3            THE COURT:  Were comprehensive and I thought

4    you folks did a good job.  So I'm happy to just move

5    right in.

6            MR. OLSEN:  Good.

7            THE COURT:  I understand that we have an issue

8    with regard to the interpreter that we want to

9    clarify.  Is there an issue or is there a stipulation

10   as to the qualifications?

11           MR. LILLIS:  Here's what I'd like to do, your

12   Honor.  We had an original interpreter arranged and we

13   got a call yesterday from the service that her mom or

14   her mother-in-law had passed away and so she canceled

15   on us because she's going to a funeral this afternoon.

16   So we scrambled around and we found someone last

17   evening, who is based in Philadelphia, who is outside.

18           So she has never testified before in open

19   court.  We received her resume this morning.  What I

20   would propose, your Honor, is we bring in the

21   interpreter.  The witness -- my witness is outside.  I

22   kept him outside.  We bring in the interpreter and I

23   do a short voir dire about her and her qualifications,

24   then counsel if he want can cross.  I would then offer

25   her as an interpreter in the Danish and English

6

1   languages and then the Court would make a decision as

2   to whether the Court is comfortable with her serving

3   in that role.

4          THE COURT:  Let me hear from defense counsel.

5   Have you folks had an opportunity to review her resume

6   and curriculum vitae?

7          MR. GUTTERMAN:  Yes, I did, your Honor.  I

8   have no objections to it.  I think it's a good idea

9   that she at least be questioned by Mr. Lillis for her

10  credentials.

11         THE COURT:  Okay.

12         MR. OLSEN:  Your Honor, one more.  Just a

13  housekeeping function before Mr. Lillis starts his

14  voir dire.

15         We have for you, as the pretrial order talks

16  about, a deposition of Janet Hays that's being

17  submitted to your Honor since she's not here.  She is

18  no longer employed by C.H. Robinson; is residing out

19  in Minnesota.  The Plaintiff has green highlighted

20  Plaintiffs' portions of the deposition; Defendant has

21  yellow highlighted.  And I have the original

22  deposition -- full deposition with the highlights of

23  both parties for your Honor.

24         THE COURT:  Okay.  So we're going to offer

25  this and mark it as an exhibit and go ahead and move

7

1    it in.

2            MR. OLSEN:  I believe it's exhibit number --

3            MR. LILLIS:  It's marked already -- it's

4    Exhibit G.

5            MR. OLSEN:  It's Exhibit G on Plaintiff's list

6    of exhibits.

7            THE COURT:  Is it a joint submission?

8            MR. LILLIS:  Yes.

9            MR. GUTTERMAN:  I would say so, yes, your

10   Honor.

11           THE COURT:  All right.

12           MR. LILLIS:  We had discussed it at the final

13   pretrial, your Honor, and counsel for both sides

14   agreed to mark it up accordingly.  In fact, we did it

15   before the magistrate.

16           THE COURT:  Okay.

17           MR. LILLIS:  And so we gave them our

18   designations a week ago --

19           MR. OLSEN:  Give this to you, your Honor.

20           THE COURT:  Yes, if you can pass that up.

21           MR. OLSEN:  Because it's now marked.  At that

22   time we had in green and we had to do the yellow.  So

23   now we have --

24           MR. LILLIS:  That's Exhibit G.

25           MR. GUTTERMAN:  This would be Exhibit G that

8

1    we'll hand to you, your Honor.

2           MR. OLSEN:  Thank you, your Honor.

3           THE COURT:  Thank you.  Any other housekeeping

4    or preliminary matters before we bring in the

5    interpreter?

6           MR. LILLIS:  I guess if we're housekeeping I

7    guess we'll keep going -- well, just one second.  One

8    of the Defendants was served and in default and so

9    we're going to be looking for judgment against that

10   other co-defendant.

11          THE COURT:  Okay.  That's not necessary for --

12          MR. LILLIS:  Not necessary for right now.

13          MR. OLSEN:  Not necessary for this, your

14   Honor.  The other Defendant, NRT, which is the motor

15   carrier, is out of business and that's all we know

16   about them.  I don't know anything about their

17   insurance or anything about their insurance or

18   anything about.  All I know --

19          MR. LILLIS:  They were served.

20          MR. OLSEN:  They were served, okay.

21          THE COURT:  Fair enough.

22          MR. LILLIS:  I'm going to bring in the

23   interpreter, your Honor.

24          THE COURT:  All right.  Let's go.  Let's move

25   forward.

DELERUAN - DIRECT - LILLIS

9

```
 1        Come forward, Ms. Deleuran.  I'll ask you to
 2   please stand.  And can you swear in the witness,
 3   please.
 4   METTE DELEURAN, SWORN.
 5        THE DEPUTY COURT CLERK:  Please state your
 6   name for the record and spell your last name.
 7        THE WITNESS:  Mette Deleuran, D-E-L-E-R-U-A-N.
 8        THE COURT:  I ask that you pull the seat
 9   forward and speak directly into the microphone because
10   the court reporter is taking down everything that's
11   said here.  So just keep your voice up.
12        So just some preliminary information that
13   we're going to have to obtain and then we'll proceed.
14        Mr. Lillis.
15        MR. LILLIS:  Thank you, your Honor.
16   DIRECT EXAMINATION BY MR. LILLIS:
17   Q.   Good morning, Ms. Deleuran.
18   A.   Good morning.
19   Q.   I'm going to show you what we have premarked as
20   Plaintiffs' H and ask if you can identify that.
21   A.   That's my resume.
22   Q.   And could you please briefly provide the Court
23   with your educational background.
24   A.   I have a law degree from a Danish university and
25   I have a JD from an American university.
```

DELERUAN - DIRECT - LILLIS

10

1   Q.    What American -- what university?

2   A.    Rutgers University.

3   Q.    When did you obtain your law degree from Rutgers

4   approximately?

5   A.    1997.

6   Q.    And when did you obtain your law degree in

7   Denmark?

8   A.    The same year.

9   Q.    And where were you born?

10  A.    I was born in Denmark.

11  Q.    And how many years did you live in Denmark?

12  A.    I lived in Denmark for approximately 25 years.

13  Q.    Where do you live now?

14  A.    I live in the United States.

15  Q.    When did you first come to the United States to

16  live?

17  A.    I came the first time in 1988.

18  Q.    Okay.  And how long were you here?

19  A.    I was here for one year at the time.

20  Q.    Okay.  What happened then, the next time?

21  A.    I came back in -- other than vacations I came

22  back to live again in 1995 and I've been here ever

23  since.

24  Q.    And what is your relationship and knowledge with

25  the Danish language?

11

1  A.    It's my first language.

2  Q.    When you were growing up as a child, what

3  language was spoken in your home?

4  A.    Danish.

5  Q.    When you were in grade school or early school

6  years in Denmark what language was used in school?

7  A.    Danish.

8  Q.    Could you please explain to the Court what is

9  your relationship and experience with the English

10  language, ma'am.

11  A.    I first learned English in grade school in

12  Denmark and it has been the language that I use on a

13  daily basis since I moved here permanently in 1995.

14  Q.    Are you currently employed, ma'am?

15  A.    Yes, I am.

16  Q.    And by whom?

17  A.    Chubb Insurance.

18  Q.    Where is that located?

19  A.    Philadelphia.

20  Q.    And what is your job with Chubb?

21  A.    I work on reinsurance claims.

22  Q.    Does Chubb have any relationship with this

23  dispute?

24  A.    No.

25  Q.    Have you ever performed any interpreter or

12

1   translation services from the Danish and English

2   language and back and forth before today?

3   A.    Yes.

4   Q.    Could you please describe to the court what your

5   prior experience has been.

6   A.    I was a contractor with a company that did over

7   the phone translations and interpretations and they

8   would call me whenever they needed someone with a

9   Danish/English language pair.

10  Q.    Have you ever testified in open court before?

11  A.    No.

12  Q.    Have you ever done any interpretation in

13  depositions or other legal testimony?

14  A.    No.

15  Q.    Have you ever done any interpretation in, for

16  example, immigration proceedings?

17  A.    No.

18  Q.    Did I ask you to spend some time with the

19  witness this morning?

20  A.    Yes.

21  Q.    And did I ask you to talk socially with him?

22  A.    Yes.

23  Q.    Did you?

24  A.    Yes.

25  Q.    What was your experience -- how did you

DELERUAN - CROSS - GUTTERMAN

13

1    experience the conversation with him this morning?

2    A.    It was very -- it was just a casual conversation

3    mostly about our families.

4    Q.    I understand that.  But how did you -- did you

5    understand him?  Did he understand you?  Could you

6    please explain the quality of the communication and

7    understanding between you and the witness this morning

8    during this social visit.

9    A.    It was a very -- there were no language issues

10   at all.  I understand him perfectly.

11   Q.    And what language were you speaking with the

12   witness this morning?

13   A.    Danish only.

14        MR. LILLIS:  Your Honor, I'd like to offer H

15   into evidence.

16        THE COURT:  Mr. Gutterman.

17        MR. GUTTERMAN:  Yes, your Honor.  I just have

18   a few questions.

19   CROSS EXAMINATION BY MR. GUTTERMAN:

20   Q.    You said that you had no conversation with

21   Mr. Bastholm with regard to anything other than in

22   Danish; is that correct?

23   A.    Correct.

24   Q.    Did he at all indicate to you in Danish that he

25   was able to speak English fluently and understand

DELERUAN - CROSS - GUTTERMAN

14

1    English fluently?  Did you have any discussion about

2    that?

3    A.    No, he didn't say he spoke English fluently.

4            MR. GUTTERMAN:  Thank you.  No other

5    questions, your Honor.

6            THE COURT:  Mr. Lillis.

7            MR. LILLIS:  Your Honor, we would like to

8    offer the witness as an interpreter as of service to

9    the court and to the witness.

10            THE COURT:  Just a few questions from the

11    Court.

12            Ms. Deleuran, were there any dialect or

13    idiomatic usage patterns of the person requiring

14    interpreting services that you noticed when you had

15    your conversation with him this morning?

16            THE WITNESS:  No.

17            THE COURT:  And you do understand that you are

18    to be -- and I understand you've not testified in

19    court before, that you're here to be a neutral party

20    who is here to facilitate communication and that you

21    should not offer advice or interject your opinion into

22    the proceedings, correct?

23            THE WITNESS:  I understand that, your Honor.

24            THE COURT:  With that, counsel, we're going to

25    grant and accept Ms. Deleuran as a Danish to English

DELERUAN - CROSS - GUTTERMAN

15

1    interpreter.

2         MR. LILLIS:  And English to Danish.

3         THE COURT:  Well, it's going to be both.

4         MR. LILLIS:  Both.

5         THE COURT:  Danish to English and English to

6    Danish interpreting for the proceedings today.

7         MR. LILLIS:  Thank you, your Honor.

8         THE WITNESS:  Thank you, your Honor.

9         THE COURT:  You may step down.

10        MR. LILLIS:  I'm going to call the witness.

11        THE COURT:  We're going to have to swear in

12   the interpreter and then also swear in the witness.

13        THE DEPUTY COURT CLERK:  Please state your

14   name for the record and spell your last name.

15        THE WITNESS:  Mette Deleuran, D-E-L-E-U-R-A-N.

16        THE COURT:  And let's swear in the witness.

17   MICHAEL BASTHOLM, STATE'S DEFENDANT WITNESS, SWORN.

18        THE DEPUTY COURT CLERK:  Please state your

19   name for the record and spell your last name.

20        THE WITNESS:  Michael Bastholm,

21   B-A-S-T-H-O-L-M.

22        THE COURT:  Mr. Bastholm, you can have a seat.

23   Ms. Deleuran we're going to invoke your interpretive

24   services.  My first question is going to be to

25   Mr. Bastholm.

DELERUAN - CROSS - GUTTERMAN

16

1     Do you understand the interpreter?  Do you

2     have any problems in terms of understanding the

3     interpreter?  I understand you had an opportunity --

4     and you can feel free to translate -- this morning.

5     Do you have any problems understanding the

6     interpreter?

7          THE WITNESS:  No.

8          THE COURT:  And are you able to communicate

9     effectively with the interpreter?

10         THE WITNESS:  Yes.

11         THE COURT:  Do you wish to proceed with the

12    services of an interpreter and not rely on your own

13    understanding of English?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  Just so we're clear, all

16    your responses have to go through the interpreter, and

17    the interpreter will provide the English response for

18    the record.  Okay?  So you can't answer in English at

19    all.

20         THE WITNESS:  Yes.

21         MR. LILLIS:  Your Honor, perhaps the Court may

22    want to instruct the interpreter that she needs to

23    translate verbatim.

24         THE COURT:  Counsel, I'm not giving that

25    instruction.  I mean, sometimes English -- languages

BASTHOLM - DIRECT - LILLIS

17

1    don't translate verbatim, which is why we have an

2    interpreter.

3              MR. LILLIS:  You're right, your Honor.  Thank

4    you.

5    DIRECT EXAMINATION BY MR. LILLIS:

6    Q.    Mr. Bastholm, what is your mother tongue?

7    A.    It's Danish.

8    Q.    And where do you live, sir?

9    A.    I live in Denmark.

10   Q.    And are you employed?

11   A.    Yes.

12   Q.    By whom?

13   A.    Toms Confectionery Group.

14   Q.    And what is the business of Toms?

15   A.    Chocolate producer.

16   Q.    And what is your position with Toms?

17   A.    Shipping manager.

18   Q.    And what are your duties as shipping manager?

19   A.    I receive orders and I plan shipping.

20   Q.    Do you have any particular geographical

21   jurisdiction as part of your job?

22   A.    No.

23   Q.    What is the jurisdiction?

24   A.    Global.

25   Q.    Does Toms provide and distribute its products

BASTHOLM - DIRECT - LILLIS

18

1 worldwide?

2 A.    Yes.

3 Q.    Does Toms distribute its products in the United

4 States?

5 A.    Yes.

6 Q.    How long have you been working as the shipping

7 manager at Toms?

8 A.    In all, five years but separated in two terms.

9 Q.    Did you have a position before you became

10 shipping manager at Toms?

11 A.    Yes.  Shipping assistant and shipping senior

12 planner.

13 Q.    So how long have you been in the shipping

14 department at Toms?

15 A.    11 years.

16 Q.    Before you were in the shipping department at

17 Toms, were you working at Toms?

18 A.    No.

19 Q.    Where were you working before Toms?

20 A.    The name of the company?

21 Q.    Well, what type of job?

22 A.    Shipping work.

23 Q.    How long in total have you been doing shipping

24 work as part of your job?

25 A.    23 years.

BASTHOLM - DIRECT - LILLIS

19

1    Q.    Now, are you familiar with a company called C.H.

2    Robinson?

3    A.    Yes.

4    Q.    How did you come to be familiar with C.H.

5    Robinson?

6    A.    From a colleague and from her emails.

7    Q.    And what did you learn from the former colleague

8    and emails?

9    A.    That we made use of the services of C.H.

10   Robinson to transport goods from storage facilitates

11   to Costco.

12   Q.    What is the relationship of Costco to Toms?

13   A.    Costco buys chocolate products from Toms.

14   Q.    Are you familiar with a company called Assured,

15   A-S-S-U-R-E-D, Packaging Inc.?

16   A.    Yes.

17   Q.    Who are they?

18   A.    It was the company responsible for packing

19   chocolate products.

20   Q.    And where were they located?

21   A.    Pennsylvania.

22   Q.    And what was the relationship between Assured

23   Packaging and Toms?

24   A.    Toms has employed Assured Packaging to package

25   chocolate products.

BASTHOLM - DIRECT - LILLIS

20

1   Q.    Did Assured provide any other products other

2   than packaging?

3   A.    Yes.  They stored goods until they were ready

4   for distribution and helped prepare the bill of

5   lading.

6   Q.    Do you know a company called Coregistics,

7   C-O-R-E-G-I-S-T-I-C-S?

8   A.    Yes.  Coregistics.

9   Q.    Who are they?

10  A.    It's a company that packages chocolates on

11  behalf of Toms.

12  Q.    So it was doing similar functions to the Assured

13  Packaging?

14  A.    Yes, same services.

15        MR. LILLIS:  Now, your Honor, I have placed in

16  front of the witness a binder that contains Plaintiff

17  trial exhibits A for apple through F for frank.  I

18  have removed Exhibit G, which is the deposition of

19  Janet Hays, and I informed counsel of this before we

20  started the direct examination.  All of these are in

21  evidence, your Honor.

22        THE COURT:  Mr. Gutterman.

23        MR. GUTTERMAN:  Yes.  I have no objection to

24  that, your Honor.

25        THE COURT:  So moved.

BASTHOLM - DIRECT - LILLIS

21

1    ( Plaintiff's Exhibit A, B, C, D, E, and F in

2    evidence.)

3    Q.    So, sir, you have that binder in front of you

4    with exhibits A through F, sir?

5    A.    Yes.

6    Q.    I'd like to turn you to Exhibit A, please.

7    A.    Yes, looking.

8    Q.    What is Exhibit A?

9    A.    It's a bill of lading related to transportation

10   from Assured Packaging in Levittown, New Jersey, [sic]

11   to Coregistics in Cranbury, New Jersey.

12   Q.    Do you know who prepared that bill of lading?

13   A.    Yes, Mr. Suffern (phonetic), an employee of

14   Assured Packaging on behalf of Toms.

15   Q.    And what shipment is this?

16   A.    It was the shipment of bottles -- of chocolate

17   bottles with liquor.

18   Q.    Did anything happen to the shipment unusual?

19   A.    Yes, the truck that was transporting the goods

20   was a cooling truck and it broke down during

21   transportation.

22   Q.    And did anything happen to the chocolate?

23   A.    Yes, the chocolates were damaged from the heat.

24   Q.    Now, is there any reference on Exhibit A to

25   carrier?

22

1   A.    Yes, on the top left corner carrier is mentioned

2   as C.H. Robinson.

3   Q.    Is there any other carrier mentioned on

4   Exhibit A?

5   A.    Yes.  Bottom right-hand corner is a carrier is

6   mentioned, NR Transport.

7   Q.    Before this loss or problem with the chocolate,

8   did you know about NR Transport?

9   A.    No.

10  Q.    Now, there are signatures down at the bottom of

11  Exhibit A?

12  A.    Yes.

13  Q.    With dates on it.  What do those signatures mean

14  to you?

15  A.    The signature on the left is from the shipper

16  Assured Packaging.

17  Q.    Okay.  And the signature on the right?

18  A.    The signature on the right is from NR Transport

19  and it's proof that they were given the goods.

20  Q.    And what is this bill of lading Exhibit A?

21  A.    It's the shipping contract with C.H. Robinson

22  pertaining to the transportation from Assured to

23  Coregistics.

24  Q.    And what is Exhibit B, sir?

25  A.    It's a packing list that details the products

BASTHOLM - DIRECT - LILLIS

23

1  which were included in the transport.

2  Q.    Is there any relationship between the list of

3  cargo described on Exhibit A, the bill of lading, and

4  the description on the packing list Exhibit B?

5  A.    The goods that are listed in the packing list

6  are a true copy of the ones that are listed in the

7  bill of lading.

8  Q.    And who prepares the packing list, sir?  Sorry,

9  withdrawn.  Who prepared Exhibit B, the packing list?

10  A.    Assured Packaging on behalf of Toms.

11  Q.    Okay.  If you can to Exhibit C, sir.  What is

12  Exhibit C?

13  A.    It's a contract between -- it's a transportation

14  contract from C.H. Robinson.

15        MR. LILLIS:  I think we're having an

16  interpreter issue here on the word but --

17        THE COURT:  Okay.

18        MR. LILLIS:  I understand, your Honor.

19  Q.    Go ahead.

20  A.    A receipt.  It's a receipt for the transport and

21  the oil from Assured to Coregistics.

22        THE COURT:  Mr. Lillis.

23        MR. LILLIS:

24  Q.    We're working with Exhibit C.  What is the

25  purpose of Exhibit C?

BASTHOLM - DIRECT - LILLIS

24

1    A.    It's a bill from C.H. Robinson to Toms for the

2    transportation agreement.

3    Q.    And what is the purpose of the bill, Exhibit C?

4    A.    Toms pays C.H. Robinson for the transportation

5    and the oil that was expended in -- during the course

6    of the transportation.

7    Q.    Did Toms pay this bill?

8    A.    Yes.

9    Q.    And what are the various items of the bill?

10   A.    Line haul.  One line item is for the actual

11   transportation, the truck.

12   Q.    And what is that called?

13   A.    Line haul.

14   Q.    L-I-N-E H-A-U-L, in English?

15   A.    Yes.

16   Q.    And what other items are there?

17   A.    The second line item is the fuel surcharge, the

18   oil and the gas that was used in connection with the

19   transportation.

20   Q.    And what is the measure for the fuel surcharge

21   item?

22   A.    There is a price per mile.

23   Q.    If we go down to the bottom of Exhibit C?

24   A.    Yes.

25   Q.    There's some small typed written language, and

BASTHOLM - DIRECT - LILLIS

25

1   Line 4 of that --

2   A.     Yes.

3   Q.     -- references "applicable bill of lading."  Do

4   you see that?

5   A.     Yes.

6   Q.     In your view, what is the applicable bill of

7   lading for this damaged shipment?

8   A.     That's Exhibit 1, the bill of lading.

9   Q.     Exhibit A?  You said 1.

10  A.     Excuse me, Exhibit A.

11  Q.     I'm going to ask you to turn to Exhibit D, sir.

12  D for Delta?

13  A.     Yes.

14  Q.     Before the court proceedings and litigation on

15  this damaged cargo did you ever see Exhibit D before?

16  A.     No.

17  Q.     Exhibit E, E for echo?

18  A.     Yes.

19  Q.     Before this litigation or before this Court

20  proceedings regarding this damaged cargo, did you ever

21  see Exhibit E?

22  A.     No.

23  Q.     Prior to this incident and this shipment, back

24  in 2013, did you ever visit the C.H. Robinson website?

25  A.     Presumably yes, but I never studied it closely.

BASTHOLM - DIRECT - LILLIS

26

1   Q.    So you visited it, but you didn't study it?

2   A.    Yes.

3   Q.    And Exhibit F for foxtrot?

4   A.    Yes.

5   Q.    Before this litigation and before these court

6   proceedings regarding this damaged chocolate, did you

7   ever see Exhibit F?

8   A.    No.

9   Q.    Now, moving back to generally exhibits A, B and

10  C, are they normal documents that you would see as

11  part of your job on a daily basis?

12  A.    Yes.

13  Q.    Looking at Exhibit A, the bill of lading, just

14  generally when would you first see the bill of lading,

15  just any bill of lading after a shipment is made?

16  A.    On the actual day or on the day after.

17  Q.    And who would send you that?

18  A.    In this case it was Assured Packaging.

19  Q.    And how would they send it to you?

20  A.    Via email.

21  Q.    And when you would receive it, would you study

22  the whole bill of lading, just generally?

23  A.    I would skim it over and I'd check the date and

24  check the PO number.  Normally it would be Costco's PO

25  number.

BASTHOLM - DIRECT - LILLIS

27

1    Q.    What's the reason for checking the date and

2    checking the PO number?

3    A.    So I can send the bill to Costco.

4    Q.    And would Assured also send you the packing list

5    Exhibit B when they would email you the bill of

6    lading?

7    A.    Yes.

8    Q.    And who send you Exhibit C?

9    A.    That's C.H. Robinson.

10   Q.    And who did you deal with at C.H. Robinson, if

11   anyone?

12   A.    Janet Hays.

13   Q.    Did you deal with anyone else at C.H. Robinson

14   other than Janet Hays?

15        MR. GUTTERMAN:  Objection as to the question.

16   It's not limited to the specific matter.

17        THE COURT:  Do you want to rephrase, counsel.

18   The objection, is that limited to this matter?

19        MR. LILLIS:  Your Honor, I wasn't intending to

20   limit it to it.

21        THE COURT:  Counsel, I'm going -- overrule the

22   objection.  I'm going to allow the question.  I think

23   you can ask it generally.

24        MR. LILLIS:  Maybe madame reporter could read

25   it back and maybe I could do a better one.  Let's see

28

1    what she says.

2              (Whereupon the Reporter reads the requested

3    portion of the record.)

4              MR. LILLIS:  I'm going to withdraw it and ask

5    a better question.

6              THE COURT:  Okay.

7    Q.    You had testified in the beginning of the

8    examination that you became aware of C.H. Robinson

9    through a colleague and some email, correct?

10   A.    Yes, that's correct.

11   Q.    Do you remember approximately what year that

12   was?

13   A.    It would have been 2007 or 2008 when I took over

14   that job from a colleague.

15   Q.    And from 2007 to 2008 up until this time of this

16   shipment in 2013, were you the representative of the

17   shipping department and Toms -- at Toms dealing with

18   C.H. Robinson?

19   A.    Yes, I was the primary contact person.

20   Q.    Okay.  Now, during this five or six-year period

21   that we just described of 2007 or '8 through 2013, did

22   you have a contact person or persons at C.H. Robinson

23   that you dealt with?

24   A.    At one point I had a male contact.  I don't

25   remember his name.  And subsequently it was Janet

BASTHOLM - DIRECT - LILLIS

29

1   Hays.

2   Q.    Do you have a recollection today as you sit here

3   testifying in this court as to how many years before

4   2013 you dealt with Janet Hays?

5   A.    Not exactly, about four to five years.

6   Q.    Approximately?

7   A.    Approximately.

8   Q.    During that four to five-year approximate

9   period, did you deal with anyone else other than Janet

10  Hays?

11  A.    Not that I recall.

12  Q.    Do you recall what type of service in terms of

13  quality that Janet Hays and C.H. Robinson provided you

14  during that five-year period?

15  A.    Yes, good and responsible service.

16  Q.    And how -- if there were shipments to be made to

17  Costco, for example, how would the shipment happen

18  between you and Janet Hays?

19  A.    The procedure was that -- with the agreement

20  with Janet Hays and C.H. Robinson was that they would

21  provide a list of POs to Costco which showed which

22  dates the goods were to be delivered.

23  Q.    And that would be from whom to whom?

24  A.    From our packing company to C.H. Robinson.

25  Q.    Okay.  Then what would happen?

BASTHOLM - DIRECT - LILLIS

30

1    A.    Janet would reach out to the packer or the

2    packer would reach out to Janet and make arrangement

3    for a pick up at the packer.

4    Q.    Now, before this particular damage case that

5    we're talking about now, did Toms have any damage

6    cases with C.H. Robinson?

7    A.    Not in my time.

8    Q.    During your time, did your customer Costco have

9    any problems with C.H. Robinson in terms of their

10   deliveries or performance or schedule or anything like

11   that?

12   A.    No.

13   Q.    Did Janet Hays ever tell you that C.H. Robinson

14   was acting only as a broker?

15   A.    No, that was never discussed.

16   Q.    Did Janet Hays ever send you an email or a

17   writing or a fax or a bill or anything that told you

18   that C.H. Robinson was acting as a broker only?

19   A.    No, never.

20   Q.    Do you recall submitting a claim to C.H.

21   Robinson for this damaged shipment of chocolates?

22   A.    Yes, I recall.

23   Q.    And do you recall at some time thereafter

24   receiving C.H. Robinson's response?

25   A.    Yes.

BASTHOLM - DIRECT - LILLIS

31

1   Q.    And what was their response, as best you can
2   recall it?
3   A.    Yeah.  Yes, I got two responses.  The first was
4   that they had received my mail and the second one was
5   that they had 90 days to review the claim.
6   Q.    And did there come a time when they had reviewed
7   the claim and advised you of their position?
8   A.    No, not as I recall.
9   Q.    Did they ever accept the claim?
10  A.    No, not as I recall.
11  Q.    Did C.H. Robinson pay you for the loss?
12  A.    No.
13  Q.    Did they ever tell you why they weren't paying
14  the loss?
15  A.    No.
16        MR. LILLIS:  I have nothing further on direct,
17  your Honor.
18        THE COURT:  Mr. Gutterman, at this time I
19  invite you to cross-examine the witness.
20        MR. GUTTERMAN:  Thank you, your Honor.
21  CROSS EXAMINATION BY MR. GUTTERMAN:
22  Q.    Mr. Bastholm, my name is Barry Gutterman and I
23  represent the Defendant C.H. Robinson.  I would like
24  to have you before you the list of exhibits that the
25  booklet that the Plaintiff has given you.  It's called

32

1    Plaintiffs' bench book.  And also another folder that

2    has Defendant C.H. Robinson's trial exhibit books.

3    I'd like you to have both of those books before you.

4              Do you have those books before you?

5    A.    No.

6    Q.    Pardon me?

7    A.    No.

8    Q.    Okay.  You have neither book; is that correct?

9              MR. LILLIS:  He has mine.

10             MR. GUTTERMAN:  I'm handing the witness the

11   trial exhibits that were prepared by C.H. Robinson.

12   A.    Yes, I have them.

13   Q.    I'd like to state that many of the questions I

14   was about to ask you were covered in quite detail by

15   Mr. Lillis so the amount of questions I have for you

16   will be reduced considerably from what I originally

17   had planned.  What I'd like to first ask you --

18             THE COURT:  Mr. Gutterman, take smaller bites

19   so the interpreter can --

20             MR. GUTTERMAN:  Fine.  Excuse me.

21             THE WITNESS:  I understand.

22   Q.    You testified that Exhibit A was the bill of

23   lading that was prepared by Assured Packaging; is that

24   correct?

25   A.    Yes.

BASTHOLM - CROSS - GUTTERMAN

33

1   Q.    Did C.H. Robinson to the best of your knowledge

2   issue any other bill of lading for the shipment?

3   A.    No, not that I'm aware.

4   Q.    Now, at the bottom of the bill of lading you

5   testified that, on the right hand corner, it said NRT

6   Transport and there was a signature.  Based upon that

7   testimony was that the carrier in your opinion that

8   actually transported the shipment at issue?

9   A.    It's my understanding that NRT drove the goods

10  on behalf of C.H. Robinson.

11  Q.    Thank you.  Did you have any other type of

12  agreement with C.H. Robinson other than the bill of

13  lading which was marked as Exhibit A?

14  A.    No, no signed agreement, no.

15  Q.    Now, turning to -- I have two booklets here so

16  you have to bear with me.  Turning to the bill of

17  lading which has been marked as Exhibit A, is there

18  any signature on that particular document by C.H.

19  Robinson at all?

20  A.    Yes, NR Transport.

21  Q.    I'm asking about now if there are any signature

22  by C.H. Robinson on the bill of lading?

23  A.    No.  Nothing from C.H. Robinson.

24  Q.    Now, on the left side of the bill of lading at

25  the bottom, you had testified that Assured had been

BASTHOLM - CROSS - GUTTERMAN

34

1    the one who was the shipper; is that correct?

2    A.    Yes, that's correct.

3    Q.    I just want to be clear, there's also a

4    signature there that I cannot read.  Do you know who

5    actually signed the bill of lading on behalf of

6    Assured?

7    A.    I'm not exactly clear but I would assume it's

8    Adam Samuel, who is our contact person at Assured.

9    Q.    Now, on that bill of lading it refers to Toms

10   Confectionary Group as "bill freight 2."  Tell me what

11   that means.

12   A.    It means that C.H. Robinson and Toms have

13   entered an agreement and that once the transport had

14   been completed, C.H. Robinson is to bill Toms.

15   Q.    Do you have any evidence at all that C.H.

16   Robinson transported the goods at all in this

17   particular shipment?

18   A.    No.

19   Q.    Do you have any evidence that C.H. Robinson ever

20   loaded or unloaded the shipment itself, the cargo from

21   the shipment?

22   A.    No, but I can see that in our transport which

23   handled the goods on behalf of C.H. Robinson has

24   signed the bill of lading for receipt of the goods.

25   Q.    In other words, your statement is that C.H.

BASTHOLM - CROSS - GUTTERMAN

35

1    Robinson entered into this bill of lading with you but

2    isn't it correct that Assured Packaging is the one who

3    prepared the bill of lading?

4            MR. GUTTERMAN:  Can you read it back.

5            (Whereupon the Reporter reads the requested

6    portion of the record.)

7            THE WITNESS:  It's correct that Assured

8    Packaging prepared the bill of lading on behalf of

9    C.H. Robinson.

10   Q.    Did you personally have any input for anything

11   that was placed on the bill of lading with regard to

12   the reference to the carrier?

13   A.    No.

14   Q.    Did you have any conversations with anyone at

15   Assured Packaging as to why C.H. Robinson was listed

16   in one spot on the particular bill of lading as the

17   carrier?

18   A.    No.

19   Q.    I'd like you to take a look at Defendants'

20   Exhibit Number 9 in the list of trial exhibits.

21   A.    Yes.

22   Q.    Okay.  Have you seen this document before,

23   before today?

24   A.    Yes.

25   Q.    And when would that have been, approximately?

BASTHOLM - CROSS - GUTTERMAN

36

1    A.    I don't remember.

2    Q.    Would it have been a few years ago or would it

3    have been in more recent time before your deposition

4    was taken last year?

5    A.    It was in connection with the deposition, as I

6    recall.

7    Q.    Thank you.  Do you know who prepared this

8    report?

9    A.    I don't recall.

10   Q.    Does it mention the name of the company that

11   actually did the survey?

12   A.    Yes.

13   Q.    And what is the name?

14   A.    International Surveyors and Adjusters.

15   Q.    I'll read the sentence:  "We hereby certify

16   that, in accordance with the instruction of WK Webster

17   (Overseas) Ltd. received on July 22, 2013, that the

18   assigned marine surveyors immediately communicated

19   with the parties concerned, undertook a survey and

20   reported the following."

21        Tell me, WK Webster, who are they?

22   A.    I don't know.

23   Q.    Did you at all retain -- ask to have WK Webster

24   step in and order a survey?

25   A.    I simply don't remember.

37

1   Q.    I would like you to silently read Section 1.2

2   on Page 2 and the third and fifth paragraphs.

3           INTERPRETER:  Which paragraphs, I'm sorry?

4           MR. GUTTERMAN:  This is 1.2, transit details,

5   under Page 2.

6   Q.    I'd like you to read that silently then I'll ask

7   you a few questions.

8   A.    Transit details, is that the one?

9   Q.    In particular, let me make it clear I really

10  want you look now at Paragraphs 3 and 5 under

11  sections 1.2, just read those paragraphs.

12  A.    Yes.

13  Q.    I will read it for the record.  Paragraph 3

14  says, "we also understand Assured Packaging appointed

15  C.H.R. on behalf of Toms Confectionary Group to

16  arrange and coordinate the delivery of 2,430 out of

17  2,662 cartons from Levittown, Pennsylvania, to

18  Coregistics, located at 260 Prospect Plains Road in

19  Cranbury, New Jersey."

20          I'm asking if you agree with that -- those

21  sentences?

22  A.    Yes, in that sentence, yes.

23  Q.    And Paragraph 5 for the record says, "CHR

24  appointed National Refrigerated Trucking to physically

25  transport the shipment from Levittown to Cranbury."

BASTHOLM - CROSS - GUTTERMAN

38

1    Do you agree with that sentence?

2    A.    Yes, I can see that based on the bill of lading.

3    Q.    Now, I'd like you -- I know -- take a little bit

4    of time.  You said you had reviewed this before.  You

5    don't have necessarily read it if you recall

6    everything in it.  I would like you to read the entire

7    report so I can ask you a question.  Silently.

8         THE COURT:  Mr. Lillis.

9         MR. LILLIS:  Objection.  I think he should

10   focus the witness on a particular paragraph and

11   section, as opposed to -- this is a five-page report.

12        MR. GUTTERMAN:  I'll focus on the question.

13   Q.    The question I will ask is in this particular

14   survey is there any reference at all to C.H. Robinson

15   being a carrier, which would require you to review the

16   entire document unless you know for a fact it was or

17   was not?

18        THE COURT:  One second.  Mr. Lillis.

19        MR. LILLIS:  Your Honor, the document speaks

20   for itself.  It's in evidence.  And we don't need the

21   witness to read the document to say what the document

22   says.

23        MR. GUTTERMAN:  I'd also like to know if he

24   agrees with the conclusion reached, if there was no

25   reference to C.H. Robinson being in there.

BASTHOLM - CROSS - GUTTERMAN

39

1        THE COURT:  Counsel, I'm going to overrule the

2   objection.  You can proceed.  You can answer the

3   question.

4        Why don't you repeat the question that you

5   want him to answer.  Mr. Gutterman --

6        MR. GUTTERMAN:  Oh, you want me to repeat it?

7        THE COURT:  Yes.

8   Q.   Basically, I want to know if you have reviewed

9   this document and if you found anything in there that

10  indicates that C.H. Robinson was referred to as a

11  carrier, even though the documents speaks for itself.

12  A.   In the few paragraphs that I read no, I don't

13  see that.

14  Q.   Did C.H. Robinson ever tell you that it owned

15  any type of equipment that it could have transported

16  your cargo for you?

17  A.   No, but at the same time they never told me that

18  they didn't.

19        MR. GUTTERMAN:  I would like to strike that.

20  I didn't ask that question.

21        THE COURT:  So noted, Counsel.

22  Q.   Did C.H. Robinson ever tell you they took

23  physical or title possession or delivery of the cargo?

24  A.   Can you repeat the question.

25        MR. GUTTERMAN:  You want to repeat the

BASTHOLM - CROSS - GUTTERMAN

40

1   question, Ms. Reporter.

2           MR. LILLIS:  It's kind of a multiple question,

3   your Honor.

4           THE COURT:  Again, counsel, I'm asking all

5   parties based upon the interpreter's services to

6   ask -- take smaller bites at the questions.  So why

7   don't we read back the question as it's been stated

8   right now.

9           (Whereupon the Reporter reads the requested

10  portion of the record.)

11          MR. LILLIS:  Same objection.  Multiple

12  question.

13          THE COURT:  Counsel, do you want to break

14  those down or --

15  Q.   Okay.  Did C.H. Robinson ever tell you they took

16  physical possession of the -- of your goods in this

17  particular case?

18  A.   No, that was never discussed.

19  Q.   Did they ever tell you they took title to the

20  particular goods that were shipped in this particular

21  case?

22  A.   No, but it was my understanding that since I

23  paid them they took over the responsibility of the

24  goods.

25  Q.   So this is based upon your assumption; is that

BASTHOLM - CROSS - GUTTERMAN

41

1    correct?

2    A.    No, I'd like to refer to the -- to the Exhibit C

3    which shows that I paid C.H. Robinson to transport the

4    goods.

5    Q.    So that's the basis that you're concluding is

6    because you made payment to C.H. Robinson; is that

7    correct?

8    A.    Yeah.  Yes, plus I had entered an agreement with

9    C.H. Robinson for them to transport the goods from

10   point A to point B.

11   Q.    And what agreement is that?  What document are

12   we talking about?

13   A.    Straight bill of lading.

14   Q.    Okay.  Now, it's been your testimony that C.H.

15   Robinson acted as a carrier in this particular case.

16   What's the basis for you stating or concluding this?

17   A.    That -- that's based on the fact that I entered

18   the contract with C.H. Robinson to have the goods

19   transported from point A to point B.

20   Q.    And that contract would be you're saying the

21   bill of lading; is that correct?

22   A.    Yes.

23   Q.    Do you have any other documentation that you've

24   ever seen that refers to C.H. Robinson as being the

25   carrier in this particular case other than your

42

1    statement that the name C.H. Robinson was listed in

2    one spot on the bill of lading?

3    A.    Exhibit C shows that I'm paying C.H. Robinson

4    for transport of goods.

5    Q.    Now, you testified earlier that you had looked

6    at the website but really didn't study it.  When you

7    looked at it, what did you look for in the website for

8    C.H. Robinson?

9    A.    I don't recall.

10   Q.    When you looked at the website do you recall

11   ever seeing a statement that C.H. Robinson was a

12   carrier in that website?

13   A.    No.

14   Q.    From the years 2009 up until I think it's 2013

15   or maybe '14, or when you began working for Toms which

16   I believe was what, about 11 years ago; is that

17   correct?

18   A.    2006.

19   Q.    2006.  Did you use other companies to make

20   arrangements for the transport of your goods other

21   than C.H. Robinson during the time that you worked for

22   Toms?

23   A.    Yes.

24   Q.    And what's the best estimate of the number of

25   other companies that you used to make arrangements for

BASTHOLM - CROSS - GUTTERMAN

43

1   the transport of your goods from Europe to the United

2   States?

3   A.    Is that the period from 2009 to 2013?

4   Q.    Yes.

5   A.    Two.

6   Q.    What were the names of those companies?

7   A.    PR Shipping and DSV.

8   Q.    And did you check to see if they had a website,

9   those two companies?

10  A.    No.

11  Q.    Why not?

12  A.    I didn't need it.  I know that they have a web

13  page but I didn't need it.  I didn't check to make

14  sure -- I didn't need to check to make sure they had a

15  web page.

16  Q.    Now, you previously testified that you looked at

17  the C.H. Robinson website.  Is there a reason why you

18  didn't look at their website in great detail to

19  determine who you were dealing with or the type of

20  entity that you were dealing with with regard to the

21  arrangement of the transport of your goods?

22  A.    No, there was no need for me to check their

23  website.  I understood that C.H. Robinson provided

24  transportation services for us and I didn't need to

25  check if they engaged the use of other companies.

44

1    Q.    When you say engaged in transportation services,

2    in what capacity were they engaging in transportation

3    services?

4    A.    We've used C.H. Robinson to transport goods from

5    point A to Costco's point B address.

6    Q.    Now, when you talk about transport, are we

7    talking about the physical transport or making

8    arrangements for others to make the transport?

9    A.    It was my understanding that C.H. Robinson

10   arranged for the transportation.

11   Q.    Thank you.  I'd like you to take a look at the

12   exhibit list -- the trial exhibit list which would be

13   Exhibit Number 1, which is the complaint.

14   A.    Yes.

15   Q.    Go to Page 3 and I'll read the sentence.

16   Paragraph 14.  "C.H. Robinson subcontracted the

17   physical carriage of the cargo to NRT."

18        Would you agree with that statement?  Page 3,

19   Paragraph 14?

20   A.    Yes.

21   Q.    Next, I will read the sentence and ask you a

22   question.  Go to Page 4, Paragraph 24.

23   A.    Yes.

24   Q.    It states, "as motor carrier of goods for hire,

25   C.H. Robinson was obligated by the Carmack Amendment

BASTHOLM - CROSS - GUTTERMAN

45

1    and the terms of the bill of lading to properly and

2    safely transport, handle, carry, keep, care for,

3    discharge, and deliver the cargo in the same good

4    order and condition as when received by it."

5           Do you have any proof, any documentation that

6    C.H. Robinson is actually a carrier?

7    A.    No.

8    Q.    Is it your position that C.H. Robinson was your

9    sole contact for shipments that they performed for

10   Toms?  In other words, it is your position that C.H.

11   Robinson was your sole contact for shipments that they

12   performed for Toms?

13   A.    Yes, C.H. Robinson was my only contact.

14   Q.    Besides the fact that C.H. Robinson was listed

15   as a carrier on the bill of lading prepared by Assured

16   and the fact that C.H. Robinson was a sole contact for

17   Toms, is this the basis for you concluding that C.H.

18   Robinson was a carrier in this particular shipment?

19          INTERPRETER:  I'm sorry.  Could you repeat

20   that.

21          THE COURT:  Let's read the question back.

22          MR. GUTTERMAN:  Read the question back,

23   please.

24          (Whereupon the Reporter reads the requested

25   portion of the record.)

BASTHOLM - CROSS - GUTTERMAN

46

1              THE WITNESS:  Yes, but generally I have used

2    C.H. Robinson as my transporter in cases where I have

3    entered a contract, a shipping contract with them.

4    Q.    If C.H. Robinson was not listed on this

5    particular bill of lading prepared by Assured

6    Packaging as the carrier, would you still have made a

7    claim against C.H. Robinson for the damages at issue?

8    A.    Yes, because that is who I entered the contract

9    with to have goods shipped from point A to point B.

10   Q.    Okay.  Is your company deemed to be a shipper in

11   the industry, generally?

12   A.    Yeah, you can say that.

13   Q.    Would you consider Toms to be a sophisticated or

14   knowledgeable shipper?

15   A.    I don't know if I would use the word

16   "sophisticated," but educated.

17   Q.    Educated meaning knowledgeable, very

18   knowledgeable?

19   A.    Yes, knowledgeable.

20              MR. GUTTERMAN:  I have no other questions.

21   Ken?

22              MR. OLSEN:  May I just approach Mr. Gutterman,

23   your Honor?

24              THE COURT:  Sure.

25   BY MR. OLSEN:

BASTHOLM - CROSS - GUTTERMAN

47

1    Q.    Good morning, sir.  My name is Kenneth Olsen and

2    I'm local counsel for C.H. Robinson in this matter.

3          THE COURT:  One second.  Mr. Lillis.

4          MR. LILLIS:  We normally don't have two

5    counsels representing the same client examining a

6    witness.  I don't mind if counsel takes a few minutes'

7    break.

8          MR. GUTTERMAN:  Do you have one question?

9          MR. OLSEN:  I have one question.  I can

10   certainly --

11         THE COURT:  I'm going to allow one question.

12   I think Mr. Lillis is correct, but I am going to allow

13   one question.

14         MR. OLSEN:  That's fine, your Honor.  If it's

15   out of protocol I'll be happy to have Mr. Gutterman

16   ask it.

17         THE COURT:  You're at the mike, counsel.

18         MR. OLSEN:  Thank you, your Honor.

19   Q.    Sir, in response to the last few questions from

20   Mr. Gutterman you kept on mentioning your agreement

21   with -- or agreements and contracts with C.H.

22   Robinson.  Are you referring to Exhibit A, the bill of

23   lading for this particular shipment as your agreement?

24   A.    Yes.

25   Q.    Do you -- does Toms, to your knowledge, have any

48

1  other contracts or agreements with C.H. Robinson for

2  this shipment that we're talking about today?

3  A.    Not that I'm aware of, no.

4        MR. OLSEN:  Thank you, sir.  Thank you, your

5  Honor.

6        THE COURT:  Anything on redirect, Mr. Lillis?

7        MR. LILLIS:  No redirect.

8        THE COURT:  At this time, you're excused.  You

9  can step down.  Thank you for your testimony.

10        Counsel, it's about 11:40.  We're going to

11  take a short restroom break.  Just for housekeeping,

12  where are we proceeding after that?

13        MR. GUTTERMAN:  Okay.  I will put on my sole

14  witness Chris McLoughlin and we will have redirect.

15  That's it.

16        THE COURT:  Okay.  Let's take a 10-minute

17  break.

18        THE DEPUTY COURT CLERK:  All rise.

19        (Recess at 11:41 a.m.)

20        THE DEPUTY COURT CLERK:  All rise.

21        (Open court begins at 11:54 a.m.)

22        THE COURT:  Please be seated.  Mr. Lillis.

23        MR. LILLIS:  Your Honor, we have no more live

24  witnesses.  We can formally at some point put in the

25  exhibits and also Janet Hays's transcript which you've

49

1    already received, and if we're going to do a post

2    trial findings of fact, but basically in terms of the

3    evidence, we rest.

4           THE COURT:  Okay.  Thank you very much.

5    Mr. Gutterman.

6           MR. GUTTERMAN:  Yes, your Honor.  Chris.

7           Your Honor, for the record, my sole witness on

8    behalf of C.H. Robinson is Chris McLoughlin.

9    CHRISTOPHER MCLOUGHLIN, DEFENDANTS' WITNESS, SWORN.

10          THE DEPUTY COURT CLERK:  Please state your

11   name for the record and spell your last name.

12          THE WITNESS:  It's Christopher McLoughlin,

13   M-C-L-O-U-G-H-L-I-N.

14          THE COURT:  You can be seated.

15          So for the record, Mr. McLoughlin, you've been

16   sworn.  And I would ask that you pull the seat forward

17   and speak directly into the microphone.  As you

18   notice, we have court reporter.  She is taking down

19   every word that is spoken here so it's really

20   important that you keep your voice up and that she's

21   able to hear you clearly.

22          Please wait until the question is fully posed

23   before you begin to answer.  She can't take down two

24   people speaking at the same time.  Also, she can't

25   take down a nonverbal response such as a nod of the

50

1    head or shrug of the shoulder so make sure that you

2    give a verbal response.

3              Mr. Gutterman, your witness.

4    DIRECT EXAMINATION BY MR. GUTTERMAN:

5    Q.    Yes.  Chris, have you ever testified at trial

6    before?

7    A.    No, I have not.

8    Q.    Had you ever been -- has your deposition ever

9    been taken before?

10   A.    Yes, I've been deposed before.

11   Q.    And how many depositions would you say you've

12   actually had your deposition taken?

13   A.    Approximately 10.

14   Q.    And tell me what type -- out of the 10, what

15   type of cases were they?

16   A.    The vast majority have been cargo claim-related,

17   probably 8 of 10.

18   Q.    Would these have been cargo damaged claims that

19   would have been made by a shipper or someone else

20   against C.H. Robinson?

21   A.    They are cargo claim related where a claimant

22   has involved C.H. Robinson.

23   Q.    And would also a trucker have been involved in

24   any of those of eight depositions that you've taken

25   involving cargo?

51

1   A.    Yes, there is always a trucker involved.

2   Q.    And the other two types of depositions, what did

3   they involve?

4   A.    The other two depositions were personal injury

5   cases.

6   Q.    Okay.  Are you taking any medication that would

7   affect your testimony today?

8   A.    No, I am not.

9   Q.    Tell me who are you presently employed by?

10  A.    I'm currently employed by C.H. Robinson.

11  Q.    And tell me where are they located?

12  A.    C.H. Robinson's corporate headquarters are in

13  Eden Prairie, Minnesota.

14  Q.    Is that where you're located?

15  A.    Yes, it is.

16  Q.    What is your current title?

17  A.    My current title is risk manager.

18  Q.    Okay.  Now, going back to 2009 to 2013, what was

19  your title?

20  A.    At that point in time I was a compliance and

21  claims manager.

22  Q.    When did you take over as risk manager?

23  A.    The risk manager change was approximately two

24  years ago.

25  Q.    Okay.  Now, tell me with regard to what are your

MCLOUGHLIN - DIRECT - GUTTERMAN

52

1    duties on a day-to-day basis?

2    A.    My responsibilities at C.H. Robinson as a risk

3    manager is working to create programs, procedures,

4    reviewing protocols that limit the exposure of our

5    customers and our carriers and ourselves for the

6    various cargos that we will provide transportation

7    services for primarily in North America.

8    Q.    And who do you report to?

9    A.    I report to the vice president of truckload

10   operations, Kevin Abbott.

11   Q.    Who reports to you, if anyone?

12   A.    I do not have any direct reports today.

13   Q.    How long have you been employed by C.H.

14   Robinson?

15   A.    I've been employed by C.H. Robinson for

16   approximately 17 years.

17   Q.    Prior to that 17-year period, were you employed

18   by someone else?

19   A.    Yes, I was.

20   Q.    And who was that?

21   A.    I was employed by a company called American Back

22   Haulers out of Chicago, Illinois.

23   Q.    What type of work did you do for them?

24   A.    I was in loss prevention and cargo claims

25   administration.

MCLOUGHLIN - DIRECT - GUTTERMAN

53

1    Q.    Now, prior to that particular position, had you

2    been employed by anyone else?

3    A.    Not in a professional sense, no.

4    Q.    Now, tell me anything about your educational

5    background.

6    A.    So I have a Bachelor of Science degree from

7    Indiana University in Bloomington, Indiana, and I have

8    attained several certifications, one in hazardous

9    materials that I renew every three years.  I've also

10   had various -- attended various seminars and training

11   in cargo claims, liability, cargo risk, cargo

12   security, things similar to that.

13   Q.    And how many seminars would you estimate?

14   A.    15 to 20 over the --

15   Q.    Would this be spread over what number of years?

16   A.    Over the 17 years primarily my employment with

17   C.H. Robinson.

18   Q.    Now, are you familiar with the lawsuit brought

19   by Tryg Insurance also a/s/o Toms Confectionary Group

20   versus C.H. Robinson and National Refrigerated

21   Trucking?

22   A.    Yes, I am.

23   Q.    Did you review the books and records of C.H.

24   Robinson kept in the ordinary course of business in

25   connection with the shipment?

54

1    A.    Yes.

2    Q.    Had you had the opportunity to review the

3    complaint in this particular matter?

4    A.    Yes.

5    Q.    I'd like you to take a look at Defendants' trial

6    book.  It would be Exhibit Number 1.

7    A.    I don't have the books in front of me.

8          THE COURT:  You can approach, counsel.

9    Q.    This is the trial exhibit book.  I'm handing you

10   the Plaintiffs' bench book and you also have the trial

11   book for C.H. Robinson.  Now, turn to the complaint

12   and I will read Paragraph 15 at Page 3.  Okay?

13   A.    Okay.

14   Q.    "On 16 July, 2013, C.H. Robinson and NRT in

15   consideration of certain agreed freight charges picked

16   up, received and accepted the cargo then in good

17   ordering condition from API in the Levittown, issued

18   or accepted bill of lading Number 68422 (bill of

19   lading) which named both C.H. Robinson and NRT as

20   carriers to cover the subject shipment and agreed to

21   carry the cargo to Cranbury."

22          Based upon this statement, do you take any

23   objection to any of the language in that particular

24   paragraph?

25   A.    Yes, I do.

55

1   Q.    Tell me which language you take objection to.

2   A.    C.H. Robinson did not agree to pick up, receive

3   or accept the cargo.

4   Q.    Does C.H. Robinson have any equipment to pick up

5   or receive the cargo?

6   A.    No, we do not.

7   Q.    Did C.H. Robinson have any written contract with

8   Toms Confectionery for this particular shipment?

9   A.    Not that I'm aware of.

10  Q.    Next turn to Exhibit 2 of our trial book for

11  C.H. Robinson, which is entitled "The Answer."  I'll

12  ask if you had an opportunity, when you find it, if

13  you had a chance to review this particular document?

14  A.    Yes, I have.

15  Q.    Now, referring to Page 5, and I will read the

16  sentence then ask you a question.  "CHRW did not

17  handle or transport the subject shipment and it cannot

18  be held liable for any damage to the shipments caused

19  by improper loading, securement and/or transport by

20  other parties based upon the provisions by applicable

21  law."

22        Did C.H. Robinson at any time take any

23  possession of the cargo at issue?

24  A.    No, we did not.

25  Q.    Next go to Page 6 of the answer.  Excuse me,

MCLOUGHLIN - DIRECT - GUTTERMAN

56

1  Page 5, I should say.  Seventh affirmative defense,

2  Paragraph 37, "CHRW acted as a licensed interstate

3  property broker only for the shipment -- subject

4  shipment, and as such, has no liability to the

5  Plaintiff."

6       Did C.H. Robinson have a brokerage license at

7  the time of this shipment to the best of your

8  knowledge?

9  A.    Yes, we did.

10 Q.    Does C.H. Robinson still have a broker's license

11 for other shipments?

12 A.    Yes, we still do have a property brokerage

13 license.

14 Q.    Now turn to Exhibit 3 in C.H. Robinson's trial

15 book, which is a series of one, two, three, four,

16 five pages.  Are these true and correct copies of

17 documents that are kept in C.H. Robinson in the

18 ordinary course of business?

19 A.    Yes, they are.  These are copies of our property

20 brokerage authority and the various name changes that

21 have occurred going back to 1981 on that operating

22 authority -- that property brokerage operating

23 authority.

24 Q.    Okay.  Now, does C.H. Robinson have a motor

25 carrier's license?

57

1    A.    No, we do not.

2    Q.    Did they ever have a motor carrier's license?

3    A.    No.

4    Q.    Go back to exhibit -- sorry to go out of

5    order -- Exhibit Number 1 and go to Page 6 of the

6    answer.  Excuse me, Exhibit Number 2, Page 6.  It

7    states at the top, "cross claims against NRT."  Are

8    you familiar with the fact that a cross claim was

9    filed against NRT?

10   A.    Yes, I am aware of that because NRT was the

11   motor carrier.

12   Q.    Why was a cross claim filed, to the best of your

13   knowledge?

14   A.    Because NRT was the motor carrier that hauled

15   the shipment and they are the party that's liable for

16   the loss.

17   Q.    Did you review the bill of lading that was

18   marked as Exhibit A in Plaintiffs' bench book prior to

19   today?

20   A.    Yes, I did.

21   Q.    And on that particular document who was the one

22   who signed as carrier receiving the load?

23   A.    NRT had an employee; their driver signed the

24   bill of lading.

25   Q.    Now, there's a signature on there that's hard to

58

1    read.  Who normally would sign, if you know, for NRT?

2    Would it be a driver?  Would it be someone else?  Who

3    would sign that document?

4              MR. LILLIS:  Objection.

5              THE COURT:  What's the objection?

6              MR. LILLIS:  No foundation.  He's talking what

7    NRT's practice would be.

8              THE COURT:  Mr. Gutterman.

9              MR. GUTTERMAN:  I'll rephrase it.

10   Q.   At the bottom it says NRT and there's a

11   signature in there.  Have you ever seen any documents

12   before with regard to where bills of ladings have the

13   carrier's name on there and a space, and would it

14   normally be a driver for the motor carrier who would

15   sign?

16             MR. LILLIS:  He hasn't laid any foundation,

17   your Honor, in terms of this witness's ability to

18   interpret a bill of lading and who is signing here.  I

19   mean, we have an insurance man, we have a risk manager

20   from corporate office here, and so I think he's got to

21   qualify this person a little bit.

22             MR. GUTTERMAN:  In response I've indicated

23   that had you reviewed the bill of lading prior to

24   today and is this in normal course of your routine as

25   risk manager to review bills of lading, so that's why

MCLOUGHLIN - DIRECT - GUTTERMAN

59

1    I think I've laid the foundation for him to answer the

2    question.

3              THE COURT:  I'll ask you, counsel, little more

4    foundation about his background reading bills of

5    lading, how many he's reviewed.

6    Q.    Have you involved yourself reading bills of

7    lading other than this particular case over the years

8    with regard to various cargo claims?

9    A.    Yes, I have.  Over the 17 years that I've been

10   involved with C.H. Robinson I've probably been

11   involved with thousands of cargo claims, reviewing all

12   the relative documents to the cargo claims, bills of

13   lading included.

14   Q.    Who usually signs on behalf of the motor

15   carriers in those bills of lading?  What type of

16   person would be signing?

17   A.    It's customary that the driver is signing the

18   bill of lading.

19   Q.    Thank you.  Next take a look at Plaintiffs'

20   trial Exhibit F.  Did you find that?

21   A.    Yes, I did.

22   Q.    This document at the top it states "C.H.

23   Robinson contract addendum and carrier load

24   confirmation," and it's got Number 13194339.  And I

25   want to know if this is a true and correct copy that

60

1   is kept by CHR in the ordinary course of business?

2   A.    Yes, it is.

3   Q.    Was this particular document to the best of your

4   knowledge utilized in this particular case?

5   A.    Yes, it was.

6   Q.    Tell me what is this document and what is its

7   purpose?

8   A.    This document is a rate confirmation.  It's a

9   document that we use after the terms are negotiated

10  with the carrier on an individual shipment, we will

11  send them a rate confirmation that again restates the

12  agreement that we've made with the carrier, primarily

13  laying out where the carrier supposed pick up the

14  load, where the carrier is going to be delivering the

15  load, and then the agreed upon rate for transportation

16  service -- for transportation that the carrier is

17  going to provide.

18  Q.    And on this particular document on the first

19  page who is listed as the carrier?

20  A.    The carrier is National Refrigerated Trucking.

21  Q.    And through this document itself is there a

22  reference to the fact that C.H. Robinson acts in the

23  capacity as a broker?

24  A.    Yes, this document does clarify that we are

25  acting as a broker.

61

1   Q.    Now, is this load confirmation given to Toms?

2   A.    No, it is not.

3   Q.    Why not?

4   A.    This is the agreement between Robinson and the

5   motor carrier.  It discusses privy information between

6   us and the motor carrier, primarily the rate that we

7   negotiate between ourselves.

8   Q.    Now, in other cases that you've been involved

9   with in which there were cargo claims have you seen

10  load confirmations such as this?

11  A.    Yes, I have.

12  Q.    And in any of those situations did those load

13  confirmations, are they ever given to the shipper?

14  A.    As a normal course of business the load

15  confirmation is not given to the customer.  It is used

16  as a piece of evidence in cargo claims.

17  Q.    Okay.

18  A.    From time to time.

19  Q.    Next, take a look at Exhibit D in Plaintiffs'

20  bench book.  Prior to today, had you had an

21  opportunity to review this document that is an

22  agreement for motor contract carrier services?

23  A.    Yes, I have.

24  Q.    Is this a true and correct copy kept in the

25  ordinary course of business by CHR?

MCLOUGHLIN - DIRECT - GUTTERMAN

62

1    A.    Yes, it is.

2    Q.    Tell me in general terms what this contract is

3    utilized for.

4    A.    This is our master contract agreement for

5    services.  It's a contract between Robinson as

6    property broker and the motor carrier.  It's a

7    standard course that all carriers that we do business

8    with sign a master contract agreement.  It lays out

9    our expectations for the engagement between us and the

10   motor carrier.

11   Q.    On this particular agreement who is listed as

12   the carrier?

13   A.    The carrier in this agreement is NRT.

14   Q.    And who is listed as the broker?

15   A.    C.H. Robinson is the broker.

16   Q.    Do you happen to know if NRT had a motor

17   carrier's license for this particular shipment?

18   A.    Yes, NRT was a licensed motor carrier at the

19   time of the shipment.

20   Q.    I'd like you to turn to Exhibit 7 of C.H.

21   Robinson's trial exhibits.  Okay?

22   A.    Okay.

23   Q.    Is this a true and correct copy kept by C.H.

24   Robinson in the ordinary course of business?

25   A.    Yes, it is.

63

1    Q.    Prior to today, did you review this particular

2    document in preparation for your testimony?

3    A.    Yes, I did.

4    Q.    Do you happen to know if this particular license

5    was in effect at the time of the shipment?

6    A.    Yes, it was in effect at the time of the

7    shipment.

8    Q.    Do you happen to know if NRT provided C.H.

9    Robinson with any proof of insurance?

10   A.    Yes, they did.

11   Q.    Next, look to Exhibit 8 in C.H. Robinson's trial

12   exhibits.  At the top it states, "certificate of

13   liability insurance."  Is this a true and correct copy

14   of this document kept by CHR in the ordinary course of

15   business?

16   A.    Yes, it is.

17   Q.    Prior to today did you review this particular

18   document?

19   A.    Yes, I did.

20   Q.    Do you happen to know if it was in effect at the

21   time of the shipment?

22   A.    Yes, it was in effect at the time of shipment.

23   Q.    And what is the amount of the cargo insurance?

24   A.    The carrier NRT on this insurance certificate

25   has $100,000 limit on their cargo policy with a $1,000

64

1    deductible and then a $2,500 deductible for reefer

2    breakdown situations.

3    Q.    Next I'd like to have you take a look at

4    Exhibit 9 in C.H. Robinson's trial exhibits.  Do you

5    have that in front of you?

6    A.    Yes, I do.

7    Q.    Did you review this document prior to today?

8    A.    Yes, I did.

9    Q.    In reviewing the document do you see any

10   reference at all to C.H. Robinson as a carrier?

11   A.    In this document C.H. Robinson is not referred

12   to as a carrier.

13   Q.    Is there any reference in this document as

14   referring to C.H. Robinson as contributing to the

15   loss --

16   A.    No.

17   Q.    -- as alleged?

18   A.    No, there is none.

19   Q.    Does the document refer to C.H. Robinson

20   appointing NRT to physically transport the cargo?

21   A.    Yes, it does.

22   Q.    Did C.H. Robinson order this particular survey?

23   A.    No, we did not.

24   Q.    Do you have any idea who did?

25   A.    I believe the underwriter for Toms requested

1   this survey be done.

2   Q.   Now, in your position as risk manager, do you

3   review C.H. Robinson's website at all?

4   A.   From time to time I do.

5   Q.   When you say from time to time, what would be a

6   parameter of when you would review it?

7   A.   I make a point of at least twice a year

8   reviewing the website.

9   Q.   What's the reason that you do that?

10   A.   Just to make sure that I am familiar with and

11   aware of the information that we're making public and

12   also validating the content of it is consistent with

13   our operations.

14   Q.   Now, I'll refer you to Exhibit 10 in Defendants'

15   trial exhibit book.  It's -- at the top it says C.H.

16   Robinson.  It says, "corporate overview."  And it says

17   three pages but actually only the first two pages of

18   it have anything on there, the rest just has a little

19   notation about dates.  Have you seen this particular

20   document before?

21   A.   Yes, I have.

22   Q.   Is this a true and correct copy of a document

23   kept in the ordinary course of business by C.H.

24   Robinson?

25   A.   Yes.

MCLOUGHLIN - DIRECT - GUTTERMAN

66

1    Q.    Was this website to the best of your knowledge

2    in existence at the time of the shipment?

3    A.    Yes, it was.

4    Q.    Now, I'll read from the document and ask you a

5    question.  It's under mission statement.  It says,

6    "we," meaning C.H. Robinson, "are a global provider of

7    multimodal transportation services and logistics

8    solutions operating through a network of offices in

9    North America, Europe, Asia and South America."  The

10   second sentence says, "we are a non-asset-based

11   transportation provider, meaning we do not own

12   transportation equipment that is used to transport our

13   customers' freight."

14         Okay.  Based upon that statement, would that

15   be a true and accurate statement as far as you know?

16   A.    Yes, it is.

17   Q.    What is a non-asset provider mean to you?

18   A.    A non-asset-based provider is a term that can be

19   used to refer to property brokers or third-party

20   logistics companies; entity that's primary course of

21   business is for arranging for transportation services

22   but not physically performing the transportation

23   services.

24   Q.    Is there anything on these first two pages that

25   refers to C.H. Robinson as a carrier?

67

1    A.    No, there is not.

2    Q.    Now, there was testimony that Toms was provided

3    with an invoice which I believe is Exhibit C in

4    Plaintiffs' booklet, okay?

5    A.    Okay.

6    Q.    You have that in front of you?

7    A.    Yes, I do.

8    Q.    Have you reviewed this document before?

9    A.    Yes, I have.

10   Q.    Is this the invoice for the shipment at issue?

11   A.    Yes, it is.

12   Q.    Now, there's mention of certain line haul

13   charges and fuel charges.  Would you explain what that

14   really means and who is the one who has to pay for it?

15   A.    Sure.  The line haul charge is going to be the

16   rate that is negotiated between our customer sales rep

17   and the customer that just lays out the general cost

18   that we are going to charge that customer to arrange

19   for that line haul.

20        So again, it's a predetermined pre-agreed upon

21   rate that will probably last for six months to a year

22   on a given lane.  So in this circumstances or

23   situation there was probably a negotiation between our

24   rep and Toms that set a rate of $650 to move a

25   refrigerated --  a full truckload refrigerated

68

1    shipment from Levittown to Cranbury, New Jersey.  The

2    unique part about this is we will charge that customer

3    a flat rate regardless.  We're kind of estimating

4    based on market conditions, our general knowledge of

5    what freight usually moves for and what it usually

6    costs to move things.  We will set that rate, and then

7    when we get an order to do -- an order from a customer

8    saying a shipment is ready, something needs to move,

9    then we'll go out to the carrier marketplace and try

10   and find a motor carrier to move that shipment for a

11   cost less than the rate that we're charging the

12   customer.

13        We will also include a lot of times in our

14   ratings to our customers, because fuel is a very

15   significant cost factor in all transportation, we will

16   negotiate a variable rate.  Again, the line haul rate

17   will stay consistent for a long period of time, then

18   we'll negotiate a fuel surcharge rate which is

19   variable based on some government indices at the time

20   the shipment actually moves.  So you will have your

21   basic line haul plus a fuel surcharge, which is again

22   intended to be a realization that fuel can go up and

23   down at times.  When fuel prices go high that

24   surcharge increases, and we can use that as part of

25   our negotiations on the carrier side of the equation.

69

1   Q.    So in this case it would have been a negotiation

2   that you would have had with NRT; is that correct?

3   A.    No. For this?

4   Q.    Yes?

5   A.    The negotiation with NRT is independent of this

6   rate.

7   Q.    How much would have paid in this particular case

8   to NRT?

9   A.    Hopefully something less than what was charged

10  to the --

11  Q.    Is there a document that you have that would

12  reflect -- let's see if we can -- go to Exhibit

13  Number 5 of Defendants' trial book.  Tell me if there

14  is anything in that document that reflects any type of

15  payment that would have been made to NRT.

16  A.    Yes, the second page of this document will list

17  the price that we negotiated with NRT to move the

18  load.  Now, because this negotiation for services is

19  done at a very short window to that actual time of

20  pick up, the carriers at that point are already

21  familiar with what their fuel cost is on that day,

22  where they are relative to fuel.  So we usually don't

23  line item fuel surcharge out to motor carriers.  It's

24  an all-inclusive rate to the carrier of $475.

25  Q.    Okay.  With regard to the shipment at issue do

70

1   you know if C.H. Robinson selected NRT's driver?

2   A.    No, we do not have any involvement in driver

3   selection.

4   Q.    Is that a general proposition with regard to

5   other than this particular case where you do not get

6   involved with recommending drivers?

7   A.    C.H. Robinson is not responsible for the

8   assignment of the driver.  That's a carrier --

9   Q.    Who is responsible?

10  A.    That's a motor carrier responsibility.

11  Q.    Now, this particular load confirmation, what is

12  it really used for?  I mean -- I notice there was a

13  mention of driving instructions.  What's the purpose

14  of that?  Is C.H. Robinson the one who gives some

15  directions as to how a particular shipment -- route

16  they're supposed to take?

17          MR. LILLIS:  Objection as to form.

18          THE COURT:  Mr. Gutterman.

19          MR. GUTTERMAN:

20  Q.    Is there anything in there that gives any

21  reference to directions for NRT in the load

22  confirmation, Exhibit 5?  In this --

23          MR. LILLIS:  Talking about driving directions?

24          MR. GUTTERMAN:  Yes, driving directions.  I'm

25  sorry.

MCLOUGHLIN - CROSS - LILLIS

71

1          MR. LILLIS:  Okay.

2     A.    No, there are no driving directions in this

3     document.

4     Q.    Does C.H. Robinson ever get involved in loading

5     or unloading of cargo?

6     A.    No.

7     Q.    I'm not sure if I asked the question before.  If

8     I did I'll ask it again.  Did C.H. Robinson prepare a

9     bill of lading for this shipment?

10    A.    No, we did not.

11         MR. GUTTERMAN:  Just give me one minute.  I

12    have no other questions.

13         THE COURT:  Okay.  Mr. Lillis, at this time

14    you're invited to cross-examine the witness.

15         MR. LILLIS:  Thank you, your Honor.

16    CROSS EXAMINATION BY MR. LILLIS:

17    Q.    Mr. McLoughlin, good morning -- good afternoon.

18    As part of your job in the insurance department, you

19    never had any contact with Toms, did you?

20    A.    I did not have any contact with Toms.

21    Q.    You never had any contact with Toms, correct?

22    A.    Correct.

23    Q.    And you never had any contact with Toms in terms

24    of booking loads, giving quotes, anything in the

25    commercial relationship going back and forth between

MCLOUGHLIN - CROSS - LILLIS

72

1    Toms and C.H. Robinson, correct?

2    A.    Correct.

3    Q.    In fact, Janet Hays was the representative of

4    C.H. Robinson who dealt with Toms, correct?

5    A.    Yes.

6    Q.    And Janet Hays wasn't able to be here today

7    because she's retired?

8    A.    I'm not familiar with her current employment

9    status.

10           MR. GUTTERMAN:  Your Honor, for the record,

11   upon information and belief she did retire some time

12   ago.  That's why she's not present.

13           THE COURT:  So noted.

14   Q.    Do you know her location today?

15   A.    No, I do not.

16   Q.    Did you make any effort before coming here today

17   to find out what her location was?

18   A.    No, I did not.

19   Q.    Did you ask anyone else in C.H. Robinson to

20   determine her location?

21   A.    No, I did not.

22   Q.    Did you inquire of human resources or personnel

23   department to determine her last known address?

24   A.    No.

25   Q.    Did you make -- did you inquire of any of your

73

1  colleagues at C.H. Robinson to make any effort to

2  secure her presence here today in court?

3  A.    No.

4  Q.    Toms is not an investor in C.H. Robinson; is

5  that correct?

6  A.    I don't know.

7  Q.    Do you know if they are?

8  A.    I do not know.

9  Q.    Because in Exhibit 10 in the defense book, that

10 screen shot from the website, up at the top it says

11 "investors corporate overview"?

12 A.    Yes.

13 Q.    It doesn't say customers corporate overview,

14 does it?

15 A.    No, it does not say that.

16 Q.    Do you have any evidence that Toms is an

17 investor of C.H. Robinson?

18 A.    No, I do not.

19 Q.    Do you know who the investors of C.H. Robinson

20 are?

21 A.    Personally, no.

22 Q.    Well, personally or professionally?

23 A.    Personally or professionally.  There is public

24 information about who might own stock in C.H.

25 Robinson.

MCLOUGHLIN - CROSS - LILLIS

74

1    Q.    Okay, but you don't know?

2    A.    No, I do not.

3    Q.    In Exhibit 10, there's no statement that says

4    C.H. Robinson acts as a broker only, correct?

5    A.    Correct, there's no statement that specifically

6    says C.H. Robinson acts a broker only.

7    Q.    So the answer is correct?

8    A.    Yes.

9    Q.    Is your department responsible for putting

10   out -- for preparing and transmitting invoices to

11   customers such as Exhibit C?

12   A.    No, my department is not.

13   Q.    Have you as part of your job at C.H. Robinson

14   ever been responsible for the production of invoicing

15   by C.H. Robinson to customers?

16   A.    I've been involved in discussions about what our

17   invoices should read and how they should appear.

18   Q.    In general?

19   A.    In general, yes.

20   Q.    Okay.  Looking at Exhibit C, would you agree

21   with me that that is the invoice for the shipment in

22   question?

23   A.    Yes.

24   Q.    There's nothing on this invoice that says C.H.

25   Robinson is acting as broker only, correct?

MCLOUGHLIN - CROSS - LILLIS

75

1    A.    Correct.

2    Q.    And this invoice is indeed prepared by C.H.

3    Robinson, correct?

4    A.    Yes.

5    Q.    And Exhibit C, C.H. Robinson is charging Toms

6    money for moving this cargo from Levittown, PA, to

7    Cranbury, New Jersey, correct?

8    A.    No, that's not correct.

9    Q.    How is that not correct?

10   A.    I'm sorry, is there a question?

11   Q.    The question is, C.H. Robinson is charging Toms

12   for moving the cargo from Levittown to Cranbury?

13   A.    No, we're charging Toms for arranging

14   transportation services.

15   Q.    Does it say anything on this invoice that that's

16   what you're doing?

17   A.    It doesn't say that on this invoice, no, but

18   that's what the invoice is for.

19   Q.    Line haul means moving the cargo from point A to

20   point B, correct?

21   A.    Not necessarily, no.

22   Q.    What does line haul mean then?

23   A.    Line haul is the cost of -- the cost that we're

24   charging the customer to arrange for those services to

25   move it -- to arrange for the services --

MCLOUGHLIN - CROSS - LILLIS

76

1  transportation services to get the cargo from the

2  shipping location to the destination.

3  Q.    For the cargo to move from Levittown to Cranbury

4  the customer Toms paid C.H. Robinson $663.50; is that

5  correct?

6  A.    No, that's not -- the customer was charged

7  $663.50 for Robinson to arrange for transportation

8  services to have the product moved from Levittown

9  Pennsylvania to Cranbury New Jersey.

10 Q.    So you don't agree line haul means a movement

11 from A to B?

12 A.    In this case, no.

13 Q.    No, in general, line haul -- doesn't line haul

14 mean move from A to B?

15 A.    Line haul can mean a lot of different things to

16 a lot of different people.  In my opinion, line haul

17 means in this circumstance for our invoice, that's the

18 cost for us to arrange for transportation from one

19 point to another.

20 Q.    And the fuel is for the 30 miles to go from

21 Levittown, PA, to Cranbury, correct?

22 A.    It's a fuel surcharge expense, yes.

23 Q.    Yeah, but it's for 30 miles?

24 A.    Yes.

25 Q.    And 30 miles is a difference between Levittown

MCLOUGHLIN - CROSS - LILLIS

77

1   and Cranbury, correct?

2   A.    Correct.

3   Q.    So that's actually the truck on the road those

4   30 miles, correct?

5   A.    It's a -- it's a normalizing charge to account

6   for spikes or dips in fuel cost as they occur more

7   realtime in the market.

8   Q.    And it's being charged on a per mile basis?

9   A.    It's charged on a per mile basis, yes.

10  Q.    It's 30 miles to go from Levittown, PA, to

11  Cranbury, correct?

12  A.    Correct.

13  Q.    Now, you issued an affidavit and you signed it

14  on April 11th of 2016 which was submitted as

15  Document 15-15 filed in this case on April 14th, 2016;

16  is that correct?

17  A.    Yes.

18  Q.    In Paragraph 9 you say at the time of the theft

19  to the goods there was in effect an agreement.

20        MR. LILLIS:  May I show this to the witness,

21  your Honor?

22        THE COURT:  Sure.

23  Q.    Do you see that?

24  A.    Which are we referring to again?

25  Q.    Paragraph 9?

78

1   A.    Paragraph 9, okay.

2   Q.    You say at the time of the theft.  Do you see

3   that?

4   A.    Yes.

5   Q.    Do we have a theft here in this case?

6   A.    I believe that that was the initial situation,

7   that the cargo -- the cargo was believed to be stolen

8   and then it was subsequently recovered.

9   Q.    Do you have any evidence of that?

10  A.    No.

11  Q.    Isn't it more correct that there was a

12  refrigeration breakdown and a mechanical breakdown

13  which led to a melting of the chocolate and ultimately

14  its damage?

15  A.    It's my understanding that again from the

16  carrier -- from conversations that the carrier had

17  with Robinson personnel that the load was stolen from

18  the carrier and whoever stole it didn't maintain the

19  reefer.  And the reefer shut down and the load was

20  subsequent -- and when the load was recovered it was

21  recovered with the reefer unit shut down.

22  Q.    Have you seen any evidence to that effect?  Is

23  there any exhibits here that say that?

24  A.    Not that I'm aware of, no.

25        MR. LILLIS:  Nothing further, your Honor.

79

1          THE COURT:  Anything further on redirect,

2   Mr. Gutterman.

3          MR. GUTTERMAN:  I just have one question.

4   Just one for clarification.

5   REDIRECT EXAMINATION BY MR. GUTTERMAN:

6   Q.   Was the website that was shown in Defendants'

7   Exhibit D in effect at the time of the shipment?

8   A.   Yes, it was.

9          MR. GUTTERMAN:  Thank you.  No other

10  questions.

11         THE COURT:  Mr. Lillis.

12         MR. LILLIS:  Nothing further, with this

13  witness.

14         THE COURT:  At this time you can step down,

15  Mr. McLoughlin.  Thank you for your testimony.

16  Mr. Gutterman.

17         MR. GUTTERMAN:  Yes.

18         THE COURT:  Anything further?

19         MR. GUTTERMAN:  No, I have nothing further.

20  The only thing I wanted to inquire for the record is

21  what the subsequent procedure should be.

22         MR. LILLIS:  Hold on.  I still have some

23  rebuttal.

24         THE COURT:  One second.  Counsel, I asked

25  Mr. Gutterman if he was done.

BASTHOLM - REDIRECT - LILLIS

                                                                    80

1              MR. GUTTERMAN:  No, I'm actually finished.  So

2      I have nothing further with regard to recross.

3              THE COURT:  Thank you.  Mr. Lillis.

4              MR. LILLIS:  I'd like to just put this witness

5      on rebuttal for a couple of questions.

6              THE COURT:  This witness being --

7              MR. LILLIS:  Michael -- Michael Bastholm, the

8      one we had before.

9              THE COURT:  All right.  Fine.  Bring him up.

10             Remind you that you are under oath.  You

11     recall the oath you've taken, correct?

12             THE WITNESS:  Yes.

13             THE COURT:  As does the interpreter?

14             INTERPRETER:  Yes.

15             THE COURT:  You can proceed, counsel.

16     CONT'D RECROSS EXAMINATION BY MR. LILLIS:

17             MR. LILLIS:  Thank you, your Honor.

18     Q.    Is Toms an investor in C.H. Robinson?

19     A.    No.

20     Q.    Has Toms had any other relationship with C.H.

21     Robinson other than that of customer?

22     A.    No, not that I'm aware of.

23             MR. LILLIS:  Nothing further, your Honor.

24             THE COURT:  Anything, Mr. Gutterman?

25             MR. GUTTERMAN:  No, your Honor.

81

1          THE COURT:  Okay.  You can step down.  Thank

2     you very much.  So with that testimony, is there

3     anything further?  I take it at this time both parties

4     have rested?

5          MR. LILLIS:  Yes, your Honor, we have rested;

6     both sides have rested.  And we just have -- we just

7     have some housekeeping, which is what Mr. Gutterman

8     was starting to do before rebuttal.  I don't know how

9     you want to handle it, your Honor, if we want to go

10    off the record or we want to have discussion with

11    counsel and the Court.

12         THE COURT:  What are housekeeping items?

13         MR. LILLIS:  Well, the items going to be first

14    of all we were able, as I think you can see, to put in

15    a very cooperative clean pretrial order, so in terms

16    of the exhibits, all the exhibits that were referenced

17    here today have been stipulated to be admissible.

18         THE COURT:  Okay.

19         MR. LILLIS:  So that's Number 1.  Number 2, we

20    did submit this morning Janet Hays's marked transcript

21    which you now have.  Green for the Plaintiff, yellow

22    for the Defendant.

23         Number 3, we did submit -- both counsel

24    submitted what we felt were fairly comprehensive trial

25    briefs laying out the law as we see it.  Number 4, we

82

1    did have a conversation this morning, Mr. Gutterman

2    and myself, and we thought it might be helpful once

3    the transcript is available to do proposed findings of

4    fact to submit to the Court subject to a schedule that

5    the reporter and counsel and the Court can live with.

6         THE COURT:  So to that point there, I'm going

7    to ask that you folks meet and confer and present to

8    the Court a proposed schedule.  You can consult with

9    my court reporter in terms of the turnaround for the

10   transcript and whatever you folks deem is a reasonable

11   schedule just submit something in writing as to the

12   proposed schedule.

13        MR. LILLIS:  That's fine.

14        MR. GUTTERMAN:  So that would be a schedule

15   after we receive the transcripts.

16        THE COURT:  Yes.

17        MR. LILLIS:  That's fine, your Honor.  I think

18   that's all we need is each side putting in proposed

19   findings.

20        THE COURT:  Okay.

21        MR. LILLIS:  If that's okay with the Court.

22        THE COURT:  That's absolutely fine.  That's

23   what I would do in the ordinary course.  So with that,

24   I'm just going to ask that you confer with my

25   courtroom deputy and my law clerk just to make sure

83

1   that all of your items are in, that we have everything

2   that you want to have us here, and that you confer

3   with the court reporter to get the turnaround time for

4   the transcript and get something to the Court with

5   regard to the schedule.

6       And I think we're in good shape here.  I do

7   want to congratulate folks on the professionalism

8   here.  It makes life easier for everybody when the

9   attorneys can be professional with one another, can

10  communicate, can provide joint exhibits and joint

11  stipulations.  You have no idea how much paper we go

12  through receiving just both sides' submissions and

13  then their arguments as to why the other side

14  shouldn't get the other stuff in.  So I do appreciate

15  it when the parties can work together.

16          MR. LILLIS:  Thank you, your Honor.

17          MR. GUTTERMAN:  Thank you, your Honor.

18          MR. LILLIS:  We appreciate all the

19  graciousness from the Court and everyone working here.

20          THE COURT:  Thank you so much.  Okay, counsel.

21  Good seeing all of you.  Thank you very much.

22          MR. LILLIS:  Thank you, your Honor.

23  Appreciate it.

24          MR. GUTTERMAN:  Thank you, your Honor.

25          THE DEPUTY COURT CLERK:  All rise.

## $

**$1,000** [1] - 63:25
**$100,000** [1] - 63:25
**$2,500** [1] - 64:1
**$475** [1] - 69:24
**$650** [1] - 67:24
**$663.50** [2] - 76:4, 76:7

## '

**'14** [1] - 42:15

## /

**/S** [1] - 1:21

## 0

**08608** [1] - 1:10

## 1

**1** [6] - 25:8, 25:9, 44:13, 54:6, 57:5, 81:19
**1.2** [3] - 37:1, 37:4, 37:11
**10** [6] - 50:13, 50:14, 50:17, 65:14, 73:9, 74:3
**10-minute** [1] - 48:16
**11** [2] - 18:15, 42:16
**11:40** [1] - 48:10
**11:41** [1] - 48:19
**11:54** [1] - 48:21
**11th** [1] - 77:14
**13** [1] - 2:6
**13194339** [1] - 59:24
**14** [2] - 44:16, 44:19
**14th** [1] - 77:15
**15** [2] - 53:14, 54:12
**15-15** [1] - 77:15
**15-5343** [1] - 3:8
**16** [1] - 54:14
**17** [4] - 2:8, 52:16, 53:16, 59:9
**17-year** [1] - 52:17
**1981** [1] - 56:21
**1988** [1] - 10:17
**1995** [2] - 10:22, 11:13
**1997** [1] - 10:5

## 2

**2** [6] - 34:10, 37:2, 37:5, 55:10, 57:6, 81:19
**2,430** [1] - 37:16
**2,662** [1] - 37:17
**20** [1] - 53:14
**2006** [2] - 42:18, 42:19
**2007** [3] - 28:13, 28:15, 28:21
**2008** [2] - 28:13, 28:15

**2009** [3] - 42:14, 43:3, 51:18
**2013** [9] - 25:24, 28:16, 28:21, 29:4, 36:17, 42:14, 43:3, 51:18, 54:14
**2016** [2] - 77:14, 77:15
**2017** [1] - 1:10
**21** [1] - 2:17
**22** [1] - 36:17
**23** [1] - 18:25
**24** [1] - 44:22
**25** [1] - 10:12
**260** [1] - 37:18
**28** [1] - 1:20

## 3

**3** [7] - 37:10, 37:13, 44:15, 44:18, 54:12, 56:14, 81:23
**30** [5] - 76:20, 76:23, 76:25, 77:4, 77:10
**31** [1] - 2:9
**37** [1] - 56:2
**3:15-cv-05343-MAS-TJB** [1] - 1:5

## 4

**4** [4] - 1:10, 25:1, 44:22, 81:25
**402** [1] - 1:9

## 5

**5** [6] - 37:10, 37:23, 55:15, 56:1, 69:13, 70:22
**50** [1] - 2:11

## 6

**6** [3] - 55:25, 57:5, 57:6
**68422** [1] - 54:18

## 7

**7** [1] - 62:20
**71** [1] - 2:11
**753** [1] - 1:21
**79** [1] - 2:12

## 8

**8** [3] - 28:21, 50:17, 63:11
**80** [1] - 2:12

## 9

**9** [6] - 2:6, 35:20, 64:4, 77:18, 77:25, 78:1
**90** [1] - 31:5
**9:59** [1] - 3:2

## A

**a.m** [3] - 3:2, 48:19, 48:21
**a/s/o** [1] - 53:19
**Abbott** [1] - 52:10
**ability** [1] - 58:17
**able** [5] - 13:25, 16:8, 49:21, 72:6, 81:14
**absolutely** [1] - 82:22
**accept** [3] - 14:25, 31:9, 55:3
**accepted** [2] - 54:16, 54:18
**accordance** [1] - 36:16
**accordingly** [1] - 7:14
**account** [1] - 77:5
**accurate** [1] - 66:15
**acted** [2] - 41:15, 56:2
**acting** [4] - 30:14, 30:18, 60:25, 74:25
**ACTION** [1] - 1:4
**action** [1] - 3:24
**acts** [3] - 60:22, 74:4, 74:6
**actual** [3] - 24:10, 26:16, 69:19
**Adam** [1] - 34:8
**addendum** [1] - 59:23
**address** [3] - 4:5, 44:5, 72:23
**Adjusters** [1] - 36:14
**administration** [1] - 52:25
**admissible** [1] - 81:17
**advice** [1] - 14:21
**advised** [1] - 31:7
**affect** [1] - 51:7
**affidavit** [1] - 77:13
**afternoon** [2] - 5:15, 71:17
**ago** [5] - 7:18, 36:2, 42:16, 51:24, 72:12
**agree** [6] - 37:20, 38:1, 44:18, 55:2, 74:20, 76:10
**agreed** [6] - 4:16, 7:14, 54:15, 54:20, 60:15, 67:20
**agreement** [17] - 24:2, 29:19, 33:12, 33:14, 34:13, 41:8, 41:11, 47:20, 47:23, 60:12, 61:4, 61:22, 62:4, 62:8, 62:11, 62:13, 77:19
**agreements** [2] - 47:21, 48:1
**agrees** [1] - 38:24
**ahead** [2] - 6:25, 23:19
**al** [4] - 1:3, 1:7, 3:6, 3:7
**all-inclusive** [1] - 69:24
**alleged** [1] - 64:17
**allow** [3] - 27:22, 47:11, 47:12
**Amendment** [3] - 4:4, 4:8, 44:25
**America** [3] - 52:7, 66:9
**American** [3] - 9:25, 10:1, 52:21
**amount** [2] - 32:15, 63:23

**answer** [8] - 16:18, 39:2, 39:5, 49:23, 55:25, 57:6, 59:1, 74:7
**Answer** [1] - 55:11
**API** [1] - 54:17
**appear** [1] - 74:17
**appearance** [1] - 3:18
**appearances** [1] - 3:9
**apple** [1] - 20:17
**applicable** [3] - 25:3, 25:6, 55:20
**appointed** [2] - 37:14, 37:24
**appointing** [1] - 64:20
**appreciate** [3] - 83:14, 83:18, 83:23
**approach** [2] - 46:22, 54:8
**approximate** [1] - 29:8
**April** [2] - 77:14, 77:15
**arguments** [1] - 83:13
**arises** [1] - 3:24
**arrange** [6] - 37:16, 67:18, 75:24, 75:25, 76:7, 76:18
**arranged** [2] - 5:12, 44:10
**arrangement** [2] - 30:2, 43:21
**arrangements** [3] - 42:20, 42:25, 44:8
**arranging** [2] - 66:21, 75:13
**Asia** [1] - 66:9
**asserted** [1] - 3:25
**asset** [3] - 66:10, 66:17, 66:18
**assigned** [1] - 36:18
**assignment** [1] - 70:8
**assistant** [1] - 18:11
**ASSOCIATES** [1] - 1:18
**assume** [1] - 34:7
**assumption** [1] - 40:25
**Assured** [23] - 19:14, 19:22, 19:24, 20:1, 20:12, 21:10, 21:14, 22:16, 22:22, 23:10, 23:21, 26:18, 27:4, 32:23, 33:25, 34:6, 34:8, 35:2, 35:7, 35:15, 37:14, 45:15, 46:5
**ASSURED** [1] - 19:15
**attained** [1] - 53:8
**attended** [1] - 53:10
**attorneys** [1] - 83:9
**authority** [3] - 56:20, 56:22, 56:23
**available** [1] - 82:3
**aware** [8] - 28:8, 33:3, 48:3, 55:9, 57:10, 65:11, 78:24, 80:22

## B

**B-A-S-T-H-O-L-M** [1] - 15:21
**Bachelor** [1] - 53:6

**background** [3] - 9:23, 53:5, 59:4
**Barry** [2] - 3:14, 31:22
**BARRY** [1] - 1:18
**based** [13] - 5:17, 33:6, 38:2, 40:5, 40:25, 41:17, 54:22, 55:20, 66:10, 66:14, 66:18, 68:4, 68:19
**basic** [1] - 68:21
**basis** [8] - 11:13, 26:11, 41:5, 41:16, 45:17, 52:1, 77:8, 77:9
**BASTHOLM** [2] - 2:7, 15:17
**Bastholm** [7] - 13:21, 15:20, 15:22, 15:25, 17:6, 31:22, 80:7
**bear** [1] - 33:16
**became** [2] - 18:9, 28:8
**began** [1] - 42:15
**begin** [1] - 49:23
**beginning** [1] - 28:7
**begins** [2] - 3:2, 48:21
**behalf** [14] - 1:16, 1:17, 1:19, 3:14, 20:11, 21:14, 23:10, 33:10, 34:5, 34:23, 35:8, 37:15, 49:8, 59:14
**belief** [1] - 72:11
**bench** [4] - 32:1, 54:10, 57:18, 61:20
**BENCH** [1] - 1:7
**best** [7] - 31:1, 33:1, 42:24, 56:7, 57:12, 60:3, 66:1
**better** [2] - 27:25, 28:5
**between** [14] - 13:7, 19:22, 23:2, 23:13, 29:18, 61:4, 61:5, 61:7, 62:5, 62:9, 67:16, 67:23, 71:25, 76:25
**bill** [53] - 20:4, 21:9, 21:12, 22:20, 23:3, 23:7, 24:1, 24:3, 24:7, 24:9, 25:3, 25:6, 25:8, 26:13, 26:14, 26:15, 26:22, 27:3, 27:5, 30:17, 32:22, 33:2, 33:4, 33:12, 33:16, 33:22, 33:24, 34:5, 34:9, 34:10, 34:14, 34:24, 35:1, 35:3, 35:8, 35:11, 35:16, 38:2, 41:13, 41:21, 42:2, 45:1, 45:15, 46:5, 47:22, 54:18, 57:17, 57:24, 58:18, 58:23, 59:18, 71:9
**bills** [6] - 58:12, 58:25, 59:4, 59:6, 59:12, 59:15
**binder** [2] - 20:16, 21:3
**bit** [2] - 38:3, 58:21
**bites** [2] - 32:18, 40:6
**Bloomington** [1] - 53:7
**book** [13] - 32:1, 32:8, 54:6, 54:9, 54:10, 54:11, 55:10, 56:15, 57:18, 61:20, 65:15,
69:13, 73:9
**booking** [1] - 71:24
**booklet** [2] - 31:25, 67:4
**booklets** [1] - 33:15
**books** [5] - 32:2, 32:3, 32:4, 53:23, 54:7
**born** [2] - 10:9, 10:10
**bottles** [3] - 4:2, 21:16, 21:17
**bottom** [6] - 22:5, 22:10, 24:23, 33:4, 33:25, 58:10
**breach** [1] - 3:24
**break** [4] - 40:13, 47:7, 48:11, 48:17
**breakdown** [3] - 64:2, 78:12
**briefly** [1] - 9:22
**briefs** [2] - 5:1, 81:25
**bring** [5] - 5:20, 5:22, 8:4, 8:22, 80:9
**broke** [1] - 21:20
**broker** [13] - 4:4, 4:7, 30:14, 30:18, 56:3, 60:23, 60:25, 62:6, 62:14, 62:15, 74:4, 74:6, 74:25
**broker's** [1] - 56:10
**brokerage** [4] - 56:6, 56:12, 56:20, 56:22
**brokers** [1] - 66:19
**brought** [1] - 53:18
**business** [12] - 8:15, 17:14, 53:24, 56:18, 60:1, 61:14, 61:25, 62:7, 62:24, 63:15, 65:23, 66:21
**buys** [1] - 19:13
**BY** [1] - 1:15, 2:6, 2:6, 2:8, 2:9, 2:11, 2:11, 2:12, 2:12, 9:16, 13:19, 17:5, 31:21, 46:25, 50:4, 71:16, 79:5, 80:16

# C

**C.H** [151] - 1:6, 3:7, 3:14, 3:16, 3:20, 6:18, 19:1, 19:4, 19:9, 22:2, 22:21, 23:14, 24:1, 24:4, 25:24, 27:9, 27:10, 27:13, 28:8, 28:18, 28:22, 29:13, 29:20, 29:24, 30:6, 30:9, 30:13, 30:18, 30:20, 30:24, 31:11, 31:23, 32:2, 32:11, 33:1, 33:10, 33:12, 33:18, 33:22, 33:23, 34:12, 34:14, 34:15, 34:19, 34:23, 34:25, 35:9, 35:15, 38:14, 38:25, 39:10, 39:14, 39:22, 40:15, 41:3, 41:6, 41:9, 41:14, 41:18, 41:24, 42:1, 42:3, 42:8, 42:11, 42:21, 43:17, 43:23, 44:4, 44:9, 44:16, 44:25, 45:6, 45:8, 45:10, 45:13,
45:14, 45:16, 45:17, 46:2, 46:4, 46:7, 47:2, 47:21, 48:1, 49:8, 50:20, 50:22, 51:10, 51:12, 52:2, 52:13, 52:15, 53:17, 53:20, 53:23, 54:11, 54:14, 54:19, 55:2, 55:4, 55:7, 55:11, 55:22, 56:6, 56:10, 56:14, 56:17, 56:24, 59:10, 59:22, 60:22, 62:15, 62:20, 62:23, 63:8, 63:11, 64:4, 64:10, 64:11, 64:14, 64:19, 64:22, 65:3, 65:15, 65:23, 66:6, 66:25, 70:1, 70:7, 70:14, 71:4, 71:8, 72:1, 72:4, 72:19, 73:1, 73:4, 73:17, 73:19, 73:24, 74:4, 74:6, 74:13, 74:15, 74:24, 75:2, 75:5, 75:11, 76:4, 80:18, 80:20
**C.H.R** [1] - 37:15
**canceled** [1] - 5:14
**cannot** [2] - 34:4, 55:17
**capacity** [2] - 44:2, 60:23
**care** [1] - 45:2
**cargo** [37] - 23:3, 25:15, 25:20, 34:20, 39:16, 39:23, 44:17, 45:3, 50:16, 50:18, 50:21, 50:25, 52:24, 53:11, 54:16, 54:21, 55:3, 55:5, 55:23, 59:8, 59:11, 59:12, 61:9, 61:16, 63:23, 63:25, 64:20, 71:5, 75:6, 75:12, 75:19, 76:1, 76:3, 78:7
**cargos** [1] - 52:6
**Carmack** [3] - 4:4, 4:8, 44:25
**carriage** [1] - 44:17
**carrier** [53] - 4:4, 4:7, 8:15, 21:25, 22:1, 22:3, 22:5, 33:7, 35:12, 35:17, 38:15, 39:11, 41:15, 41:25, 42:12, 44:24, 45:6, 45:15, 45:18, 46:6, 57:11, 57:14, 57:22, 58:14, 59:23, 60:10, 60:12, 60:13, 60:14, 60:16, 60:19, 60:20, 61:5, 61:6, 61:22, 62:6, 62:10, 62:12, 62:13, 62:18, 63:24, 64:10, 64:12, 66:25, 68:9, 68:10, 68:25, 69:24, 70:8, 70:10, 78:16, 78:18
**carrier's** [4] - 56:25, 57:2, 58:13, 62:17
**carriers** [6] - 52:5, 54:20, 59:15, 62:7, 69:20, 69:23
**carry** [2] - 45:2, 54:21
**cartons** [1] - 37:17
**case** [16] - 4:18, 4:22, 26:18, 30:4, 40:17, 40:21, 41:15, 41:25, 59:7, 60:4, 69:1, 69:7, 70:5, 76:12, 77:15,
78:5
**cases** [5] - 30:6, 46:2, 50:15, 51:5, 61:8
**casual** [1] - 13:2
**Cathy** [1] - 1:21
**caused** [1] - 55:18
**CCR** [1] - 1:21
**certain** [2] - 54:15, 67:12
**certainly** [2] - 4:13, 47:10
**certificate** [2] - 63:12, 63:24
**certifications** [1] - 53:8
**Certified** [1] - 1:20
**certify** [1] - 36:15
**chance** [1] - 55:13
**change** [1] - 51:23
**changes** [1] - 56:20
**charge** [4] - 67:15, 67:18, 68:2, 77:5
**charged** [4] - 69:9, 76:6, 77:8, 77:9
**charges** [3] - 54:15, 67:13
**charging** [5] - 68:11, 75:5, 75:11, 75:13, 75:24
**check** [7] - 26:23, 26:24, 43:8, 43:13, 43:14, 43:22, 43:25
**checking** [2] - 27:1, 27:2
**Chicago** [1] - 52:22
**child** [1] - 11:2
**chocolate** [10] - 4:1, 17:15, 19:13, 19:19, 19:25, 21:16, 21:22, 22:7, 26:6, 78:13
**chocolates** [3] - 20:10, 21:23, 30:21
**CHR** [4] - 37:23, 60:1, 61:25, 63:14
**Chris** [5] - 3:20, 48:14, 49:6, 49:8, 50:5
**Christopher** [1] - 49:12
**CHRISTOPHER** [2] - 2:10, 49:9
**CHRW** [2] - 55:16, 56:2
**Chubb** [3] - 11:17, 11:20, 11:22
**circumstance** [1] - 76:17
**circumstances** [1] - 67:22
**CIVIL** [1] - 1:4
**claim** [10] - 3:25, 30:20, 31:5, 31:7, 31:9, 46:7, 50:16, 50:21, 57:8, 57:12
**claim-related** [1] - 50:16
**claimant** [1] - 50:21
**claims** [11] - 11:21, 50:18, 51:21, 52:24, 53:11, 57:7, 59:8, 59:11, 59:12, 61:9, 61:16
**clarification** [1] - 79:4
**clarify** [2] - 5:9, 60:24
**Clarkson** [1] - 1:9

**clean** [1] - 81:15
**clear** [4] - 16:15, 34:3, 34:7, 37:9
**clearly** [1] - 49:21
**clerk** [1] - 82:25
**CLERK** [8] - 3:1, 9:5, 15:13, 15:18, 48:18, 48:20, 49:10, 83:25
**client** [1] - 47:5
**closely** [1] - 25:25
**closing** [1] - 4:22
**co** [1] - 8:10
**co-defendant** [1] - 8:10
**colleague** [4] - 19:6, 19:7, 28:9, 28:14
**colleagues** [1] - 73:1
**comfortable** [1] - 6:2
**coming** [1] - 72:16
**commercial** [1] - 71:25
**communicate** [2] - 16:8, 83:10
**communicated** [1] - 36:18
**communication** [2] - 13:6, 14:20
**companies** [6] - 42:19, 42:25, 43:6, 43:9, 43:25, 66:20
**company** [11] - 12:6, 18:20, 19:1, 19:14, 19:18, 20:6, 20:10, 29:24, 36:10, 46:10, 52:21
**complaint** [3] - 44:13, 54:3, 54:11
**completed** [1] - 34:14
**completely** [1] - 4:25
**compliance** [1] - 51:20
**comprehensive** [2] - 5:3, 81:24
**concerned** [1] - 36:19
**concluding** [3] - 41:5, 41:16, 45:17
**conclusion** [1] - 38:24
**condition** [2] - 45:4, 54:17
**conditions** [1] - 68:4
**conduct** [1] - 4:14
**Confectionary** [3] - 34:10, 37:15, 53:19
**Confectionery** [2] - 17:13, 55:8
**confer** [3] - 82:7, 82:24, 83:2
**confirmation** [7] - 59:24, 60:8, 60:11, 61:1, 61:15, 70:11, 70:22
**confirmations** [2] - 61:10, 61:13
**congratulate** [1] - 83:7
**connection** [3] - 24:18, 36:5, 53:25
**consider** [1] - 46:13
**considerably** [1] - 32:16

**consideration** [1] - 54:15
**consistent** [2] - 65:12, 68:17
**consult** [1] - 82:8
**CONT'D** [2] - 2:12, 80:16
**contact** [12] - 28:19, 28:22, 28:24, 34:8, 45:9, 45:11, 45:13, 45:16, 71:19, 71:20, 71:21, 71:23
**contains** [1] - 20:16
**content** [1] - 65:12
**contract** [16] - 3:25, 22:21, 23:13, 23:14, 41:18, 41:20, 46:3, 46:8, 55:7, 59:23, 61:22, 62:2, 62:4, 62:5, 62:8
**contractor** [1] - 12:6
**contracts** [2] - 47:21, 48:1
**contributing** [1] - 64:14
**conversation** [5] - 13:1, 13:2, 13:20, 14:15, 82:1
**conversations** [2] - 35:14, 78:16
**cooling** [1] - 21:20
**cooperative** [1] - 81:15
**coordinate** [1] - 37:16
**copies** [2] - 56:16, 56:19
**copy** [6] - 23:6, 59:25, 61:24, 62:23, 63:13, 65:22
**Coregistics** [2] - 20:6, 20:8, 21:11, 22:23, 23:21, 37:18
**COREGISTICS** [1] - 20:7
**corner** [3] - 22:1, 22:5, 33:5
**corporate** [5] - 51:12, 58:20, 65:16, 73:11, 73:13
**Correct** [1] - 1:20
**correct** [52] - 4:21, 4:22, 4:23, 13:22, 13:23, 14:22, 28:9, 28:10, 32:8, 32:24, 34:1, 34:2, 35:2, 35:7, 41:1, 41:7, 41:21, 42:17, 47:12, 56:16, 59:25, 61:24, 62:23, 63:13, 65:22, 69:2, 71:21, 71:22, 72:1, 72:2, 72:4, 73:5, 74:4, 74:5, 74:7, 74:25, 75:1, 75:3, 75:7, 75:8, 75:9, 75:20, 76:5, 76:21, 77:1, 77:2, 77:4, 77:11, 77:12, 77:16, 78:11, 80:11
**cost** [8] - 67:17, 68:11, 68:15, 69:21, 75:23, 76:18, 77:6
**Costco** [7] - 19:11, 19:12, 19:13, 27:3, 29:17, 29:21, 30:8
**Costco's** [2] - 26:24, 44:5
**costs** [1] - 68:6
**Counsel** [6] - 16:24, 27:21, 39:1, 39:21, 40:13, 79:24
**counsel** [20] - 3:9, 3:16,

5:24, 6:4, 7:13, 14:24, 20:19, 27:17, 40:4, 47:2, 47:6, 47:17, 48:10, 54:8, 59:3, 80:15, 81:11, 81:23, 82:5, 83:20
**counsels** [1] - 47:5
**COUNSELS** [1] - 3:4
**couple** [1] - 80:5
**course** [13] - 24:5, 53:24, 56:18, 58:24, 60:1, 61:14, 61:25, 62:7, 62:24, 63:14, 65:23, 66:20, 82:23
**COURT** [98] - 1:1, 3:1, 3:3, 3:5, 3:12, 3:17, 3:22, 4:25, 5:3, 5:7, 6:4, 6:11, 6:24, 7:7, 7:11, 7:16, 7:20, 8:3, 8:11, 8:21, 8:24, 9:5, 9:8, 13:16, 14:6, 14:10, 14:17, 14:24, 15:3, 15:5, 15:9, 15:11, 15:13, 15:16, 15:18, 15:22, 16:8, 16:11, 16:15, 16:24, 20:22, 20:25, 23:17, 23:22, 27:17, 27:21, 28:6, 31:18, 32:18, 38:8, 38:18, 39:1, 39:7, 39:21, 40:4, 40:13, 45:21, 46:24, 47:3, 47:11, 47:17, 48:6, 48:8, 48:16, 48:18, 48:20, 48:22, 49:4, 49:10, 49:14, 54:8, 58:5, 58:8, 59:3, 70:18, 71:13, 72:13, 77:22, 79:1, 79:11, 79:14, 79:18, 79:24, 80:3, 80:6, 80:9, 80:13, 80:15, 80:24, 81:1, 81:12, 81:18, 82:6, 82:16, 82:20, 82:22, 83:20, 83:25
**Court** [14] - 6:1, 6:2, 9:22, 11:8, 14:11, 16:21, 25:19, 81:11, 82:4, 82:5, 82:8, 82:21, 83:4, 83:19
**court** [15] - 3:2, 5:19, 9:10, 12:4, 12:10, 14:9, 14:19, 25:14, 26:5, 29:3, 48:21, 49:18, 73:2, 82:9, 83:3
**Courthouse** [1] - 1:9
**courtroom** [1] - 82:25
**cover** [1] - 54:20
**covered** [1] - 32:14
**Cranbury** [12] - 21:11, 37:19, 37:25, 54:21, 68:1, 75:7, 75:12, 76:3, 76:9, 76:21, 77:1, 77:11
**create** [1] - 52:3
**credentials** [1] - 6:10
**cross** [7] - 4:19, 5:24, 31:19, 57:7, 57:8, 57:12, 71:14
**CROSS** [6] - 2:6, 2:9, 2:11, 13:19, 31:21, 71:16
**cross-examine** [3] - 4:19, 31:19, 71:14

**CRR** [1] - 1:21
**crux** [1] - 4:6
**current** [3] - 51:16, 51:17, 72:8
**curriculum** [1] - 6:6
**customary** [1] - 59:17
**customer** [12] - 30:8, 61:15, 67:16, 67:17, 67:18, 68:2, 68:7, 68:12, 75:24, 76:4, 76:6, 80:21
**customers** [5] - 52:5, 68:14, 73:13, 74:11, 74:15
**customers'** [1] - 66:13

## D

**D-E-L-E-R-U-A-N** [1] - 9:7
**D-E-L-E-U-R-A-N** [1] - 15:15
**daily** [2] - 11:13, 26:11
**damage** [5] - 4:1, 30:4, 30:5, 55:18, 78:14
**damaged** [7] - 21:23, 25:7, 25:15, 25:20, 26:6, 30:21, 50:18
**damages** [2] - 4:2, 46:7
**Danish** [14] - 5:25, 9:24, 10:25, 11:4, 11:7, 12:1, 13:13, 13:22, 13:24, 14:25, 15:2, 15:5, 15:6, 17:7
**Danish/English** [1] - 12:9
**date** [2] - 26:23, 27:1
**dates** [3] - 22:13, 29:22, 65:19
**day-to-day** [1] - 52:1
**days** [1] - 31:5
**deal** [3] - 27:10, 27:13, 29:9
**dealing** [3] - 28:17, 43:19, 43:20
**dealt** [3] - 28:23, 29:4, 72:4
**decision** [1] - 6:1
**deductible** [2] - 64:1
**deem** [1] - 82:10
**deemed** [1] - 46:10
**default** [1] - 8:8
**Defendant** [7] - 4:3, 4:6, 6:20, 8:14, 31:23, 32:2, 81:22
**DEFENDANT** [1] - 15:17
**defendant** [1] - 8:10
**Defendants** [7] - 1:8, 1:17, 1:19, 4:1, 4:19, 4:21, 8:8
**Defendants'** [5] - 35:19, 54:5, 65:14, 69:13, 79:6
**DEFENDANTS'** [1] - 49:9
**defense** [3] - 6:4, 56:1, 73:9
**degree** [4] - 9:24, 10:3, 10:6, 53:6
**DELEURAN** [2] - 2:5, 9:4
**Deleuran** [7] - 9:1, 9:7, 9:17, 14:12, 14:25, 15:15, 15:23

4

**deliver** [1] - 45:3
**delivered** [1] - 29:22
**deliveries** [1] - 30:10
**delivering** [1] - 60:14
**delivery** [2] - 37:16, 39:23
**Delta** [1] - 25:12
**Denmark** [7] - 10:7, 10:10, 10:11, 10:12, 11:6, 11:12, 17:9
**department** [7] - 18:14, 18:16, 28:17, 71:18, 72:23, 74:9, 74:12
**deposed** [1] - 50:10
**deposition** [9] - 6:16, 6:20, 6:22, 20:18, 36:3, 36:5, 50:8, 50:12
**depositions** [5] - 12:13, 50:11, 50:24, 51:2, 51:4
**deputy** [1] - 82:25
**DEPUTY** [8] - 3:1, 9:5, 15:13, 15:18, 48:18, 48:20, 49:10, 83:25
**describe** [1] - 12:4
**described** [2] - 23:3, 28:21
**DESCRIPTION** [1] - 2:16
**description** [1] - 23:4
**designations** [1] - 7:18
**destination** [1] - 76:2
**detail** [2] - 32:14, 43:18
**details** [3] - 22:25, 37:4, 37:8
**determine** [3] - 43:19, 72:20, 72:23
**dialect** [1] - 14:12
**difference** [1] - 76:25
**different** [2] - 76:15, 76:16
**dips** [1] - 77:6
**dire** [2] - 5:23, 6:14
**direct** [3] - 20:20, 31:16, 52:12
**DIRECT** [6] - 2:6, 2:8, 2:11, 9:16, 17:5, 50:4
**directions** [5] - 70:15, 70:21, 70:23, 70:24, 71:2
**directly** [2] - 9:9, 49:17
**discharge** [1] - 45:3
**discussed** [3] - 7:12, 30:15, 40:18
**discusses** [1] - 61:5
**discussion** [2] - 14:1, 81:10
**discussions** [1] - 74:16
**dispute** [2] - 4:3, 11:23
**distribute** [2] - 17:25, 18:3
**distribution** [1] - 20:4
**DISTRICT** [3] - 1:1, 1:1, 1:12
**Docket** [1] - 3:7
**document** [36] - 33:18, 35:22, 38:16, 38:19, 38:21, 39:9, 41:11, 55:13, 57:21, 58:3, 59:22, 60:3, 60:6,

60:8, 60:9, 60:18, 60:21, 60:24, 61:21, 63:2, 63:14, 63:18, 64:7, 64:9, 64:11, 64:13, 64:19, 65:20, 65:22, 66:4, 67:8, 69:11, 69:14, 69:16, 71:3
**Document** [1] - 77:15
**documentation** [2] - 41:23, 45:5
**documents** [5] - 26:10, 39:11, 56:17, 58:11, 59:12
**done** [5] - 12:12, 12:15, 65:1, 69:19, 79:25
**down** [15] - 9:10, 15:9, 21:20, 22:10, 24:23, 40:14, 48:9, 49:18, 49:23, 49:25, 68:23, 78:19, 78:21, 79:14, 81:1
**driver** [7] - 57:23, 58:2, 58:14, 59:17, 70:1, 70:2, 70:8
**drivers** [1] - 70:6
**driving** [4] - 70:13, 70:23, 70:24, 71:2
**drove** [1] - 33:9
**DSV** [1] - 43:7
**during** [8] - 13:8, 21:20, 24:5, 28:20, 29:8, 29:14, 30:8, 42:21
**duties** [2] - 17:18, 52:1

## E

**early** [1] - 11:5
**easier** [1] - 83:8
**East** [1] - 1:9
**echo** [1] - 25:17
**Eden** [1] - 51:13
**educated** [2] - 46:16, 46:17
**educational** [2] - 9:23, 53:4
**effect** [7] - 63:5, 63:6, 63:20, 63:22, 77:19, 78:22, 79:7
**effectively** [1] - 16:9
**effort** [2] - 72:16, 73:1
**eight** [1] - 50:24
**email** [4] - 26:20, 27:5, 28:9, 30:16
**emails** [2] - 19:6, 19:8
**employed** [11] - 6:18, 11:14, 17:10, 19:24, 51:9, 51:10, 52:13, 52:15, 52:17, 52:21, 53:2
**employee** [2] - 21:13, 57:23
**employment** [2] - 53:16, 72:8
**engaged** [2] - 43:25, 44:1
**engagement** [1] - 62:9
**engaging** [1] - 44:2
**English** [16] - 5:25, 11:9, 11:11, 12:1, 13:25, 14:1, 14:3, 14:25, 15:2, 15:5, 16:13, 16:17, 16:18, 16:25,

24:14
**ENGLISH** [1] - 1:15
**entered** [6] - 34:13, 35:1, 41:8, 41:17, 46:3, 46:8
**entering** [1] - 3:18
**entire** [2] - 38:6, 38:16
**entitled** [1] - 55:11
**entity** [2] - 43:20, 66:20
**equation** [1] - 68:25
**equipment** [3] - 39:15, 55:4, 66:12
**ESQ** [1] - 1:17
**ESQS** [1] - 1:15
**ESQUIRE** [1] - 1:15
**estimate** [2] - 42:24, 53:13
**estimating** [1] - 68:3
**et** [4] - 1:3, 1:7, 3:6, 3:7
**Europe** [2] - 43:1, 66:9
**evening** [1] - 5:17
**EVID** [1] - 2:16
**evidence** [12] - 4:11, 13:15, 20:21, 21:2, 34:15, 34:19, 38:20, 49:3, 61:16, 73:16, 78:9, 78:22
**exactly** [2] - 29:5, 34:7
**examination** [2] - 20:20, 28:8
**EXAMINATION** [16] - 2:6, 2:6, 2:8, 2:9, 2:11, 2:11, 2:12, 2:12, 9:16, 13:19, 17:5, 31:21, 50:4, 71:16, 79:5, 80:16
**examine** [4] - 4:19, 31:19, 71:14
**examining** [1] - 47:5
**example** [2] - 12:16, 29:17
**excuse** [4] - 25:10, 32:20, 55:25, 57:6
**excused** [1] - 48:8
**Exhibit** [64] - 2:17, 7:4, 7:5, 7:24, 7:25, 20:18, 21:1, 21:6, 21:8, 21:24, 22:4, 22:11, 22:20, 22:24, 23:3, 23:4, 23:9, 23:11, 23:12, 23:24, 23:25, 24:3, 24:23, 25:8, 25:9, 25:10, 25:11, 25:15, 25:17, 25:21, 26:3, 26:7, 26:13, 27:5, 27:8, 32:22, 33:13, 33:17, 35:20, 41:2, 42:3, 44:13, 47:22, 54:6, 55:10, 56:14, 57:5, 57:6, 57:18, 59:20, 61:19, 62:20, 63:11, 64:4, 65:14, 67:3, 69:12, 70:22, 73:9, 74:3, 74:11, 74:20, 75:5, 79:7
**exhibit** [8] - 6:25, 7:2, 32:2, 44:12, 54:9, 57:4, 65:15
**exhibits** [15] - 7:6, 20:17, 21:4, 26:9, 31:24, 32:11, 35:20, 48:25, 62:21, 63:12,

64:4, 78:23, 81:16, 83:10
**existence** [1] - 66:2
**expectations** [1] - 62:9
**expended** [1] - 24:5
**expense** [1] - 76:22
**experience** [4] - 11:9, 12:5, 12:25, 13:1
**explain** [3] - 11:8, 13:6, 67:13
**exposure** [1] - 52:4
**extent** [1] - 4:11

## F

**facilitate** [1] - 14:20
**facilitates** [1] - 19:10
**fact** [11] - 4:24, 7:14, 38:16, 41:17, 45:14, 45:16, 49:2, 57:8, 60:22, 72:3, 82:4
**factor** [1] - 68:15
**fair** [1] - 8:21
**fairly** [1] - 81:24
**familiar** [8] - 19:1, 19:4, 19:14, 53:18, 57:8, 65:10, 69:21, 72:8
**families** [1] - 13:3
**far** [1] - 66:15
**fax** [1] - 30:17
**felt** [1] - 81:24
**few** [7] - 13:18, 14:10, 36:2, 37:7, 39:12, 47:6, 47:19
**fifth** [1] - 37:2
**filed** [3] - 57:9, 57:12, 77:15
**final** [1] - 7:12
**findings** [3] - 49:2, 82:3, 82:19
**fine** [7] - 4:12, 32:20, 47:14, 80:9, 82:13, 82:17, 82:22
**finished** [1] - 80:1
**first** [12] - 10:15, 10:17, 11:1, 11:11, 15:24, 26:14, 31:3, 32:17, 60:18, 65:17, 66:24, 81:13
**Fisher** [1] - 1:9
**fit** [1] - 4:20
**five** [7] - 18:8, 28:20, 29:5, 29:8, 29:14, 38:11, 56:16
**five-page** [1] - 38:11
**five-year** [2] - 29:8, 29:14
**flat** [1] - 68:3
**fluently** [3] - 13:25, 14:1, 14:3
**focus** [3] - 4:5, 38:10, 38:12
**folder** [1] - 32:1
**folks** [6] - 4:16, 5:4, 6:5, 82:7, 82:10, 83:7
**follow** [1] - 4:15
**following** [1] - 36:20
**FOR** [1] - 1:1
**Ford** [1] - 1:21

**form** [1] - 70:17
**formally** [1] - 48:24
**former** [1] - 19:7
**forth** [2] - 12:2, 71:25
**forward** [4] - 8:25, 9:1, 9:9, 49:16
**foundation** [4] - 58:6, 58:16, 59:1, 59:4
**four** [3] - 29:5, 29:8, 56:15
**foxtrot** [1] - 26:3
**frank** [1] - 20:17
**free** [1] - 16:4
**freight** [4] - 34:10, 54:15, 66:13, 68:5
**front** [5] - 20:16, 21:3, 54:7, 64:5, 67:6
**fuel** [14] - 24:17, 24:20, 67:13, 68:14, 68:18, 68:21, 68:22, 68:23, 69:21, 69:22, 69:23, 76:20, 76:22, 77:6
**full** [2] - 6:22, 67:25
**fully** [1] - 49:22
**function** [1] - 6:13
**functions** [1] - 20:12
**funeral** [1] - 5:15

## G

**gas** [1] - 24:18
**general** [7] - 62:2, 67:17, 68:4, 70:4, 74:18, 74:19, 76:13
**generally** [6] - 26:9, 26:14, 26:22, 27:23, 46:1, 46:11
**geographical** [1] - 17:20
**given** [6] - 22:19, 31:25, 61:1, 61:13, 61:15, 67:22
**global** [2] - 17:14, 66:6
**goods** [24] - 19:10, 20:3, 21:19, 22:19, 23:5, 29:22, 33:9, 34:16, 34:23, 34:24, 40:16, 40:20, 40:24, 41:4, 41:9, 41:18, 42:4, 42:20, 43:1, 43:21, 44:4, 44:24, 46:9, 77:19
**government** [1] - 68:19
**graciousness** [1] - 83:19
**grade** [2] - 11:5, 11:11
**grant** [1] - 14:25
**great** [1] - 43:18
**green** [3] - 6:19, 7:22, 81:21
**Group** [4] - 17:13, 34:10, 37:15, 53:19
**growing** [1] - 11:2
**guess** [2] - 8:6, 8:7
**Gutterman** [20] - 3:14, 13:16, 20:22, 31:18, 31:22, 32:18, 39:5, 46:22, 47:15, 47:20, 49:5, 50:3, 58:8, 70:18, 79:2, 79:16, 79:25, 80:24,

81:7, 82:1
**GUTTERMAN** [47] - 1:18, 2:6, 2:9, 2:11, 2:12, 3:13, 6:7, 7:9, 7:25, 13:17, 13:19, 14:4, 20:23, 27:15, 31:20, 31:21, 32:10, 32:20, 35:4, 37:4, 38:12, 38:23, 39:6, 39:19, 39:25, 45:22, 46:20, 47:8, 48:13, 49:6, 50:4, 58:9, 58:22, 70:19, 70:24, 71:11, 72:10, 79:3, 79:5, 79:9, 79:17, 79:19, 80:1, 80:25, 82:14, 83:17, 83:24
**H**

**hand** [3] - 8:1, 22:5, 33:5
**handing** [2] - 32:10, 54:9
**handle** [3] - 45:2, 55:17, 81:9
**handled** [1] - 34:23
**happy** [2] - 5:4, 47:15
**hard** [1] - 57:25
**haul** [15] - 24:10, 24:13, 67:12, 67:15, 67:19, 68:16, 68:21, 75:19, 75:22, 75:23, 76:10, 76:13, 76:15, 76:16
**HAUL** [1] - 24:14
**hauled** [1] - 57:14
**Haulers** [1] - 52:22
**Hays** [14] - 6:16, 20:19, 27:12, 27:14, 29:1, 29:4, 29:10, 29:13, 29:18, 29:20, 30:13, 30:16, 72:3, 72:6
**Hays's** [2] - 48:25, 81:20
**hazardous** [1] - 53:8
**head** [1] - 50:1
**headquarters** [1] - 51:12
**hear** [2] - 6:4, 49:21
**heat** [1] - 21:23
**held** [1] - 55:18
**helped** [1] - 20:4
**helpful** [1] - 82:2
**hereby** [1] - 36:15
**high** [1] - 68:23
**highlighted** [2] - 6:19, 6:21
**highlights** [1] - 6:22
**hire** [1] - 44:24
**hold** [1] - 79:22
**home** [1] - 11:3
**Honor** [59] - 3:4, 3:10, 3:13, 3:15, 4:23, 5:12, 5:20, 6:7, 6:12, 6:17, 6:23, 7:10, 7:13, 7:19, 8:1, 8:2, 8:14, 8:23, 9:15, 13:14, 13:17, 14:5, 14:7, 14:23, 15:7, 15:8, 16:21, 17:3, 20:15, 20:21, 20:24, 23:18, 27:19, 31:17, 31:20, 38:19, 40:3, 46:23, 47:14, 47:18, 48:5,

48:23, 49:6, 49:7, 58:17, 71:15, 72:10, 77:21, 78:25, 80:17, 80:23, 80:25, 81:5, 81:9, 82:17, 83:16, 83:17, 83:22, 83:24
**HONORABLE** [1] - 1:11
**hopefully** [1] - 69:9
**housekeeping** [6] - 6:13, 8:3, 8:6, 48:11, 81:7, 81:12
**human** [1] - 72:22

## I

**idea** [3] - 6:8, 64:24, 83:11
**IDEN** [1] - 2:16
**identify** [1] - 9:20
**idiomatic** [1] - 14:13
**Illinois** [1] - 52:22
**immediately** [1] - 36:18
**immigration** [1] - 12:16
**important** [1] - 49:20
**improper** [1] - 55:19
**INC** [1] - 1:6
**Inc** [1] - 19:15
**incident** [1] - 25:23
**inclined** [1] - 4:9
**include** [1] - 68:13
**included** [2] - 23:1, 59:13
**inclusive** [1] - 69:24
**increases** [1] - 68:24
**indeed** [1] - 75:2
**independent** [1] - 69:5
**Indiana** [1] - 53:7
**indicate** [1] - 13:24
**indicated** [1] - 58:22
**indicates** [1] - 39:10
**indices** [1] - 68:19
**individual** [1] - 60:10
**industry** [1] - 46:11
**informal** [1] - 4:15
**information** [5] - 9:12, 61:5, 65:11, 72:11, 73:24
**informed** [1] - 20:19
**initial** [1] - 78:6
**injury** [1] - 51:4
**input** [1] - 35:10
**inquire** [3] - 72:22, 72:25, 79:20
**instruct** [1] - 16:22
**instruction** [2] - 16:25, 36:16
**instructions** [1] - 70:13
**insurance** [8] - 8:17, 58:19, 63:9, 63:13, 63:23, 63:24, 71:18
**INSURANCE** [1] - 1:3
**Insurance** [3] - 3:6, 11:17, 53:19
**intended** [1] - 68:22
**intending** [1] - 27:19

**interject** [1] - 14:21
**International** [1] - 36:14
**interpret** [1] - 58:18
**interpretation** [2] - 12:12, 12:15
**interpretations** [1] - 12:7
**interpreter** [23] - 5:8, 5:12, 5:21, 5:22, 5:25, 8:5, 8:23, 11:25, 14:8, 15:1, 15:12, 16:1, 16:3, 16:6, 16:9, 16:12, 16:16, 16:17, 16:22, 17:2, 23:16, 32:19, 80:13
**INTERPRETER** [3] - 37:3, 45:19, 80:14
**interpreter's** [1] - 40:5
**interpreting** [2] - 14:14, 15:6
**interpretive** [1] - 15:23
**interstate** [1] - 56:2
**investor** [3] - 73:4, 73:17, 80:18
**investors** [2] - 73:11, 73:19
**invite** [1] - 31:19
**invited** [1] - 71:14
**invoice** [9] - 67:3, 67:10, 74:21, 74:24, 75:2, 75:15, 75:17, 75:18, 76:17
**invoices** [2] - 74:10, 74:17
**invoicing** [1] - 74:14
**invoke** [1] - 15:23
**involve** [1] - 51:3
**involved** [10] - 50:22, 50:23, 51:1, 59:6, 59:10, 59:11, 61:8, 70:6, 71:4, 74:16
**involvement** [1] - 70:2
**involving** [1] - 50:25
**issue** [10] - 4:6, 5:7, 5:9, 23:16, 33:2, 33:8, 46:7, 55:23, 67:10, 69:25
**issued** [2] - 54:17, 77:13
**issues** [1] - 13:9
**item** [4] - 24:10, 24:17, 24:21, 69:23
**items** [5] - 24:9, 24:16, 81:12, 81:13, 83:1
**itself** [4] - 34:20, 38:20, 39:11, 60:21

## J

**Janet** [18] - 6:16, 20:19, 27:12, 27:14, 28:25, 29:4, 29:9, 29:13, 29:18, 29:20, 30:1, 30:2, 30:13, 30:16, 48:25, 72:3, 72:6, 81:20
**JD** [1] - 9:25
**JERSEY** [1] - 1:1
**Jersey** [7] - 1:10, 21:10, 21:11, 37:19, 68:1, 75:7, 76:9
**job** [9] - 5:4, 11:20, 17:21,

18:21, 18:24, 26:11, 28:14, 71:18, 74:13
**John** [1] - 3:10
**JOHN** [1] - 1:15
**joint** [3] - 7:7, 83:10
**JUDGE** [1] - 1:12
**judgment** [1] - 8:9
**July** [2] - 36:17, 54:14
**jurisdiction** [2] - 17:21, 17:23

## K

**keep** [4] - 8:7, 9:11, 45:2, 49:20
**Ken** [1] - 46:21
**KENNEDY** [1] - 1:15
**Kenneth** [2] - 3:15, 47:1
**KENNETH** [1] - 1:17
**kept** [9] - 5:22, 47:20, 53:24, 56:17, 60:1, 61:24, 62:23, 63:14, 65:23
**Kevin** [1] - 52:10
**kind** [3] - 4:10, 40:2, 68:3
**knowledge** [8] - 10:24, 33:1, 47:25, 56:8, 57:13, 60:4, 66:1, 68:4
**knowledgeable** [4] - 46:14, 46:17, 46:18, 46:19
**known** [1] - 72:23

## L

**lading** [50] - 20:5, 21:9, 21:12, 22:20, 23:3, 23:7, 25:3, 25:7, 25:8, 26:13, 26:14, 26:15, 26:22, 27:6, 32:23, 33:2, 33:4, 33:13, 33:17, 33:22, 33:24, 34:5, 34:9, 34:24, 35:1, 35:3, 35:8, 35:11, 35:16, 38:2, 41:13, 41:21, 42:2, 45:1, 45:15, 46:5, 47:23, 54:18, 54:19, 57:17, 57:24, 58:18, 58:23, 58:25, 59:5, 59:7, 59:13, 59:15, 59:18, 71:9
**ladings** [1] - 58:12
**laid** [2] - 58:16, 59:1
**lane** [1] - 67:22
**language** [13] - 10:25, 11:1, 11:3, 11:6, 11:10, 11:12, 12:2, 12:9, 13:9, 13:11, 24:25, 54:23, 55:1
**languages** [2] - 6:1, 16:25
**last** [9] - 5:16, 9:6, 15:14, 15:19, 36:4, 47:19, 49:11, 67:21, 72:23
**law** [7] - 5:14, 9:24, 10:3, 10:6, 55:21, 81:25, 82:25
**lawsuit** [1] - 53:18

**laying** [2] - 60:13, 81:25
**lays** [2] - 62:8, 67:17
**learn** [1] - 19:7
**learned** [1] - 11:11
**least** [2] - 6:9, 65:7
**led** [1] - 78:13
**left** [3] - 22:1, 22:15, 33:24
**legal** [1] - 12:13
**less** [2] - 68:11, 69:9
**Levittown** [12] - 21:10, 37:17, 37:25, 54:17, 68:1, 75:6, 75:12, 76:3, 76:8, 76:21, 76:25, 77:10
**liability** [4] - 4:7, 53:11, 56:4, 63:13
**liable** [2] - 55:18, 57:15
**license** [7] - 56:6, 56:10, 56:13, 56:25, 57:2, 62:17, 63:4
**licensed** [2] - 56:2, 62:18
**life** [1] - 83:8
**Lillis** [16] - 3:11, 6:9, 6:13, 9:14, 14:6, 23:22, 32:15, 38:8, 38:18, 47:3, 47:12, 48:6, 48:22, 71:13, 79:11, 80:3
**LILLIS** [70] - 1:15, 2:6, 2:8, 2:11, 2:12, 3:10, 4:23, 5:11, 7:3, 7:8, 7:12, 7:17, 7:24, 8:6, 8:12, 8:19, 8:22, 9:15, 9:16, 13:14, 14:7, 15:2, 15:4, 15:7, 15:10, 16:21, 17:3, 17:5, 20:15, 23:15, 23:18, 23:23, 27:19, 27:24, 28:4, 31:16, 32:9, 38:9, 38:19, 40:2, 40:11, 47:4, 48:7, 48:23, 58:4, 58:6, 58:16, 70:17, 70:23, 71:1, 71:15, 71:16, 77:20, 78:25, 79:12, 79:22, 80:4, 80:7, 80:16, 80:17, 80:23, 81:5, 81:13, 81:19, 82:13, 82:17, 82:21, 83:16, 83:18, 83:22
**limit** [3] - 27:20, 52:4, 63:25
**limited** [2] - 27:16, 27:18
**line** [18] - 24:10, 24:13, 24:17, 67:12, 67:15, 67:19, 68:16, 68:21, 69:23, 75:19, 75:22, 75:23, 76:10, 76:13, 76:15, 76:16
**LINE** [1] - 24:14
**Line** [1] - 25:1
**liquor** [2] - 4:1, 21:17
**list** [14] - 7:5, 22:25, 23:2, 23:4, 23:5, 23:8, 23:9, 27:4, 29:21, 31:24, 35:20, 44:12, 69:16
**listed** [9] - 23:5, 23:6, 35:15, 42:1, 45:14, 46:4, 60:19,

62:11, 62:14
**litigation** [3] - 25:14, 25:19, 26:5
**live** [10] - 4:20, 10:11, 10:13, 10:14, 10:16, 10:22, 17:8, 17:9, 48:23, 82:5
**lived** [1] - 10:12
**load** [14] - 57:22, 59:23, 60:14, 60:15, 61:1, 61:10, 61:12, 61:14, 69:18, 70:11, 70:21, 78:17, 78:19, 78:20
**loaded** [1] - 34:20
**loading** [2] - 55:19, 71:4
**loads** [1] - 71:24
**local** [2] - 3:16, 47:2
**located** [5] - 11:18, 19:20, 37:18, 51:11, 51:14
**location** [4] - 72:14, 72:17, 72:20, 76:2
**logistics** [2] - 66:7, 66:20
**look** [10] - 35:19, 37:10, 42:7, 43:18, 44:11, 54:5, 59:19, 61:19, 63:11, 64:3
**looked** [2] - 42:5, 42:7, 42:10, 43:16
**looking** [4] - 8:9, 21:7, 26:13, 74:20
**loss** [6] - 22:7, 31:11, 31:14, 52:24, 57:16, 64:15
**Ltd** [1] - 36:17

## M

**M-C-L-O-U-G-H-L-I-N** [1] - 49:13
**ma'am** [2] - 11:10, 11:14
**madame** [1] - 27:24
**magistrate** [1] - 7:15
**mail** [1] - 31:4
**maintain** [1] - 78:18
**majority** [1] - 50:16
**male** [1] - 28:24
**man** [1] - 58:19
**manager** [12] - 17:17, 17:18, 18:7, 18:10, 51:17, 51:21, 51:22, 51:23, 52:3, 58:19, 58:25, 65:2
**marine** [1] - 36:18
**mark** [2] - 6:25, 7:14
**marked** [6] - 7:3, 7:21, 33:13, 33:17, 57:18, 81:20
**market** [2] - 68:4, 77:7
**marketplace** [1] - 68:9
**master** [2] - 62:4, 62:8
**materials** [1] - 53:9
**matter** [7] - 3:6, 4:10, 4:15, 27:16, 27:18, 47:2, 54:3
**matters** [1] - 8:4
**MCLOUGHLIN** [3] - 2:10, 3:20, 49:9

**McLoughlin** [7] - 3:20, 48:14, 49:8, 49:12, 49:15, 71:17, 79:15
**mean** [9] - 4:11, 16:25, 22:13, 58:19, 66:17, 70:12, 75:22, 76:14, 76:15
**meaning** [3] - 46:17, 66:6, 66:11
**means** [6] - 34:11, 34:12, 67:14, 75:19, 76:10, 76:17
**measure** [1] - 24:20
**mechanical** [1] - 78:12
**medication** [1] - 51:6
**meet** [1] - 82:7
**melting** [1] - 78:13
**mention** [3] - 36:10, 67:12, 70:13
**mentioned** [3] - 22:1, 22:3, 22:6
**mentioning** [1] - 47:20
**Mette** [2] - 9:7, 15:15
**METTE** [2] - 2:5, 9:4
**Michael** [3] - 15:20, 80:7
**MICHAEL** [3] - 1:11, 2:7, 15:17
**microphone** [2] - 9:9, 49:17
**might** [2] - 73:24, 82:2
**mike** [1] - 47:17
**mile** [3] - 24:22, 77:8, 77:9
**miles** [5] - 76:20, 76:23, 76:25, 77:4, 77:10
**mind** [1] - 47:6
**mine** [1] - 32:9
**miniature** [1] - 4:1
**Minnesota** [2] - 6:19, 51:13
**minute** [1] - 71:11
**minutes'** [1] - 47:6
**mission** [1] - 66:5
**mom** [1] - 5:13
**money** [1] - 75:6
**months** [1] - 67:21
**morning** [20] - 3:3, 3:4, 3:10, 3:12, 3:13, 3:15, 3:17, 5:19, 9:17, 9:18, 12:19, 13:1, 13:7, 13:12, 14:15, 16:4, 47:1, 71:17, 81:20, 82:1
**mostly** [1] - 13:3
**mother** [2] - 5:14, 17:6
**mother-in-law** [1] - 5:14
**motor** [18] - 8:14, 44:24, 56:24, 57:2, 57:11, 57:14, 58:14, 59:14, 61:5, 61:6, 61:22, 62:6, 62:10, 62:16, 62:18, 68:10, 69:23, 70:10
**move** [11] - 5:4, 6:25, 8:24, 67:24, 68:6, 68:8, 68:10, 69:17, 75:25, 76:3, 76:14
**moved** [3] - 11:13, 20:25, 76:8

**movement** [1] - 76:10
**moves** [2] - 68:5, 68:20
**moving** [4] - 26:9, 75:6, 75:12, 75:19
**MR** [133] - 2:6, 2:6, 2:8, 2:9, 2:11, 2:11, 2:12, 2:12, 3:10, 3:13, 3:15, 3:20, 4:23, 5:1, 5:6, 5:11, 6:7, 6:12, 7:2, 7:3, 7:5, 7:8, 7:9, 7:12, 7:17, 7:19, 7:21, 7:24, 7:25, 8:2, 8:6, 8:12, 8:13, 8:19, 8:20, 8:22, 9:15, 9:16, 13:14, 13:17, 13:19, 14:4, 14:7, 15:2, 15:4, 15:7, 15:10, 16:21, 17:3, 17:5, 20:15, 20:23, 23:15, 23:18, 23:23, 27:15, 27:19, 27:24, 28:4, 31:16, 31:20, 31:21, 32:9, 32:10, 32:20, 35:4, 37:4, 38:9, 38:12, 38:19, 38:23, 39:6, 39:19, 39:25, 40:2, 40:11, 45:22, 46:20, 46:22, 46:25, 47:4, 47:8, 47:9, 47:14, 47:18, 48:4, 48:7, 48:13, 48:23, 49:6, 50:4, 58:4, 58:6, 58:9, 58:16, 58:22, 70:17, 70:19, 70:23, 70:24, 71:1, 71:11, 71:15, 71:16, 72:10, 77:20, 78:25, 79:3, 79:5, 79:9, 79:12, 79:17, 79:19, 79:22, 80:1, 80:4, 80:7, 80:16, 80:17, 80:23, 80:25, 81:5, 81:13, 81:19, 82:13, 82:14, 82:17, 82:21, 83:16, 83:17, 83:18, 83:22, 83:24
**multimodal** [1] - 66:7
**multiple** [2] - 40:2, 40:11

**N**

**name** [17] - 9:6, 15:14, 15:19, 18:20, 28:25, 31:22, 36:10, 36:13, 42:1, 47:1, 49:11, 56:20, 58:13
**named** [1] - 54:19
**names** [1] - 43:6
**National** [3] - 37:24, 53:20, 60:20
**necessarily** [2] - 38:5, 75:21
**necessary** [3] - 8:11, 8:12, 8:13
**need** [9] - 4:13, 4:24, 38:20, 43:12, 43:13, 43:14, 43:22, 43:24, 82:18
**needed** [1] - 12:8
**needs** [2] - 16:22, 68:8
**negotiate** [3] - 61:7, 68:16, 68:18

**negotiated** [3] - 60:9, 67:16, 69:17
**negotiation** [4] - 67:23, 69:1, 69:5, 69:18
**negotiations** [1] - 68:25
**network** [1] - 66:8
**neutral** [1] - 14:19
**never** [9] - 5:18, 25:25, 30:15, 30:19, 39:17, 40:18, 71:19, 71:21, 71:23
**NEW** [1] - 1:1
**New** [7] - 1:10, 21:10, 21:11, 37:19, 68:1, 75:7, 76:9
**next** [8] - 10:20, 44:21, 55:10, 55:25, 59:19, 61:19, 63:11, 64:3
**non** [3] - 66:10, 66:17, 66:18
**non-asset** [1] - 66:17
**non-asset-based** [2] - 66:10, 66:18
**none** [1] - 64:18
**nonverbal** [1] - 49:25
**normal** [4] - 4:15, 26:10, 58:24, 61:14
**normalizing** [1] - 77:5
**normally** [4] - 26:24, 47:4, 58:1, 58:14
**North** [2] - 52:7, 66:9
**notation** [1] - 65:19
**noted** [2] - 39:21, 72:13
**nothing** [8] - 31:16, 33:23, 74:24, 78:25, 79:12, 79:19, 80:2, 80:23
**notice** [2] - 49:18, 70:12
**noticed** [1] - 14:14
**NR** [4] - 22:6, 22:8, 22:18, 33:20
**NRT** [25] - 8:14, 33:5, 33:9, 44:17, 54:14, 54:19, 57:7, 57:9, 57:10, 57:14, 57:23, 58:1, 58:10, 62:13, 62:16, 62:18, 63:8, 63:24, 64:20, 69:2, 69:5, 69:8, 69:15, 69:17, 70:21
**NRT's** [2] - 58:7, 70:1
**Number** [13] - 3:7, 35:20, 44:13, 54:6, 54:18, 57:5, 57:6, 59:24, 69:13, 81:19, 81:23, 81:25
**NUMBER** [2] - 1:4, 2:16
**number** [6] - 7:2, 26:24, 26:25, 27:2, 42:24, 53:15

**O**

**oath** [2] - 80:10, 80:11
**objection** [12] - 20:23, 27:15, 27:18, 27:22, 38:9, 39:2, 40:11, 54:23, 55:1, 58:4, 58:5, 70:17

**objections** [2] - 4:12, 6:8
**obligated** [1] - 44:25
**obtain** [3] - 9:13, 10:3, 10:6
**occur** [1] - 77:6
**occurred** [1] - 56:21
**OF** [1] - 1:1
**offer** [5] - 5:24, 6:24, 13:14, 14:8, 14:21
**office** [1] - 58:20
**offices** [1] - 66:8
**oil** [3] - 23:21, 24:5, 24:18
**OLSEN** [18] - 1:17, 3:15, 5:1, 5:6, 6:12, 7:2, 7:5, 7:19, 7:21, 8:2, 8:13, 8:20, 46:22, 46:25, 47:9, 47:14, 47:18, 48:4
**Olsen** [2] - 3:16, 47:1
**once** [2] - 34:13, 82:2
**one** [32] - 4:5, 6:12, 8:7, 10:19, 24:10, 27:25, 28:24, 31:4, 34:1, 35:2, 35:16, 37:8, 38:18, 42:2, 47:3, 47:8, 47:9, 47:11, 47:13, 53:8, 56:15, 57:21, 67:14, 70:14, 71:11, 76:18, 79:3, 79:4, 79:24, 80:8, 83:9
**one-day** [1] - 4:5
**ones** [1] - 23:6
**Open** [2] - 3:2, 48:21
**open** [2] - 5:18, 12:10
**opening** [2] - 4:17, 4:24
**operating** [3] - 56:21, 56:22, 66:8
**operations** [2] - 52:10, 65:13
**opinion** [3] - 14:21, 33:7, 76:16
**opportunity** [5] - 6:5, 16:3, 54:2, 55:12, 61:21
**opposed** [1] - 38:11
**order** [8] - 6:15, 36:24, 45:4, 57:5, 64:22, 68:7, 81:15
**ordering** [1] - 54:17
**orders** [1] - 17:19
**ordinary** [8] - 53:24, 56:18, 60:1, 61:25, 62:24, 63:14, 65:23, 82:23
**original** [2] - 5:12, 6:21
**originally** [1] - 32:16
**ourselves** [2] - 52:5, 61:7
**outside** [3] - 5:17, 5:21, 5:22
**overrule** [2] - 27:21, 39:1
**Overseas** [1] - 36:17
**overview** [3] - 65:16, 73:11, 73:13
**own** [3] - 16:12, 66:11, 73:24
**owned** [1] - 39:14

**P**

**P.C** [1] - 1:18

**PA** [3] - 75:6, 76:21, 77:10
**package** [1] - 19:24
**packages** [1] - 20:10
**Packaging** [15] - 19:15, 19:23, 19:24, 20:13, 21:10, 21:14, 22:16, 23:10, 26:18, 32:23, 35:2, 35:8, 35:15, 37:14, 46:6
**packaging** [1] - 20:2
**packer** [3] - 30:1, 30:2, 30:3
**packing** [8] - 19:18, 22:25, 23:4, 23:5, 23:8, 23:9, 27:4, 29:24
**Page** [11] - 37:2, 37:5, 44:15, 44:18, 44:22, 54:12, 55:15, 55:25, 56:1, 57:5, 57:6
**PAGE** [1] - 2:3
**page** [5] - 38:11, 43:13, 43:15, 60:19, 69:16
**pages** [4] - 56:16, 65:17, 66:24
**paid** [4] - 40:23, 41:3, 69:7, 76:4
**pair** [1] - 12:9
**paper** [1] - 83:11
**Paragraph** [10] - 37:13, 37:23, 44:16, 44:19, 44:22, 54:12, 56:2, 77:18, 77:25, 78:1
**paragraph** [2] - 38:10, 54:24
**paragraphs** [4] - 37:2, 37:3, 37:11, 39:12
**Paragraphs** [1] - 37:10
**parameter** [1] - 65:6
**pardon** [1] - 32:6
**part** [7] - 17:21, 18:24, 26:11, 68:2, 68:24, 71:18, 74:13
**particular** [37] - 17:20, 30:4, 33:18, 34:17, 35:16, 37:9, 38:10, 38:13, 40:17, 40:20, 41:15, 41:25, 45:18, 46:5, 47:23, 53:1, 54:3, 54:23, 55:8, 55:13, 57:21, 59:7, 60:3, 60:4, 60:18, 62:11, 62:17, 63:1, 63:4, 63:17, 64:22, 65:19, 69:7, 70:5, 70:11, 70:15
**parties** [8] - 4:2, 4:3, 6:23, 36:19, 40:5, 55:20, 81:3, 83:15
**party** [3] - 14:19, 57:15, 66:19
**pass** [1] - 7:20
**passed** [1] - 5:14
**patterns** [1] - 14:13
**pay** [3] - 24:7, 31:11, 67:14
**paying** [2] - 31:13, 42:3
**payment** [2] - 41:6, 69:15
**pays** [1] - 24:4
**PECK** [1] - 1:15

**Pennsylvania** [3] - 19:21, 37:17, 76:9
**people** [2] - 49:24, 76:16
**per** [3] - 24:22, 77:8, 77:9
**perfectly** [1] - 13:10
**performance** [1] - 30:10
**performed** [3] - 11:25, 45:9, 45:12
**performing** [1] - 66:22
**perhaps** [1] - 16:21
**period** [6] - 28:20, 29:9, 29:14, 43:3, 52:17, 68:17
**permanently** [1] - 11:13
**person** [6] - 14:13, 28:19, 28:22, 34:8, 58:21, 59:16
**personal** [1] - 51:4
**personally** [4] - 35:10, 73:21, 73:22, 73:23
**personnel** [2] - 72:22, 78:17
**persons** [1] - 28:22
**pertaining** [1] - 22:22
**Philadelphia** [2] - 5:17, 11:19
**phone** [1] - 12:7
**phonetic** [1] - 21:13
**physical** [4] - 39:23, 40:16, 44:7, 44:17
**physically** [3] - 37:24, 64:20, 66:22
**pick** [5] - 30:3, 55:2, 55:4, 60:13, 69:20
**picked** [1] - 54:15
**piece** [1] - 61:16
**placed** [2] - 20:15, 35:11
**Plains** [1] - 37:18
**Plaintiff** [5] - 6:19, 20:16, 31:25, 56:5, 81:21
**Plaintiff's** [3] - 2:17, 7:5, 21:1
**Plaintiffs** [5] - 1:4, 1:16, 3:11, 3:25, 4:18
**Plaintiffs'** [6] - 6:20, 9:20, 32:1, 54:10, 57:18, 59:19, 61:19, 67:4
**plan** [1] - 17:19
**planned** [1] - 32:17
**planner** [1] - 18:12
**plus** [2] - 41:8, 68:21
**PO** [3] - 26:24, 27:2
**point** [17] - 28:24, 41:10, 41:19, 44:5, 46:9, 48:24, 51:20, 65:7, 69:20, 75:19, 75:20, 76:19, 82:6
**policy** [1] - 63:25
**portion** [4] - 28:3, 35:6, 40:10, 45:25
**portions** [1] - 6:20
**POs** [1] - 29:21
**posed** [1] - 49:22
**position** [7] - 17:16, 18:9,

31:7, 45:8, 45:10, 53:1, 65:2
**possession** [3] - 39:23, 40:16, 55:23
**post** [1] - 49:1
**PR** [1] - 43:7
**practice** [1] - 58:7
**Prairie** [1] - 51:13
**pre** [1] - 67:20
**pre-agreed** [1] - 67:20
**predetermined** [1] - 67:20
**preliminary** [2] - 8:4, 9:12
**premarked** [1] - 9:19
**preparation** [1] - 63:2
**prepare** [2] - 20:4, 71:8
**prepared** [10] - 21:12, 23:9, 32:11, 32:23, 35:3, 35:8, 36:7, 45:15, 46:5, 75:2
**prepares** [1] - 23:8
**preparing** [1] - 74:10
**presence** [1] - 73:2
**present** [2] - 72:12, 82:7
**presently** [1] - 51:9
**president** [1] - 52:9
**presumably** [1] - 25:25
**pretrial** [3] - 6:15, 7:13, 81:15
**prevention** [1] - 52:24
**previously** [1] - 43:16
**price** [4] - 24:22, 69:17
**prices** [1] - 68:23
**primarily** [4] - 52:7, 53:16, 60:12, 61:6
**primary** [2] - 28:19, 66:20
**privy** [1] - 61:5
**problem** [1] - 22:7
**problems** [3] - 16:2, 16:5, 30:9
**procedure** [2] - 29:19, 79:21
**procedures** [1] - 52:3
**proceed** [4] - 9:13, 16:11, 39:2, 80:15
**proceeding** [1] - 48:12
**proceedings** [6] - 12:16, 14:22, 15:6, 25:14, 25:20, 26:6
**producer** [1] - 17:15
**product** [1] - 76:8
**production** [1] - 74:14
**products** [7] - 17:25, 18:3, 19:13, 19:19, 19:25, 20:1, 22:25
**professional** [2] - 53:3, 83:9
**professionalism** [1] - 83:7
**professionally** [2] - 73:22, 73:23
**programs** [1] - 52:3
**proof** [3] - 22:19, 45:5, 63:9
**properly** [1] - 45:1

**property** [6] - 56:3, 56:12, 56:19, 56:22, 62:6, 66:19
**propose** [1] - 5:20
**proposed** [4] - 82:3, 82:8, 82:12, 82:18
**proposition** [1] - 70:4
**Prospect** [1] - 37:18
**protocol** [2] - 4:16, 47:15
**protocols** [1] - 52:4
**provide** [8] - 9:22, 16:17, 17:25, 20:1, 29:21, 52:6, 60:17, 83:10
**provided** [4] - 29:13, 43:23, 63:8, 67:2
**provider** [4] - 66:6, 66:11, 66:17, 66:18
**provisions** [1] - 55:20
**public** [2] - 65:11, 73:23
**pull** [2] - 9:8, 49:16
**purpose** [4] - 23:25, 24:3, 60:7, 70:13
**purposes** [1] - 4:7
**put** [6] - 4:18, 4:21, 48:13, 48:24, 80:4, 81:14
**putting** [2] - 74:9, 82:18

## Q

**qualifications** [2] - 5:10, 5:23
**qualify** [1] - 58:21
**quality** [2] - 13:6, 29:13
**questioned** [1] - 6:9
**questions** [12] - 13:18, 14:5, 14:10, 32:13, 32:15, 37:7, 40:6, 46:20, 47:19, 71:12, 79:10, 80:5
**quite** [1] - 32:14
**quotes** [1] - 71:24

## R

**rate** [15] - 60:8, 60:11, 60:15, 61:6, 67:16, 67:21, 67:24, 68:3, 68:6, 68:11, 68:16, 68:18, 69:6, 69:24
**ratings** [1] - 68:14
**reach** [2] - 30:1, 30:2
**reached** [1] - 38:24
**read** [22] - 27:24, 34:4, 35:4, 36:15, 37:1, 37:6, 37:11, 37:13, 38:5, 38:6, 38:21, 39:12, 40:7, 44:15, 44:21, 45:21, 45:22, 54:12, 55:15, 58:1, 66:4, 74:17
**reading** [2] - 59:4, 59:6
**reads** [4] - 28:2, 35:5, 40:9, 45:24
**ready** [2] - 20:3, 68:8
**realization** [1] - 68:22

**really** [6] - 4:20, 37:9, 42:6, 49:19, 67:14, 70:12
**realtime** [1] - 77:7
**reason** [3] - 27:1, 43:17, 65:9
**reasonable** [1] - 82:10
**rebuttal** [3] - 79:23, 80:5, 81:8
**receipt** [3] - 23:20, 34:24
**receive** [5] - 17:19, 26:21, 55:2, 55:5, 82:15
**received** [6] - 5:19, 31:4, 36:17, 45:4, 49:1, 54:16
**receiving** [3] - 30:24, 57:22, 83:12
**recent** [1] - 36:3
**recess** [1] - 48:19
**recollection** [1] - 29:2
**recommending** [1] - 70:6
**record** [17] - 3:6, 9:6, 15:14, 15:19, 16:18, 28:3, 35:6, 37:13, 37:23, 40:10, 45:25, 49:7, 49:11, 49:15, 72:10, 79:20, 81:10
**records** [1] - 53:23
**recovered** [3] - 78:8, 78:20, 78:21
**RECROSS** [2] - 2:12, 80:16
**recross** [1] - 80:2
**redirect** [4] - 48:6, 48:7, 48:14, 79:1
**REDIRECT** [2] - 2:12, 79:5
**reduced** [1] - 32:16
**reefer** [4] - 64:1, 78:19, 78:21
**refer** [4] - 41:2, 64:19, 65:14, 66:19
**reference** [8] - 21:24, 35:12, 38:14, 38:25, 60:22, 64:10, 64:13, 70:21
**referenced** [1] - 81:16
**references** [1] - 25:3
**referred** [2] - 39:10, 64:11
**referring** [4] - 47:22, 55:15, 64:14, 77:24
**refers** [3] - 34:9, 41:24, 66:25
**reflect** [1] - 69:12
**reflects** [1] - 69:14
**Refrigerated** [3] - 37:24, 53:20, 60:20
**refrigerated** [2] - 67:25
**refrigeration** [1] - 78:12
**regard** [11] - 5:8, 13:21, 35:11, 43:20, 51:25, 58:12, 59:8, 69:25, 70:4, 80:2, 83:5
**regarding** [2] - 25:20, 26:6
**regardless** [1] - 68:3
**reinsurance** [1] - 11:21
**related** [3] - 21:9, 50:16, 50:21
**relationship** [8] - 10:24,

11:9, 11:22, 19:12, 19:22,
23:2, 71:25, 80:20
**relative** [2] - 59:12, 69:22
**relax** [1] - 4:10
**rely** [1] - 16:12
**remember** [4] - 28:11, 28:25,
36:1, 36:25
**remind** [1] - 80:10
**removed** [1] - 20:18
**renew** [1] - 53:9
**rep** [2] - 67:16, 67:24
**repeat** [5] - 39:4, 39:6, 39:24,
39:25, 45:19
**rephrase** [2] - 27:17, 58:9
**report** [5] - 36:8, 38:7, 38:11,
52:8, 52:9
**reported** [1] - 36:20
**Reporter** [4] - 28:2, 35:5,
40:9, 45:24
**reporter** [7] - 9:10, 27:24,
40:1, 49:18, 82:5, 82:9,
83:3
**reports** [2] - 52:11, 52:12
**represent** [1] - 31:23
**representative** [2] - 28:16,
72:3
**representing** [1] - 47:5
**requested** [4] - 28:2, 35:5,
40:9, 45:24, 64:25
**require** [1] - 38:15
**required** [1] - 1:20
**requiring** [1] - 14:13
**residing** [1] - 6:18
**resources** [1] - 72:22
**response** [7] - 16:17, 30:24,
31:1, 47:19, 49:25, 50:2,
58:22
**responses** [2] - 16:16, 31:3
**responsibilities** [1] - 52:2
**responsibility** [2] - 40:23,
70:10
**responsible** [6] - 19:18,
29:15, 70:7, 70:9, 74:9,
74:14
**rest** [2] - 49:3, 65:18
**restates** [1] - 60:11
**rested** [3] - 81:4, 81:5, 81:6
**restroom** [1] - 48:11
**resume** [3] - 5:19, 6:5, 9:21
**retain** [1] - 36:23
**retire** [1] - 72:11
**retired** [1] - 72:7
**review** [14] - 6:5, 31:5, 38:15,
53:23, 54:2, 55:13, 57:17,
58:25, 61:21, 63:1, 63:17,
64:7, 65:3, 65:6
**reviewed** [6] - 31:6, 38:4,
39:8, 58:23, 59:5, 67:8
**reviewing** [4] - 52:4, 59:11,
64:9, 65:8

**right-hand** [1] - 22:5
**rise** [4] - 3:1, 48:18, 48:20,
83:25
**risk** [8] - 51:17, 51:22, 51:23,
52:2, 53:11, 58:19, 58:25,
65:2
**Road** [1] - 37:18
**road** [1] - 77:3
**Robinson** [146] - 3:7, 3:14,
3:16, 3:21, 6:18, 19:2,
19:5, 19:10, 22:2, 22:21,
23:14, 24:1, 24:4, 25:24,
27:9, 27:10, 27:13, 28:8,
28:18, 28:22, 29:13, 29:20,
29:24, 30:6, 30:9, 30:13,
30:18, 30:21, 31:11, 31:23,
32:11, 33:1, 33:10, 33:12,
33:19, 33:22, 33:23, 34:12,
34:14, 34:16, 34:19, 34:23,
35:1, 35:9, 35:15, 38:14,
38:25, 39:10, 39:14, 39:22,
40:15, 41:3, 41:6, 41:9,
41:15, 41:18, 41:24, 42:1,
42:3, 42:8, 42:11, 42:21,
43:17, 43:23, 44:4, 44:9,
44:16, 44:25, 45:6, 45:8,
45:11, 45:13, 45:14, 45:16,
45:18, 46:2, 46:4, 46:7,
47:2, 47:22, 48:1, 49:8,
50:20, 50:22, 51:10, 52:2,
52:14, 52:15, 53:17, 53:20,
53:24, 54:11, 54:14, 54:19,
55:2, 55:4, 55:7, 55:11,
55:22, 56:6, 56:10, 56:17,
56:24, 59:10, 59:23, 60:22,
61:4, 62:5, 62:15, 62:24,
63:9, 64:10, 64:11, 64:14,
64:19, 64:22, 65:16, 65:24,
66:6, 66:25, 70:1, 70:7,
70:14, 71:4, 71:8, 72:1,
72:4, 72:19, 73:1, 73:4,
73:17, 73:19, 73:25, 74:4,
74:6, 74:13, 74:15, 74:25,
75:3, 75:5, 75:11, 76:4,
76:7, 78:17, 80:18, 80:21
**ROBINSON** [1] - 1:6
**Robinson's** [8] - 30:24, 32:2,
51:12, 56:14, 62:21, 63:11,
64:4, 65:3
**role** [1] - 6:3
**route** [1] - 70:15
**routine** [1] - 58:24
**RPR** [1] - 1:21
**rules** [1] - 4:10
**Rutgers** [2] - 10:2, 10:3

## S

**safely** [1] - 45:2
**sake** [1] - 4:13

**sales** [1] - 67:16
**Samuel** [1] - 34:8
**schedule** [7] - 30:10, 82:4,
82:8, 82:11, 82:12, 82:14,
83:5
**SCHMIDT** [1] - 1:15
**school** [4] - 11:5, 11:6, 11:11
**Science** [1] - 53:6
**scrambled** [1] - 5:16
**screen** [1] - 73:10
**seat** [3] - 9:8, 15:22, 49:16
**seated** [3] - 3:3, 48:22, 49:14
**second** [8] - 8:7, 24:17, 31:4,
38:18, 47:3, 66:10, 69:16,
79:24
**section** [1] - 38:11
**Section** [2] - 1:21, 37:1
**sections** [1] - 37:11
**secure** [1] - 73:2
**securement** [1] - 55:19
**security** [1] - 53:12
**see** [18] - 4:19, 25:4, 25:15,
25:21, 26:7, 26:10, 26:14,
27:25, 34:22, 38:2, 39:13,
43:8, 64:9, 69:12, 77:23,
78:2, 81:14, 81:25
**seeing** [2] - 42:11, 83:21
**selected** [1] - 70:1
**selection** [1] - 70:3
**seminars** [2] - 53:10, 53:13
**send** [7] - 26:17, 26:19, 27:3,
27:4, 27:8, 30:16, 60:11
**senior** [1] - 18:11
**sense** [1] - 53:3
**sentence** [7] - 36:15, 37:22,
38:1, 44:15, 44:21, 55:16,
66:10
**sentences** [1] - 37:21
**separated** [1] - 18:8
**series** [1] - 56:15
**served** [3] - 8:8, 8:19, 8:20
**service** [5] - 5:13, 14:8,
29:12, 29:15, 60:16
**services** [22] - 12:1, 14:14,
15:24, 16:12, 19:9, 20:14,
40:5, 43:24, 44:1, 44:3,
52:7, 61:22, 62:5, 66:7,
66:21, 66:23, 69:18, 75:14,
75:24, 75:25, 76:1, 76:8
**serving** [1] - 6:2
**set** [2] - 67:24, 68:6
**Seventh** [1] - 56:1
**several** [1] - 53:8
**shape** [1] - 83:6
**shipment** [44] - 21:15, 21:16,
21:18, 25:7, 25:23, 26:15,
28:16, 29:17, 30:21, 33:2,
33:8, 34:17, 34:20, 34:21,
37:25, 45:18, 47:23, 48:2,
53:25, 54:20, 55:8, 55:17,

56:3, 56:4, 56:7, 57:15,
60:10, 62:17, 62:19, 63:5,
63:7, 63:21, 63:22, 66:2,
67:10, 68:1, 68:8, 68:10,
68:20, 69:25, 70:15, 71:9,
74:21, 79:7
**shipments** [5] - 29:16, 45:9,
45:11, 55:18, 56:11
**SHIPP** [1] - 1:11
**shipped** [2] - 40:20, 46:9
**shipper** [6] - 22:15, 34:1,
46:10, 46:14, 50:19, 61:13
**shipping** [15] - 17:17, 17:18,
17:19, 18:6, 18:10, 18:11,
18:13, 18:16, 18:22, 18:23,
22:21, 28:17, 46:3, 76:2
**Shipping** [1] - 43:7
**short** [3] - 5:23, 48:11, 69:19
**shot** [1] - 73:10
**shoulder** [1] - 50:1
**show** [2] - 9:19, 77:20
**showed** [1] - 29:21
**shown** [1] - 79:6
**shows** [2] - 41:3, 42:3
**shrug** [1] - 50:1
**shut** [2] - 78:19, 78:21
**sic** [1] - 21:10
**side** [4] - 33:24, 68:25,
82:18, 83:13
**sides** [2] - 7:13, 81:6
**sides'** [1] - 83:12
**sign** [4] - 58:1, 58:3, 58:15,
62:8
**signature** [9] - 22:15, 22:17,
22:18, 33:6, 33:18, 33:21,
34:4, 57:25, 58:11
**signatures** [2] - 22:10, 22:13
**signed** [6] - 33:14, 34:5,
34:24, 57:22, 57:23, 77:13
**significant** [1] - 68:15
**signing** [3] - 58:18, 59:16,
59:17
**signs** [1] - 59:14
**silently** [3] - 37:1, 37:6, 38:7
**similar** [2] - 20:12, 53:12
**simply** [1] - 36:25
**sit** [1] - 29:2
**sitting** [1] - 3:19
**situation** [2] - 67:23, 78:6
**situations** [2] - 61:12, 64:2
**six** [2] - 28:20, 67:21
**six-year** [1] - 28:20
**skim** [1] - 26:23
**small** [1] - 24:25
**smaller** [2] - 32:18, 40:6
**social** [1] - 13:8
**socially** [1] - 12:21
**sole** [5] - 45:9, 45:11, 45:16,
48:13, 49:7

solutions [1] - 66:8
someone [5] - 5:16, 12:8, 50:19, 52:18, 58:2
sometimes [1] - 16:25
sophisticated [2] - 46:13, 46:16
sorry [6] - 23:8, 37:3, 45:19, 57:4, 70:25, 75:10
South [1] - 66:9
space [1] - 58:13
speaking [2] - 13:11, 49:24
speaks [2] - 38:19, 39:11
specific [1] - 27:16
specifically [1] - 74:5
spell [4] - 9:6, 15:14, 15:19, 49:11
spend [1] - 12:18
spikes [1] - 77:6
spoken [2] - 11:3, 49:19
spot [2] - 35:16, 42:2
spread [1] - 53:10
stand [1] - 9:2
standard [1] - 62:7
started [1] - 20:20
starting [1] - 81:8
starts [1] - 6:13
state [5] - 9:5, 15:13, 15:18, 32:13, 49:10
State [1] - 1:9
STATE'S [1] - 15:17
statement [10] - 34:25, 42:1, 42:11, 44:18, 54:22, 66:5, 66:14, 66:15, 74:3, 74:5
statements [3] - 4:17, 4:22, 4:24
STATES [2] - 1:1, 1:12
states [4] - 44:24, 57:7, 59:22, 63:12
States [5] - 1:9, 10:14, 10:15, 18:4, 43:2
stating [1] - 41:16
status [1] - 72:9
stay [1] - 68:17
step [5] - 15:9, 36:24, 48:9, 79:14, 81:1
still [5] - 4:15, 46:6, 56:10, 56:12, 79:22
stipulated [2] - 4:2, 81:17
stipulation [1] - 5:9
stipulations [1] - 83:11
stock [1] - 73:24
stole [1] - 78:18
stolen [2] - 78:7, 78:17
storage [1] - 19:10
stored [1] - 20:3
straight [1] - 41:13
Street [1] - 1:9
strike [1] - 39:19
studied [1] - 25:25

study [3] - 26:1, 26:21, 42:6
stuff [1] - 83:14
subcontracted [1] - 44:16
subject [4] - 54:20, 55:17, 56:3, 82:4
submission [1] - 7:7
submissions [1] - 83:12
submit [4] - 81:20, 81:23, 82:4, 82:11
submitted [4] - 5:2, 6:17, 77:14, 81:24
submitting [1] - 30:20
subsequent [2] - 78:20, 79:21
subsequently [2] - 28:25, 78:8
Suffern [1] - 21:13
supposed [2] - 60:13, 70:16
surcharge [7] - 24:17, 24:20, 68:18, 68:21, 68:24, 69:23, 76:22
survey [6] - 36:11, 36:19, 36:24, 38:14, 64:22, 65:1
Surveyors [1] - 36:14
surveyors [1] - 36:18
swear [4] - 9:2, 15:11, 15:12, 15:16
sworn [1] - 49:16
SWORN [3] - 9:4, 15:17, 49:9

### T

table [1] - 3:19
talks [1] - 6:15
term [1] - 66:18
terms [12] - 16:2, 18:8, 29:12, 30:9, 45:1, 49:2, 58:17, 60:9, 62:2, 71:23, 81:15, 82:9
testified [10] - 5:18, 12:10, 14:18, 28:7, 32:22, 33:5, 33:25, 42:5, 43:16, 50:5
testifying [1] - 29:3
testimony [9] - 12:13, 33:7, 41:14, 48:9, 51:7, 63:2, 67:2, 79:15, 81:2
THE [113] - 1:1, 3:1, 3:3, 3:5, 3:12, 3:17, 3:22, 4:25, 5:3, 5:7, 6:4, 6:11, 6:24, 7:7, 7:11, 7:16, 7:20, 8:3, 8:11, 8:21, 8:24, 9:5, 9:7, 9:8, 13:16, 14:6, 14:10, 14:16, 14:17, 14:23, 14:24, 15:3, 15:5, 15:8, 15:9, 15:11, 15:13, 15:15, 15:16, 15:18, 15:20, 15:22, 16:7, 16:8, 16:10, 16:11, 16:14, 16:15, 16:20, 16:24, 20:22, 20:25, 23:17, 23:22, 27:17, 27:21, 28:6, 31:18, 32:18, 32:21,

35:7, 38:8, 38:18, 39:1, 39:7, 39:21, 40:4, 40:13, 45:21, 46:1, 46:24, 47:3, 47:11, 47:17, 48:6, 48:8, 48:16, 48:18, 48:20, 48:22, 49:4, 49:10, 49:12, 49:14, 54:8, 58:5, 58:8, 59:3, 70:18, 71:13, 72:13, 77:22, 79:1, 79:11, 79:14, 79:18, 79:24, 80:3, 80:6, 80:9, 80:12, 80:13, 80:15, 80:24, 81:1, 81:12, 81:18, 82:6, 82:16, 82:20, 82:22, 83:20, 83:25
theft [3] - 77:18, 78:2, 78:5
thereafter [1] - 30:23
therefore [1] - 4:5
third [2] - 37:2, 66:19
third-party [1] - 66:19
thousands [1] - 59:11
three [3] - 53:9, 56:15, 65:17
title [5] - 39:23, 40:19, 51:16, 51:17, 51:19
Title [1] - 1:20
today [18] - 12:2, 15:6, 29:2, 35:23, 48:2, 51:7, 52:12, 57:19, 58:24, 61:20, 63:1, 63:17, 64:7, 72:6, 72:14, 72:16, 73:2, 81:17
together [1] - 83:15
Toms [55] - 17:13, 17:14, 17:16, 17:25, 18:3, 18:7, 18:10, 18:14, 18:17, 18:19, 19:12, 19:13, 19:23, 19:24, 20:11, 21:14, 23:10, 24:1, 24:4, 24:7, 28:17, 30:5, 34:9, 34:12, 34:14, 37:15, 42:15, 42:22, 45:10, 45:12, 45:17, 46:13, 47:25, 53:19, 55:8, 61:1, 64:25, 67:2, 67:24, 71:19, 71:20, 71:21, 71:23, 72:1, 72:4, 73:4, 73:16, 75:5, 75:11, 75:13, 76:4, 80:18, 80:20
tongue [1] - 17:6
took [5] - 28:13, 39:22, 40:15, 40:19, 40:23
top [6] - 22:1, 57:7, 59:22, 63:12, 65:15, 73:10
total [1] - 18:23
training [1] - 53:10
transcript [5] - 48:25, 81:20, 82:3, 82:10, 83:4
transcripts [1] - 82:15
transit [2] - 37:4, 37:8
translate [3] - 16:4, 16:23, 17:1
translation [1] - 12:1
translations [1] - 12:2
transmitting [1] - 74:10

Transport [5] - 22:6, 22:8, 22:18, 33:6, 33:20
transport [21] - 19:10, 23:1, 23:20, 34:13, 34:22, 37:25, 41:3, 41:9, 42:4, 42:20, 43:1, 43:21, 44:4, 44:6, 44:7, 44:8, 45:2, 55:17, 55:19, 64:20, 66:12
transportation [26] - 21:9, 21:21, 22:22, 23:13, 24:2, 24:4, 24:6, 24:11, 24:19, 43:24, 44:1, 44:2, 44:10, 52:6, 60:15, 60:16, 66:7, 66:11, 66:12, 66:21, 66:22, 68:15, 75:14, 76:1, 76:7, 76:18
transported [4] - 33:8, 34:16, 39:15, 41:19
transporter [1] - 46:2
transporting [1] - 21:19
Trenton [1] - 1:10
trial [21] - 4:5, 5:1, 20:17, 32:2, 32:11, 35:20, 44:12, 49:2, 50:5, 54:5, 54:9, 54:10, 55:10, 56:14, 59:20, 62:21, 63:11, 64:4, 65:15, 69:13, 81:24
TRIAL [1] - 1:7
truck [4] - 21:19, 21:20, 24:11, 77:3
trucker [2] - 50:23, 51:1
Trucking [5] - 37:24, 53:21, 60:20
truckload [2] - 52:9, 67:25
true [8] - 23:6, 56:16, 59:25, 61:24, 62:23, 63:13, 65:22, 66:15
True [1] - 1:20
try [1] - 68:9
Tryg [2] - 3:6, 53:19
TRYG [1] - 1:3
turn [6] - 21:6, 25:11, 54:11, 55:10, 56:14, 62:20
turnaround [2] - 82:9, 83:3
turning [2] - 33:15, 33:16
twice [1] - 65:7
two [14] - 4:20, 18:8, 31:3, 33:15, 43:5, 43:9, 47:4, 49:23, 51:2, 51:4, 51:23, 56:15, 65:17, 66:24
type [10] - 18:21, 29:12, 33:11, 39:15, 43:19, 50:14, 50:15, 52:23, 59:15, 69:14
typed [1] - 24:25
types [1] - 51:2

### U

U.S.C [1] - 1:21
ultimately [1] - 78:13

**under** [6] - 4:4, 4:7, 37:5, 37:10, 66:5, 80:10
**underlying** [1] - 3:24
**understood** [1] - 43:23
**undertook** [1] - 36:19
**underwriter** [1] - 64:25
**unique** [1] - 68:2
**unit** [1] - 78:21
**UNITED** [2] - 1:1, 1:12
**United** [5] - 1:9, 10:14, 10:15, 18:3, 43:1
**university** [3] - 9:24, 9:25, 10:1
**University** [2] - 10:2, 53:7
**unless** [1] - 38:16
**unloaded** [1] - 34:20
**unloading** [1] - 71:5
**unusual** [1] - 21:18
**up** [17] - 4:25, 7:14, 7:20, 9:11, 11:2, 28:15, 30:3, 42:14, 49:20, 54:16, 55:2, 55:4, 60:13, 68:22, 69:20, 73:10, 80:9
**usage** [1] - 14:13
**utilized** [2] - 60:4, 62:3

## V

**vacations** [1] - 10:21
**validating** [1] - 65:12
**variable** [2] - 68:16, 68:19
**various** [6] - 24:9, 52:6, 53:10, 56:20, 59:8
**vast** [1] - 50:16
**verbal** [1] - 50:2
**verbatim** [2] - 16:23, 17:1
**versus** [1] - 53:20
**via** [1] - 26:20
**vice** [1] - 52:9
**view** [1] - 25:6
**visit** [2] - 13:8, 25:24
**visited** [1] - 26:1
**vitae** [1] - 6:6
**voice** [2] - 9:11, 49:20
**voir** [2] - 5:23, 6:14
**vs** [1] - 1:5

## W

**wait** [1] - 49:22
**web** [2] - 43:12, 43:15
**website** [14] - 25:24, 42:6, 42:7, 42:10, 42:12, 43:8, 43:17, 43:18, 43:23, 65:3, 65:8, 66:1, 73:10, 79:6
**Webster** [3] - 36:16, 36:21, 36:23
**week** [1] - 7:18
**welcome** [1] - 3:23
**whole** [1] - 26:22

**window** [1] - 69:19
**wish** [1] - 16:11
**withdraw** [1] - 28:4
**withdrawn** [1] - 23:9
**WITNESS** [18] - 2:3, 9:7, 14:16, 14:23, 15:8, 15:15, 15:17, 15:20, 16:7, 16:10, 16:14, 16:20, 32:21, 35:7, 46:1, 49:9, 49:12, 80:12
**witness** [25] - 5:21, 9:2, 12:19, 13:7, 13:12, 14:8, 14:9, 15:10, 15:12, 15:16, 20:16, 31:19, 32:10, 38:10, 38:21, 47:6, 48:14, 49:7, 50:3, 71:14, 77:20, 79:13, 80:4, 80:6
**witness's** [1] - 58:17
**witnesses** [3] - 4:19, 4:21, 48:24
**WK** [3] - 36:16, 36:21, 36:23
**wonderful** [1] - 3:22
**word** [3] - 23:16, 46:15, 49:19
**words** [2] - 34:25, 45:10
**WORLDWIDE** [1] - 1:6
**worldwide** [1] - 18:1
**Worldwide** [2] - 3:7, 3:14
**writing** [2] - 30:17, 82:11
**written** [2] - 24:25, 55:7

## Y

**year** [9] - 10:8, 10:19, 28:11, 28:20, 29:8, 29:14, 36:4, 65:7, 67:21
**years** [18] - 10:11, 10:12, 11:6, 18:8, 18:15, 18:25, 29:3, 29:5, 36:2, 42:14, 42:16, 51:24, 52:16, 53:9, 53:15, 53:16, 59:7, 59:9
**yellow** [3] - 6:21, 7:22, 81:21
**yesterday** [1] - 5:13
**yourself** [1] - 59:6