S:\Files\5980_C.H. Robinson\POST-TRIAL SUBMISSIONS\Post-Trial PFF-Table of Contents.doc

KENNEDY LILLIS SCHMIDT & ENGLISH
John T. Lillis, Jr., Esq.
JLillis@klselaw.com
75 Maiden Lane, Suite 402
New York, New York 10038
Tel. 212-430-0800
Fax  212-430-0810

Attorneys for Plaintiffs
TRYG INSURANCE a/s/o Toms Confectionery Group
and TOMS CONFECTIONERY GROUP

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRYG INSURANCE a/s/o Toms Confectionery Group, and TOMS CONFECTIONERY GROUP, | ) ) ) ) | Case No. |
| Plaintiffs, | ) ) | 3:15-CV-05343 (MAS) (TJB) |
| - against - | ) ) | |
| C.H. ROBINSON WORLDWIDE, INC. and NATIONAL REFRIGERATED TRUCKING, LLC, | ) ) ) ) | PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

Page

**PART I**

THE PARTIES, SHIPMENT AND LOSS
(*See*, Pl. Trial Brief at 2-4)..................................................................................................1

**PART II**

THE COMMERCIAL RELATIONSHIP BETWEEN CHRW
AND TOMS WAS THAT OF A CARRIER AND A SHIPPER ...........................................5

i

A.     CHRW held itself out to Toms as a Carrier, and never advised
       Toms that CHRW would be a mere "broker" as to Toms'
       shipments (*see*, Pl. Trial Brief at 4-5 and 8-13)...........................................5

B.     CHRW's sales approach to new customers does not include the
       disclosure that CHRW intends to act only as a "broker" for the
       customers' shipments (*see*, Pl. Trial Brief at 11).......................................8

C.     CHRW offered no sales records to indicate that CHRW ever
       disclosed to Toms CHRW intended to act only as a "broker"
       for Toms' shipments. ......................................................................................9

D.     CHRW offered no evidence to rebut the testimony of its own
       witness Janet Hays, or of Toms' Michael Bastholm, concerning
       the parties' Pre-Loss Carrier-Shipper relationship. ..............................11

PART III

THE BILL OF LADING SUPPORTS PLAINTIFFS' POSITION
THAT CHRW WAS A CARRIER, NOT A BROKER
(*See*, Pl. Trial Brief at 20-21).................................................................................12

PART IV

CHRW'S INVOICE SUPPORTS PLAINTIFFS' POSITION
THAT CHRW WAS A CARRIER, NOT A BROKER ....................................................14

A.     The Contents of the CHRW Invoice (*see*, Pl. Trial Brief at 15-16
       and 18-19)...........................................................................................................14

B.     The Terms and Conditions referenced by the CHRW Invoice
       (*See*, Pl. Trial Brief at 16-17).......................................................................18

PART V

CHRW WAS THE ONLY PARTY WITH KNOWLEDGE OF NRT
(*See*, Pl. Trial Brief at 4-5, 7, 11-15 and 19-20) ....................................................20

PART VI

NEITHER THE ISA SURVEY REPORT NOR CHRW'S WEBSITE
EXCERPT SUPPORT CHRW'S "BROKER" CONTENTION)...........................................22

A.     The ISA Survey Report (Def. Ex. 9).......................................................22

**B.**      **The "Investors: Corporate Overview" Page of CHRW's**
            **Website (Def. Ex. 10)** ...............................................................................23

CONCLUSION.............................................................................................................25

KENNEDY LILLIS SCHMIDT & ENGLISH
John T. Lillis, Jr., Esq.
JLillis@klselaw.com
75 Maiden Lane, Suite 402
New York, New York 10038
Tel. 212-430-0800
Fax  212-430-0810

Attorneys for Plaintiffs
TRYG INSURANCE a/s/o Toms Confectionery Group
and TOMS CONFECTIONERY GROUP

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRYG INSURANCE a/s/o Toms Confectionery Group, and TOMS CONFECTIONERY GROUP, | ) ) ) | Case No. |
| Plaintiffs, | ) ) | 3:15-CV-05343 (MAS) (TJB) |
| - against - | ) ) | |
| C.H. ROBINSON WORLDWIDE, INC. and NATIONAL REFRIGERATED TRUCKING, LLC, | ) ) ) | PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT |
| Defendants. | ) ) | |

Plaintiffs Tryg Insurance ("Tryg") and Toms Confectionery Group ("Toms")
hereby respectfully submit the following post-trial proposed findings of fact:

## PART I

### THE PARTIES, SHIPMENT AND LOSS
(*See*, Pl. Trial Brief at 2-4)

1.    Plaintiff Toms Confectionery Group ("Toms") is a Danish chocolate manufacturer located

at Toms Alle 1, DK-2750 Ballerup, Denmark.  PTO Stipulated Fact 1.

2.    Toms was at all relevant times the owner of a shipment of miniature chocolate liquor bottles

("the Cargo").  PTO Stipulated Fact 2.

1

3.      Plaintiff Tryg Insurance ("Tryg") is a Danish company located at Klausdalsbrovej 601, 2750 Ballerup, Denmark. PTO Stipulated Fact 3.

4.      Tryg insured the Cargo against loss and damage. PTO Stipulated Fact 4.

5.      Trial witness Michael Bastholm has been shipping manager for Toms for five (5) years. Mr. Bastholm has been in the shipping department of Toms for eleven (11) years. Mr. Bastholm has been in the shipping business for twenty-three (23) years. Trial Transcript (hereinafter "TT") p. 18 ll. 6–25 (M. Bastholm).

6.      Defendant C.H. Robinson Worldwide, Inc. ("CHRW") is a Delaware corporation with an office for the transaction of business at 14701 Charlson Road, Eden Prairie, Minnesota, 55347. PTO Stipulated Fact 5.

7.      Defendant National Refrigerated Trucking, LLC ("NRT") was a New Jersey company with an office for the transaction of business at 4000 Bordentown Avenue, Suite 45, Sayreville, New Jersey, 08872. PTO Stipulated Fact 6.

8.      CHRW subcontracted the physical carriage of the Cargo to NRT. PTO Stipulated Fact 7.

9.      CHRW hired and paid the subcontractor trucker NRT. PTO Stipulated Fact 8.

10.     Toms did not hire or pay the subcontractor trucker NRT. PTO Stipulated Fact 9.

11.     CHRW did not advise Toms that NRT had been subcontracted or otherwise nominated to take possession of the Cargo. PTO Stipulated Fact 10.

12.     The arrangements for pickup of Toms' Cargo were made by CHRW in contact with the packer of the cargo (API). TT p. 29 l. 16 – p. 30 l. 3 (M. Bastholm).

13.   On July 16, 2013, at the premises of non-party Assured Packaging, Inc. ("API") in Levit-
town, Pennsylvania, the Cargo was delivered to a truck operated by NRT.  PTO Stipulated
Fact 11.

14.   The Cargo was in good order and condition at the time it was delivered to the trucker at
API in Levittown, Pennsylvania.  PTO Stipulated Fact 12.

15.   A "Straight Bill of Lading" No. 68422 (the "Bill of Lading") was issued by API for the
Cargo on July 16, 2013.  PTO Stipulated Fact 13;  Pl. Ex. A, Bill of Lading.

16.   The Bill of Lading covered shipment of the Cargo from API in Levittown, Pennsylvania to
Coregistics in Cranbury, New Jersey.  PTO Stipulated Fact 15;  Pl. Ex. A, Bill of Lading.

17.   The Bill of Lading stated on its face that the Cargo "**MUST BE TRANSPORTED BE-
TWEEN 52-68° F (11-18° C)**." PTO Stipulated Fact 16;  Pl. Ex. A, Bill of Lading.

18.   Prior to arrival in Cranbury, the refrigeration mechanism of the NRT truck carrying the
Cargo malfunctioned and ceased operating.  PTO Stipulated Fact 17.

19.   Once the NRT truck's refrigeration mechanism ceased operating, the internal temperature
of the trailer in which the Cargo was carried reached as high as 82° F.  PTO Stipulated Fact
18.

20.   The high temperature in the NRT trailer in which the Cargo was carried resulted in physical
damage to the Cargo.  PTO Stipulated Fact 19.

21.     The physical damage sustained by the Cargo occurred while the Cargo was in the care, custody and control of NRT and in transit between Levittown, Pennsylvania and Cranbury, New Jersey.  PTO Stipulated Fact 20.

22.     The Cargo was outturned from the NRT truck which had carried it to Cranbury, New Jersey on July 17, 2013.  PTO Stipulated Fact 21.

23.     The Cargo was outturned from the NRT truck which had carried it to Cranbury, New Jersey in damaged condition.  PTO Stipulated Fact 22.

24.     A Non-Conformance Report No. NCR13-006 was issued with respect to the Cargo on 17 July 2013.  PTO Stipulated Fact 23.

25.     Toms placed CHRW on written notice of the damage to the Cargo by letter dated 19 July 2013.  PTO Stipulated Fact 24.

26.     The physical damage sustained by the Cargo during shipment between Levittown, Pennsylvania and Cranbury, New Jersey rendered the Cargo unfit for use as food.  PTO Stipulated Fact 25.

27.     The physical damage sustained by the Cargo during shipment between Levittown, Pennsylvania and Cranbury, New Jersey resulted in a total loss of the Cargo's value.  PTO Stipulated Fact 26.

28.     The damaged Cargo was on-shipped to, and destroyed by, non-party Bridge Disposal, LLC on or about 14 January 2014.  PTO Stipulated Fact 27.

4

29.     The value of the Cargo lost as a result of the physical damage sustained by the Cargo during shipment between Levittown, Pennsylvania and Cranbury, New Jersey totaled U.S. $124,034.31. PTO Stipulated Fact 28.

30.     Toms submitted a claim to its insurer, Tryg, in the amount of $124,034.31 on account of the physical damage to the Cargo. PTO Stipulated Fact 29.

31.     Tryg paid Toms $115,478.00 on account of the physical damage to the Cargo, which amount reflects the full value of the Cargo less Toms' deductible under the applicable policy of insurance. PTO Stipulated Fact 30.

## PART II

### THE COMMERCIAL RELATIONSHIP BETWEEN CHRW AND TOMS WAS THAT OF A CARRIER AND A SHIPPER

**A.      CHRW held itself out to Toms as a Carrier, and never advised Toms that CHRW would be a mere "broker" as to Toms' shipments** (*see*, Pl. Trial Brief at 4-5 and 8-13).

32.     CHRW's contact at Toms was Michael Bastholm. Pl. Ex. G, Transcript of deposition of CHRW by Janet Hays, at 22-23.

33.     During the four to five years prior to the subject 2013 shipment, Toms' shipping manager Michal Bastholm's point of contact at CHRW was Janet Hays. TT p. 28 l. 20 – p. 29 l. 11 (M. Bastholm); TT p. 72 ll. 1 – 5 (C. McLoughlin).

34.     Janet Hays was Key Account Manager for CHRW. Pl. Ex. G, Hays Dep., at 9.

35.     According to CHRW's Key Account Manager Janet Hays, CHRW is a "logistics provider," meaning that CHRW is in "the business of transportation as far as it relates to shipping

goods from point A to point B, whether it is trucking, air, ocean." Pl. Ex. G, Hays Dep., at 5-6.

36.     Asked to explain the term "logistics," CHRW's Janet Hays stated "so what that means is dealing in transportation of goods." Pl. Ex. G, Hays Dep., at 11.

37.     Toms contacted CHRW – and CHRW only – for the purposes of having Toms' shipments transported from origin to destination. TT p. 45 ll. 8 – 13 (M. Bastholm).

38.     Toms considered CHRW to be the carrier of Toms' shipments because Toms contracted with CHRW for the purposes of transporting Toms' shipments. TT p. 45 ll. 14 – 18 (M. Bastholm); *also*, TT p. 46 ll. 1 – 9 (M. Bastholm).

39.     It was Toms' understanding and intention that it was paying CHRW to transport Toms' cargoes. TT p. 40 l. 19 – p. 41 l. 13 (M. Bastholm), referring to the Bill of Lading (Pl. Ex. A).

40.     It was Toms' understanding and intention that it contracted with CHRW to transport Toms' cargoes. TT p. 41 l. 14 – p. 42 l. 4 (M. Bastholm), referring to the Bill of Lading (Pl. Ex. A) and the CHRW Invoice (Pl. Ex. C).

41.     Toms understood that CHRW took responsibility for transporting Toms' Cargo. Proposed Findings of Fact 32–40, *supra*.

42.     CHRW was authorized by Toms to transport Toms' Cargo. Proposed Findings of Fact 32–40, *supra*.

6

43. CHRW is a "seamless" transportation provider for its customers. Pl. Ex. G, Hays Dep., at 65 and 75.

44. CHRW held itself out to Toms as a one-stop, "seamless" transportation provider which would take responsibility for moving Toms' shipments from origin to destination. "[W]hen we are … speaking to a customer it's C.H. Robinson, it's not all the little things inside that bubble so it's basically they are dealing with C.H. Robinson so that's what I meant [by] seamless." Pl. Ex. G, Hays Dep., at 65 and 75, lines 13-18.

45. CHRW did not advise Toms that it (CHRW) was a transportation broker only. Pl. Ex. G, Hays Dep., at 33-34 and 63-65.

46. CHRW never informed Toms that CHRW would act only as a middleman or "broker" to arrange a contract between Toms and a third-party trucker. Pl. Ex. G, Hays Dep., at 33-34 and 63-65.

47. CHRW did not inform Toms that CHRW intended to subcontract carriage of Toms' shipments to a third-party trucker. Pl. Ex. G, Hays Dep., at 33-34 and 63-65.

48. CHRW did not advise Toms whether it (CHRW) owned or did not own trucks or equipment to transport Toms' cargoes. TT p. 39 ll. 14 – 18 (M. Bastholm).

49. CHRW did not advise Toms that CHRW did not actually take physical possession of Toms' cargo. TT p. 40 ll. 15 – 18 (M. Bastholm).

50. CHRW did not hold itself out to Toms as an entity whose services were limited to arranging contracts between Toms and third-party truckers. Proposed Findings of Fact 32-49, *supra*.

51.   CHRW held itself out to Toms as taking sole responsibility for transporting Toms' shipments from origins to destinations.  Proposed Findings of Fact 32-49, *supra*.

52.   The CHRW records pertaining to Toms which CHRW's Janet Hays was able to access dated back to 2008.  Pl. Ex. G, Hays Dep., at 45-47.

53.   In none of the CHRW records dating from 2008 did CHRW's Key Account Manager Janet Hays see any correspondence or contract in which CHRW identified itself to Toms as a mere "broker," and not a carrier, of Toms' shipments.  Pl. Ex. G, Hays Dep., at 44-46.

54.   When Toms notified CHRW of the loss that is the subject of this lawsuit, CHRW did not tell Toms that CHRW would not pay the claim because it was acting merely as a "broker" with respect to the Cargo.  TT p. 30 l. 20 – p. 31 l. 15 (M. Bastholm);  Pl. Ex. G, Hays Dep., at 53.

55.   At no time prior to the subject loss did CHRW inform Toms that CHRW was anything other than a transportation provider with respect to Toms' shipments.  Proposed Findings of Fact 32–40 and 43–54, *supra*.

56.   Until after the subject loss was discovered, CHRW held itself out to Toms as a transportation provider with respect to Toms' shipments.  Proposed Findings of Fact 32–40 and 43–54, *supra*.

**B.    CHRW's sales approach to new customers does not include the disclosure that CHRW intends to act only as a "broker" for the customers' shipments** (*see*, Pl. Trial Brief at 11).

57.   When quoting shipping rate for a new customer, CHRW would discuss with the customer the nature and specific needs of the customer's freight.  Pl. Ex. G, Hays Dep., at 39-40.

58. When quoting shipping rate for a new customer, CHRW would give the customer an explanation of the rate being charged. Pl. Ex. G, Hays Dep., at 41-42.

59. In her description of a typical customer intake by CHRW, CHRW's Janet Hays made no mention of any indication being given to a customer that CHRW will only be "brokering" the shipments between the customer and a third-party carrier. Pl. Ex. G, Hays Dep., at 39-42.

60. When CHRW provides a quote to a customer for a shipment, the customer is not made aware of, or put in contact with, a subcontracted carrier to which CHRW intends to entrust the customer's goods. Pl. Ex. G, Hays Dep., at 75, lines 13-23.

61. CHRW is a "seamless" transportation provider for its customers. Pl. Ex. G, Hays Dep., at 65 and 75.

62. "[W]hen we are quoting a customer or speaking to a customer it's C.H. Robinson, it's not all the little things inside that bubble so it's basically they are dealing with C.H. Robinson so that's what I meant [by] seamless." Pl. Ex. G, Hays Dep., at 75, lines 13-18.

   **C.    CHRW offered no sales records to indicate that CHRW ever disclosed to Toms CHRW intended to act only as a "broker" for Toms' shipments.**

63. According to CHRW's Key Account Manager Janet Hays, correspondence between a new customer and CHRW would involve CHRW's sales department. Pl. Ex. G, Hays Dep., at 42.

64. The sales person who originally brought the Toms account in to CHRW was Tarek Khider. Pl. Ex. G, Hays Dep., at 43.

9

65.    Mr. Khider no longer works at CHRW and has moved to Egypt.  Pl. Ex. G, Hays Dep., at 43-44.

66.    CHRW offered no materials or files of Mr. Khider or the CHRW sales department to negate, dispute or raise doubt as to the testimony of CHRW's Key Account Manager Janet Hays that:

- CHRW never informed Toms prior to the subject loss that CHRW would act only as a broker of Toms' shipments to third-party truckers, or

- CHRW did not inform Toms that CHRW intended to subcontract carriage of Toms' shipments to a third-party trucker, or

- that CHRW held itself out to Toms as a one-stop, "seamless" transportation provider which would take responsibility for moving Toms' shipments from origin to destination

*See*, CHRW Trial Exhibits.

67.    CHRW never held itself out to Toms as anything other than a transportation provider.  Proposed Findings of Fact 32–40, 43–49, 52-53 and 57–62, *supra*.

68.    CHRW never held itself out to Toms as a middleman or broker.  Proposed Findings of Fact 32–40, 43–49, 52-53 and 57–62, *supra*.

      **D.**      **CHRW offered no evidence to rebut the testimony of its own witness Janet Hays, or of Toms' Michael Bastholm, concerning the parties' Pre-Loss Carrier-Shipper relationship.**

69.     CHRW's sole trial witness, risk manager Christopher McLoughlin, gave no evidence whatsoever concerning communications between CHRW and Toms occurring prior to the subject loss. *See generally*, TT pp. 50 – 79 (C. McLoughlin).

70.     CHRW's Christopher McLoughlin never had any contact with Toms concerning the commercial relationship between the two companies or otherwise.  TT p. 71 l. 17 – p. 72 l. 2 (C. McLoughlin).

71.     At no time during his trial testimony did CHRW's Christopher McLoughlin give evidence as to how or in what role CHRW had held itself out to Toms. *See generally*, TT pp. 50 – 79 (C. McLoughlin).

72.     Janet Hays was the representative of CHRW who dealt with Toms.  TT p. 72 ll. 3 – 5 (C. McLoughlin).

73.     CHRW made no effort to locate Janet Hays prior to trial, and made no effort to secure Ms. Hays' appearance as a witness at trial.  TT p. 72 l. 6 – p. 73 l. 3 (C. McLoughlin).

74.     At no time during his trial testimony did CHRW risk manager Christopher McLoughlin dispute, negate or express any doubt as to the testimony of CHRW Key Account Manager Janet Hays that:

- CHRW never informed Toms prior to the subject loss that CHRW would act only as a broker of Toms' shipments to third-party truckers (*see generally*, TT pp. 50 – 79 (C. McLoughlin)), *and*, Pl. Ex. G, Hays Dep., at 33-34, 44-46 and 63-65, or

11

- CHRW did not inform Toms that CHRW intended to subcontract carriage of Toms' shipments to a third-party trucker (*see generally*, TT pp. 50 – 79 (C. McLoughlin)), *and*, Pl. Ex. G, Hays Dep., at 33-34 and 63-65, or

- that CHRW held itself out to Toms as a one-stop, "seamless" transportation provider which would take responsibility for moving Toms' shipments from origin to destination. *See generally*, TT pp. 50 – 79 (C. McLoughlin); Pl. Ex. G, Hays Dep., at 65 and 75.

75.   CHRW witness Christopher McLoughlin was present in the Courtroom during trial and was present during the testimony of Toms' shipping manager Michael Bastholm.  TT p. 3 ll. 17 – 21 (The Court).

76.   At no time during his trial testimony did CHRW's Christopher McLoughlin dispute, negate or express any doubt as to the testimony of Toms Shipping Manager Michael Bastholm concerning the Carrier – Shipper relationship between CHRW and Toms. *See generally*, TT pp. 50 – 79 (C. McLoughlin).

## PART III

### THE BILL OF LADING SUPPORTS PLAINTIFFS' POSITION THAT CHRW WAS A CARRIER, NOT A BROKER
(*See*, Pl. Trial Brief at 20-21)

77.   The printed language on the face of the Bill of Lading issued for the Cargo named CHRW as "Carrier."  PTO Stipulated Fact 14;  Pl. Ex. A, Bill of Lading.

78.   The Bill of Lading (Pl. Ex. A) identified two Carriers, including CHRW.  Pl. Ex. G, Hays Dep., at 50-51.

79.    The Bill of Lading (Pl. Ex. A) was "the shipping contract with C.H. Robinson pertaining to the transportation from Assured to Coregistics." TT p. 22 ll. 20–23 (M. Bastholm).

80.    There was no contract between CHRW and Toms other than the Bill of Lading.  TT p. 33 ll. 11-14 (M. Bastholm).

81.    CHRW had no master contract with Toms.  PTO Def. Stipulated Fact 16.

82.    The Bill of Lading did not identify CHRW as anything other than a "Carrier."  Pl. Ex. A, Bill of Lading.

83.    CHRW received the Bill of Lading, the type-written portions of which named "CH Robinson" as "Carrier," shortly after the damaged shipment was delivered on July 17, 2013.  Pl. Ex. G, Hays Dep., at p. 49 l. 3 – p. 50 l. 18;  Pl. Ex. A, Bill of Lading.

84.    Toms placed CHRW on written notice of the damage to the Cargo by letter dated 19 July 2013.  PTO Stipulated Fact 24.

85.    After it received the Bill of Lading, CHRW could have protested or objected to the Bill of Lading description of "CH Robinson" as "Carrier."

86.    After it was notified of the loss and Toms' intention to hold CHRW responsible, CHRW could have protested or objected to the Bill of Lading description of "CH Robinson" as "Carrier."

87.    Despite having received the Bill of Lading, and having been notified of the loss and Toms' intention to hold CHRW responsible, CHRW never protested or objected at any time to the Bill of Lading description of "CH Robinson" as "Carrier."

88.  CHRW's failure to protest or object to the Bill of Lading description of "CH Robinson" as "Carrier" demonstrates that CHRW was content to be described as a Carrier, rather than a broker, even after being notified of the subject loss.  Proposed Findings of Fact 82–87, *supra*.

## PART IV

### CHRW'S INVOICE SUPPORTS PLAINTIFFS' POSITION THAT CHRW WAS A CARRIER, NOT A BROKER

**A.    The Contents of the CHRW Invoice** (*see*, Pl. Trial Brief at 15-16 and 18-19):

89.  Toms placed CHRW on written notice of the damage to the Cargo by letter dated 19 July 2013.  PTO Stipulated Fact 24.

90.  On or about September 12, 2013, nearly two months after being notified of the loss and Toms' intention to hold CHRW responsible therefore, CHRW issued its invoice No. 1138699681 to Toms ("the Invoice") covering the transportation of the Cargo from Levittown, Pennsylvania to Cranbury, New Jersey.  PTO Stipulated Fact 31;  Pl. Ex. C, CHRW Invoice.

91.  The Invoice (Pl. Ex. C) is "a bill from C.H. Robinson to Toms for the transportation agreement."  TT p. 23 l. 24 – p. 24 l. 2 (M. Bastholm).

92.  The "applicable bill of lading" referenced in the small print on the Invoice (Pl. Ex. C) is the Bill of Lading which is Plaintiffs' Trial Exhibit A, which named "CH Robinson" as "Carrier."  TT p. 24 l. 23 – p. 25 l. 10 (M. Bastholm).

93.  The CHRW Invoice was issued to Toms by CHRW nearly two months after CHRW learned of the subject loss.  PTO Stipulated Fact 31;  Pl. Ex. C, CHRW Invoice.

14

94.   In issuing its Invoice to Toms for the transportation covered by the Bill of Lading (Pl. Ex.
      A), CHRW could have protested or objected to the Bill of Lading description of "CH Rob-
      inson" as "Carrier."

95.   In issuing its Invoice to Toms for the transportation covered by the Bill of Lading (Pl. Ex.
      A), CHRW did not protest or object to the Bill of Lading description of "CH Robinson" as
      "Carrier." *See*, CHRW Invoice, Pl. Ex. C.

96.   CHRW could have described its services on its Invoice as "brokerage." TT p. 75 ll. 2-4
      (C. McLoughlin) (the Invoice was prepared by CHRW).

97.   The CHRW Invoice did not state or indicate that CHRW was acting as a mere "broker" of
      Toms' shipment. TT p. 74 l. 20 – p. 75 l. 1 (C. McLoughlin).

98.   In its invoice, issued nearly two months after the loss, CHRW could have disclosed that an
      entity other than CHRW had transported Toms' Cargo. TT p. 75 ll. 2-4 (C. McLoughlin)
      (the Invoice was prepared by CHRW).

99.   The Invoice did not disclose or indicate that any entity other than CHRW had transported
      the Cargo. PTO Stipulated Fact 37;  Pl. Ex. C, CHRW Invoice.

100.  In its Invoice, CHRW could have described Toms' Cargo as an "NRT Load," NRT being
      the trucker to whom CHRW subcontracted the transport. TT p. 75 ll. 2-4 (C. McLoughlin)
      (the Invoice was prepared by CHRW).

101.  The CHRW Invoice did not describe Toms' Cargo as an "NRT Load." Pl. Ex. C, CHRW
      Invoice.

102.    The Invoice described the Cargo as "CHR Load: 131943339."  PTO Stipulated Fact 36;
        Pl. Ex. C, CHRW Invoice.

103.    In its Invoice, CHRW could have identified or referred to NRT or another third-party
        trucker or subcontractor.  TT p. 75 ll. 2-4 (C. McLoughlin) (the Invoice was prepared by
        CHRW).

104.    The Invoice did not identify or refer to NRT or any third-party trucker or subcontractor.
        PTO Stipulated Fact 38;  Pl. Ex. C, CHRW Invoice.

105.    The invoices issued to Toms for *prior* shipments did not identify or refer to any third-party
        truckers or subcontractors.  PTO Stipulated Fact 39;  Pl. Ex. C, CHRW Invoice.

106.    In its invoice, CHRW could have charged for "brokerage," or "broker's commission," or
        "non-asset based transportation service" with respect to Toms' shipment.  TT p. 75 ll. 2-4
        (C. McLoughlin) (the Invoice was prepared by CHRW).

107.    The Invoice did not list or include any charges for "brokerage," or "broker's commission,"
        or "non-asset based transportation service."  Pl. Ex. C, CHRW Invoice;  *also*, PTO Stipu-
        lated Fact 34.

108.    The invoices issued to Toms for *prior* shipments did not list or include any charges for
        "brokerage" or broker's commissions.  PTO Stipulated Fact 35.

109.    The Invoice described the charges for CHRW's services with respect to the subject ship-
        ment as "Line Haul" and "Fuel Surcharge."  PTO Stipulated Fact 32;  Pl. Ex. C, CHRW
        Invoice (the invoices issued to Toms for prior shipments also described the charges for

16

CHRW's services with respect to the shipments as "Line Haul" and "Fuel Surcharge", PTO Stipulated Fact 33).

110.   The "Line Haul" charge on the Invoice (Pl. Ex. C) pertains to "the actual transportation, the truck." TT p. 24 ll. 9–15 (M. Bastholm).

111.   The CHRW Invoice was not prepared by the risk management / claims department of which CHRW witness Christopher McLoughlin is risk manager. TT p. 74 ll. 9 – 12 (C. McLoughlin).

112.   In the opinion of CHRW risk manager Christopher McLoughlin, the CHRW Invoice (Pl. Ex. C) covered only "arranging transportation services," as opposed to transportation of Toms' shipment, despite that the Invoice did not so state. TT p. 75 ll. 11 – 18 (C. McLoughlin) ("It doesn't say that on this invoice, no, but that's what the invoice is for").

113.   CHRW's Mr. McLoughlin is of the opinion "in this case" that the "line haul" charge appearing on CHRW's Invoice to Toms does not refer to the transportation of Toms' goods from origin to destination. TT p. 75 ll. 10 – 12 (C. McLoughlin).

114.   In the opinion of CHRW's Christopher McLoughlin, the "line haul" charge on CHRW's Invoice "can mean a lot of different things to a lot of different people." TT p. 76 ll. 13 – 16 (C. McLoughlin). *See also*, TT p. 76 ll. 13 – 19 (C. McLoughlin), "in my opinion, line haul means in this circumstance for our invoice, that's the cost for us to arrange for the transportation from one point to another."

17

115.    Nowhere in his testimony did CHRW's risk Manager Mr. McLoughlin offer any document or other basis for his opinions interpreting the term "line haul" as used on the face of the CHRW Invoice. *See generally*, TT pp. 50 – 79 (C. McLoughlin).

116.    The "fuel surcharge" noted on the Invoice (Pl. Ex. C) is a per-mile charge for "the oil and the gas that was used in connection with the transportation." TT p. 24 ll. 16–22 (M. Bastholm).

117.    The "fuel surcharge" noted on the Invoice is a per-mile charge for the thirty (30) mile shipment of Toms' Cargo from Levittown, Pennsylvania to Cranbury, New Jersey. TT p. 76 l. 20 – p. 77 l. 12 (C. McLoughlin).

118.    The purpose of the Invoice is that "Toms pays C.H. Robinson for the transportation and the oil that was expended in -- during the course of the transportation." TT p. 24 ll. 3–8 (M. Bastholm).

119.    The CHRW Invoice demonstrates that CHRW described itself to Toms as a Carrier, charged Toms for the services of a Carrier, and was content to hold itself out as a Carrier, rather than a broker, even two months after the subject loss. Proposed Findings of Fact 86–113, *supra*.

   **B.     The Terms and Conditions referenced by the CHRW Invoice** (*See*, Pl. Trial Brief at 16-17):

120.    CHRW's September 13, 2013 Invoice (Pl. Ex. C) referred to "terms and conditions" which were not set out on the invoice or on any other document delivered to Toms in connection with the subject shipment. PTO Def. Stipulated Fact 19.

18

121.    Prior to this litigation, Michael Bastholm, the shipping manager of Toms, who had worked

        for the shipping department of Toms for eleven (11) years, had never seen the "Terms and

        Conditions" (Pl. Ex. E) referenced in the CHRW Invoice.   TT p. 25 ll. 17–22 (M.

        Bastholm).

122.    The "Terms and Conditions" referenced on the one-page Invoice were not printed on the

        Invoice.  PTO Stipulated Fact 41.

123.    The "Terms and Conditions" referenced on the Invoice were accessible only through a

        web-site link.  Pl. Ex. C, CHRW Invoice.

124.    In its "Terms and Conditions," CHRW could have labeled or identified itself as a "broker."

125.    The "Terms and Conditions" (Pl. Ex. E) did not label or identify CHRW as a "broker."

        PTO Stipulated Fact 42.

126.    In its "Terms and Conditions," CHRW could have identified or described its own services

        as "brokerage."

127.    The "Terms and Conditions" (Pl. Ex. E) did not identify or describe CHRW's services as

        "brokerage."  PTO Stipulated Fact 43.

128.    In its "Terms and Conditions" CHRW could have stated that it would act only as a middle-

        man, having nothing to do with the performance of transport by third-party truckers; in-

        stead, CHRW's Terms and Conditions affirmatively stated that "[CHRW] shall use rea-

        sonable care in its selection of third parties or in selecting the means, route and procedure

19

to be followed in handing, transportation, clearance and delivery of the shipment ..." Pl. Ex. E, at ¶ 4, first sentence.

## PART V

### CHRW WAS THE ONLY PARTY WITH KNOWLEDGE OF NRT
(*See*, Pl. Trial Brief at 4-5, 7, 11-15 and 19-20)

129.   The only party in this action which had a contract with NRT was CHRW. PTO Stipulated Fact 44.

130.   NRT and CHRW had an Agreement at the time of the shipment at issue listing NRT as the carrier, CHRW as the broker, and that NRT was an independent contractor. PTO Def. Stipulated Fact 11.

131.   CHRW did not provide Toms with the contract between CHRW and NRT. PTO Stipulated Fact 45.

132.   CHRW did not make Toms aware of the contract between CHRW and NRT. PTO Stipulated Fact 46.

133.   The terms and conditions of the contract between CHRW and NRT were subject to a confidentiality clause (Clause 18) in that contract. PTO Stipulated Fact 47; Pl. Ex. D, "Agreement For Motor Contract Carrier Services" between CHRW and NRT dated as of 17 March 2009.

134.   Prior to this litigation, Michael Bastholm, the shipping manager of Toms, had never seen the "Agreement For Motor Contract Carrier Services" between CHRW and NRT  (Pl. Ex. D). TT p. 25 ll. 11–16 (M. Bastholm).

20

135.   CHRW did not provide Toms with the contract between CHRW and any third-party trucker or entity.  PTO Stipulated Fact 48.

136.   CHRW issued a "Load Confirmation" to NRT with respect to the Cargo.  PTO Stipulated Fact 49;  Pl. Ex. F,  C.H. Robinson "Contract Addendum and Carrier Load Confirmation" No. 131943339.

137.   The "Load Confirmation" issued by CHRW to NRT with respect to the Cargo was not given to Toms prior to the commencement of this litigation.  PTO Stipulated Fact 50.

138.   CHRW's "Load Confirmation" form was internal to the CHRW – NRT transaction, and would never have been sent to Toms because it was "proprietary." Pl. Ex. G, Hays Dep., at 73-74.

139.   CHRW's reference at trial to NRT's motor carrier authority (Def. Ex. 7) is irrelevant to CHRW's role with respect to Toms' shipment. *See*, PTO Stipulated Fact No. 10, *i.e.*, CHRW did not advise Toms that NRT had been subcontracted or otherwise nominated to take possession of the Cargo.

140.   There is neither evidence, nor any suggestion, anywhere in the record to the effect that NRT's motor carrier authority (Def. Ex. 7) was ever provided or known to Toms prior to the subject loss.

141.   CHRW's reference at trial to NRT's insurance certificate (Def. Ex. 8) is irrelevant to CHRW's role with respect to Toms' shipment. *See*, PTO Stipulated Fact No. 10, *i.e.*, CHRW did not advise Toms that NRT had been subcontracted or otherwise nominated to take possession of the Cargo.

21

142. There is neither evidence, nor any suggestion, anywhere in the record to the effect that Toms was, should have been, or could have been aware of NRT's insurance details (Def. Ex. 8) prior to the subject loss.

143. CHRW's reference at trial to its "broker" authority (Def. Ex. 3) is irrelevant; there is neither evidence, nor any suggestion anywhere in the record, to the effect that CHRW's "broker" authority (Def. Ex. 3) was ever provided or known to Toms prior to the subject loss.

144. Toms did not learn that NRT had transported the Cargo until after the damaged Cargo was delivered to Cranbury, New Jersey. Proposed Findings of Fact 128–142, *supra*.

**PART VI**

NEITHER THE ISA SURVEY REPORT NOR CHRW'S WEBSITE
EXCERPT SUPPORT CHRW'S "BROKER" CONTENTION)

**A.     The ISA Survey Report (Def. Ex. 9):**

145. The ISA survey report, quotations of which were introduced by CHRW at trial, was issued on December 4, 2013, nearly five months after the July 17, 2013 loss. *See*, ISA Survey Report, Def. Ex. 9, at page 1.

146. The surveyors who issued the survey report were assigned to this loss on July 22, 2013, after the loss occurred. *See*, Def. Ex. 9, at page 1.

147. The surveyors who issued the survey report performed their investigation into this loss on July 24, 2013, after the loss occurred. *See*, Def. Ex. 9, at page 1.

148. The survey report (Def. Ex. 9) contains no discussion of:

- How or in what role CHRW held itself out to Toms *prior* to the loss, or

22

- whether CHRW identified itself to Toms as a Carrier or as a mere transportation broker, as to respect to the subject shipment or any prior Toms shipments, or

- whether Toms authorized CHRW to transport the Cargo, or

- whether CHRW acted as a Carrier or a broker with respect to Toms' Cargo for purposes of the Carmack Amendment.

149.    Reference in the survey report to NRT's having physically carried Toms' shipment reflects only post-loss information concerning the existence or role played by NRT in the shipment. *See*, PTO Stipulated Fact No. 10, *i.e.*, CHRW did not advise Toms that NRT had been subcontracted or otherwise nominated to take possession of the Cargo; *see also*, Proposed Findings of Fact 8–10 and 122–137, *supra*.

150.    The ISA survey report is irrelevant to consideration of CHRW's "broker" contention. Proposed Findings of Fact 140–144, *supra*.

**B.      The "Investors: Corporate Overview" Page of CHRW's Website (Def. Ex. 10):**

151.    CHRW's website page "Investors: Corporate Overview" (Def. Ex. 10) referred to CHRW as a 'non-asset based transportation provider.' PTO Def. Stipulated Fact 10.

152.    CHRW's website page "Investors: Corporate Overview" did not include any definition or explanation of the phrase 'non-asset based transportation provider.' Def. Ex. 10.

153.    CHRW's trial witness Mr. McLoughlin testified that in his view the term 'non-asset based transportation provider' "can be used to refer to property brokers *or third-party logistics companies*" (TT p. 66 ll. 17– 23, italics added), and conceded that the CHRW web site

23

page where that term appeared did not identify or refer to CHRW as a "broker." TT p. 74 ll. 3–8 (C. McLoughlin).

154. As used in CHRW's selected web site excerpt, the phrase 'non-asset based transportation provider' is undefined, unclear and ambiguous. *See*, Proposed Findings of Fact 148–150, *supra*.

155. CHRW's selected website excerpt is an *investors'* corporate overview of CHRW, not a customers' corporate overview of CHRW. TT p. 73 ll. 9 – 15 (C. McLoughlin).

156. Toms was not an investor in CHRW at any time. TT p. 80 ll. 18 – 22 (M. Bastholm); *accord*, TT 73 16 – 18 (C. McLoughlin).

157. Having no doubt that CHRW was providing transportation services with respect to Toms' cargoes, Toms' shipping manager Michael Bastholm had no need to investigate in detail the CHRW website. TT p. 43 l. 16 – p. 44 l. 5 (M. Bastholm).

158. Toms had no reason to visit the "Investors: Corporate Overview" page of CHRW's web site (Def. Ex. 10). Proposed Findings of Fact 146–150, *supra*.

159. The description of CHRW as a 'non-asset based transportation provider' on the "Investors: Corporate Overview" page of CHRW's web site (Def. Ex. 10) is irrelevant to consideration of CHRW's "broker" contention. Proposed Findings of Fact 146–150, *supra*.

<u>CONCLUSION</u>

160.   Base on the foregoing Proposed Findings of Fact, CHRW was not a "broker" with respect

to Toms' Cargo.

Dated: New York, New York                    Respectfully submitted,
           June 22, 2017
                                                          KENNEDY LILLIS SCHMIDT & ENGLISH
                                                          Attorneys for Plaintiffs TRYG INSURANCE
                                                          and TOMS CONFECTIONERY GROUP

                                                          By:      *s/John T. Lillis, Jr.*
                                                          John T. Lillis, Jr., Esq.
                                                          75 Maiden Lane, Suite 402
                                                          New York, NY  10038
                                                          Tel:  (212) 430-0800
                                                          JLillis@klselaw.com