**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

TRYG INSURANCE, et al.,

        Plaintiffs,

v.

C.H. ROBINSON WORLDWIDE, INC., et al.,

        Defendants.

Civil Action No. 15-5343 (MAS) (TJB)

**OPINION AND FINAL JUDGMENT**

**SHIPP, District Judge**

    This matter comes before the Court on a Carmack Amendment claim by Plaintiffs Tryg Insurance ("Tryg") and Toms Confectionery Group ("Toms") (collectively, "Plaintiffs") against Defendants C.H. Robinson Worldwide, Inc. ("CHRW" or "Defendant") and National Refrigerated Trucking, LLC ("NRT")[1] for damage that occurred to Toms's cargo during interstate transport. (Compl., ECF No. 1.) The Court conducted a one-day bench trial on May 4, 2017 to address liability. (ECF No. 40.) The parties submitted proposed findings of fact and conclusions of law on June 22, 2017. (ECF Nos. 45, 47.) The Court now enters final judgment on the merits. After careful consideration of the entire record in this matter, and the applicable law, the Court concludes that CHRW is a "carrier" under the Carmack Amendment, 49 U.S.C. § 14706, based on the specific facts of this case and, therefore, is liable for the stipulated damages amount.

---

[1] NRT did not appear in this Action. Plaintiffs filed a separate Motion for Default Judgment against NRT. (ECF No. 44.) This decision, therefore, addresses liability only as to CHRW.

I.  **Jurisdiction**

This action involves interstate transportation of goods by a motor carrier. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 49 U.S.C. § 14706 (the "Carmack Amendment"). Venue of this action appropriately lies in the District of New Jersey pursuant to 49 U.S.C. § 14706(d). The parties do not dispute subject matter jurisdiction or venue.

II. **Procedural History**

On July 9, 2015, Plaintiffs filed a Complaint against Defendants, alleging that CHRW is liable for damage to Toms's cargo that occurred during interstate transport. (Compl. ¶¶ 24-26.) On July 27, 2015, CHRW filed an Answer and Cross-Claims against NRT. (Answer, ECF No. 6; Final Pretrial Order Stipulation of Facts ("Stipulation of Facts") ¶ 51, ECF No. 30.)[2] NRT failed to appear. (*Id.* ¶ 53.)

The parties agree that liability against CHRW is dependent on whether CHRW is a "broker" or a "carrier" for purposes of the Carmack Amendment. If CHRW is a "broker" then it is not liable for the damage that occurred during transport by NRT. If, however, CHRW is a "carrier" then liability attaches to CHRW.

On April 14, 2016, CHRW moved for summary judgment arguing that as a matter of law, CHRW is a "broker" under the Carmack Amendment. (Def.'s Br. in Supp. of Mot. for Summ. J., ECF No. 15-2.) On November 21, 2016, the Court denied Defendant's motion, finding that the inquiry into whether CHRW is a "carrier" or "broker" is inherently fact intensive. (Nov. 21, 2016 Op. Tr. 22:14-21, ECF No. 27 (citing *Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc.*, 2011

---

[2] The parties submitted stipulated facts in the Final Pretrial Order. (ECF No. 30.) Plaintiffs's stipulated facts are numbered ¶¶ 1-50. Defendant's stipulated facts restart at ¶ 1. The Court renumbers the facts to be consecutive, so that Defendant's stipulated fact ¶ 1 is referred to as ¶ 51.

WL 671747 (S.D.N.Y. Feb. 18, 2011) (denying summary judgment because, *inter alia*, the inquiry into whether entity is "broker" is not suitable for summary judgment)); *see also AIG Europe (Netherlands), N.V. v. UPS Supply Chain Sols., Inc.*, 765 F. Supp. 2d 472, 482-85 (S.D.N.Y. 2011) (same).

On May 4, 2017, the Court held a bench trial as to the issue of liability.[3] (ECF No. 40; May 4, 2017 Trial Tr. ("Trial Tr."), ECF No. 43.) The parties presented two live witnesses during the one-day trial: (1) Michael Bastholm,[4] Customer Service Representative for Toms, and (2) Christopher McLoughlin, Risk Manager for the North American Surface Transportation Division for CHRW. (*See generally* Trial Tr.) The parties also entered into evidence the deposition testimony of Janet Hays ("Hays"), an Account Coordinator for CHRW, in lieu of reading the transcript onto the record. (*See* Trial Tr. 81:1-25, ECF No. 43; Trial Ex. G (Deposition Transcript of Janet Hays) (hereinafter "Hays Dep. Tr.").)

### III. Findings of Fact[5]

#### A. The Parties

1. Toms is a Danish chocolate manufacturer located at Toms Alle 1, DK-2750 Ballerup, Denmark. (Stipulation of Facts ¶ 1.)

2. Toms was at all relevant times the owner of a shipment of miniature chocolate liquor bottles ("the Cargo"). (Stipulation of Facts ¶ 2.)

---

[3] The parties stipulated that Plaintiffs's damages are $124,034.31. The one-day bench trial addressed only liability under the Carmack Amendment. (Final Pretrial Order 20-21, ECF No. 30.)

[4] Bastholm's trial testimony was provided through a court-qualified translator, Mette Deleuran. (Trial Tr. 14:24-15:6.)

[5] In evaluating the testimony of the witnesses appearing at trial, and after the Court had the opportunity to hear their testimony and observe their demeanor, the Court undertook an

3. Tryg is a Danish company located at Klausdalsbrovej 601, 2750 Ballerup, Denmark. (Stipulation of Facts ¶ 3.)

4. Tryg insured the Cargo against loss and damage. (Stipulation of Facts ¶ 4.)

5. CHRW is a Delaware corporation with an office for the transaction of business at 14701 Charlson Road, Eden Prairie, Minnesota, 55347. (Stipulation of Facts ¶ 5.)

6. NRT is a New Jersey company with an office for the transaction of business at 4000 Bordentown Avenue, Suite 45, Sayreville, New Jersey, 08872.[6] (Stipulation of Facts ¶ 6.)

**B. CHRW's Actual Business Operations**

7. At all relevant times, CHRW possessed a broker's license, which allowed it to arrange for the transportation of property. (Stipulation of Facts ¶ 59; Trial Tr. 55:1-56:25.)

8. CHRW did not, at any relevant time, possess a motor carrier license. (Hays Dep. Tr. 57:7-9; Trial Tr. 57:2-3.)

9. CHRW does not own any trucks or equipment to transport, pick up, or receive cargo (Hays Dep. Tr. 56:24-57:2; Trial Tr. 55:4-6.)

**C. Plaintiffs's Perception of CHRW's Operations**

10. The relationship between CHRW and Toms was not formalized in a "master contract." (Stipulation of Facts ¶ 66.) Instead, transactions were agreed upon mostly via e-mail

---

individualized credibility assessment of each witness and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. Such determinations are reflected in the factual findings.

[6] The parties believe that NRT may no longer be in business. (Stipulation of Facts ¶ 6.)

messages, the transports were documented in a Bill of Lading, and an Invoice sent to the customer. (Stipulation of Facts ¶¶ 31-34, 68.)[7]

11. Michael Bastholm ("Bastholm"), a customer service representative for Toms, conducted business with CHRW on behalf of Toms. (Stipulation of Facts ¶ 68; Trial Tr. 17:10-19:11.)

12. Bastholm's point of contact at CHRW was Janet Hays, an Account Coordinator. (Trial Tr. 28:20-29:15.) Hays was assigned to the Toms account dating back to approximately 2008 or 2009 through the date of loss.[8] (Hays Dep. Tr. 13:20-14:4.)

13. Bastholm communicated with Hays to schedule shipments and request shipment quotes. (Hays Dep. Tr. 23:6-12.) Hays would arrange transportation from a designated outbound location (*i.e.*, a warehouse that stored Toms's goods) to a destination set by Toms. (Hays Dep. Tr. 20:9-21:16.)

14. Hays and Bastholm never discussed whether CHRW was a "broker" or a "carrier." Hays, therefore, never explicitly represented that CHRW was a "broker," nor did she ever state that CHRW was a "carrier." (Hays Dep. Tr. 33:24-34:17; 68:4-13; Trial Tr. 30:13-19.)

15. CHRW did not produce any evidence that it ever informed Toms that it was acting only as a broker.

16. Hays indicated to Toms that CHRW could arrange for shipping of its goods, and Hays would "make it sound like it's seamless." (Hays Dep. Tr. 64:16-65:24.)

---

[7] Toms also occasionally communicated telephonically with CHRW's accounting department. (Hays Dep. Tr. 17:23-18:11.)

[8] The Toms account was originated by a different CHRW employee. Hays took over the account when the other employee retired. (Hays Dep. Tr. 43:5-24.)

5

17. With respect to the "seamless" nature of the services provided by CHRW, Hays testified that she meant that when "quoting a customer or speaking to a customer, it's [CHRW], it's not all the little things inside that bubble so it's basically [the customer is] dealing with [CHRW]." (Hays Dep. Tr. 75:10-18.)

18. Bastholm's understanding was that CHRW "took over responsibility of the goods" because the parties had an agreement for CHRW to transport the goods and Toms paid CHRW for the transportation. (Trial Tr. 40:22-41:21.)

19. Bastholm did not know whether CHRW owned equipment for transporting Toms's goods. (Stipulation of Facts ¶ 68; Trial Tr. 65:22-66:16.) Bathsolm understood CHRW would be arranging for the transportation (Trial Tr. 44:9-10) and his position was that because CHRW "provided transportation services for [Toms] . . . [he] didn't need to check if [it] engaged the use of other companies." (*Id.* at 43:23-25.)

20. Although CHRW's website contains an explanation that CHRW is a non-asset based transportation provider, the information is maintained in the "Investors" section of the website. (Stipulation of Facts ¶ 60.) Bastholm never invested in Toms and, therefore, never had a reason to look at this section of the website. (Trial Tr. 43:16-25.)

D. **Shipment, Loss, Bill of Lading, and Invoices**

21. In or about July 2013, Toms hired CHRW to transport the Cargo from non-party Assured Packing Inc. ("Assured") in Levittown, Pennsylvania to non-party Coregistics in Cranbury, New Jersey. (Compl. ¶ 1.)

22. Unbeknownst to Toms, CHRW subcontracted the physical carriage of the Cargo to NRT. (Stipulation of Facts ¶¶ 7, 10; Trial Tr. 44:15-20.)

6

23. Defendants CHRW and NRT had an agreement at the time that the Cargo was shipped, which identified NRT as a carrier and CHRW as a broker. (Stipulation of Facts ¶ 61; Trial Ex. D (Agreement for Motor Carrier Contract Services between CHRW and NRT), at 2-11.) Toms, however, was never made aware of this agreement and the agreement contained a confidentiality clause.[9] (Stipulation of Facts ¶¶ 44, 47.)

24. On July 16, 2013, NRT picked up the Cargo from Assured. (Stipulation of Facts ¶ 11; Trial Tr. 54:14.) CHRW never had physical possession of the Cargo. (Stipulation of Facts ¶ 70; Hays Dep. Tr. 57:3-6.)

25. The Cargo was in good order and condition at the time the NRT trucker took possession at Assured. (Stipulation of Facts ¶ 12.)

26. On the same day, Assured prepared and issued Straight Bill of Lading No. 68422 (the "Bill of Lading"). (Stipulation of Facts ¶¶ 13, 56; Trial Tr. 54:17-18; 67:9-12; Trial Ex. A (Bill of Lading).) The Bill of Lading covered shipment of the Cargo from Assured in Levittown, Pennsylvania to Coregistics in Cranbury, New Jersey. (Stipulation of Facts ¶ 15; Trial Tr. 54:14-21; Trial Ex. A (Bill of Lading).)

27. The Bill of Lading contains two areas that identify the carrier. The printed language, prepared by Assured, names CHRW as "carrier." The portion of the Bill of Lading where the carrier acknowledges receipt of the cargo was signed by NRT. (Stipulation of Facts ¶¶ 14, 58; Trial Ex. A (Bill of Lading).)

---

[9] CHRW also issued a "Load Confirmation" to NRT with respect to the Cargo, which referred to CHRW as a "broker." (Stipulation of Facts ¶ 49; Trial Tr. 61:1-7; Hays Dep. Tr. 62:2-12; Trial Ex. F (C.H. Robinson Contract Addendum and Carrier Load Confirmation No. 13194339, at 3).) The "Load Confirmation," however, is also considered proprietary and was not provided to Toms. (Hays Dep. Tr. 74:2-21.)

28. The "carrier" designation is the only reference to CHRW on the Bill of Lading. (Trial Ex. A (Bill of Lading).) CHRW never objected to or clarified this designation. (Stipulation of Facts ¶ 8; Pls.' Post Trial Proposed Findings of Fact ¶¶ 85-87.)

29. The Bill of Lading stated on its face, in capital letters surrounded by asterisks, that the Cargo "must be transported between 52-68° F (11-18° C)." (Stipulation of Facts ¶ 16; Trial Ex. A (Bill of Lading).)

30. While in transit, the refrigeration mechanism of the NRT truck carrying the Cargo malfunctioned and the internal temperature of the trailer reached as high as 82° F. (Stipulation of Facts ¶¶ 17-18.) The high temperature resulted in physical damage to the Cargo, rendering it unfit for consumption as food, and resulting in a total loss of the Cargo's value. (Stipulation of Facts ¶¶ 19, 25-26.)

31. On July 17, 2013, the Cargo was outturned by NRT in Cranbury, New Jersey—the Cargo's destination—in damaged condition. (Stipulation of Facts ¶¶ 21-22, 62; Trial Tr. 21:9-23.) Thereafter on the same date, Coregistics completed Non-Conformance Report No. NCR13-006 with respect to the Cargo. (Stipulation of Facts ¶ 23.)

32. The value of the Cargo lost as a result of the physical damage sustained by the Cargo during shipment totaled $124,034.31. (Stipulation of Facts ¶¶ 28-30, 55.)

33. On July 19, 2013, Toms submitted a claim to CHRW for the loss. (Stipulation of Facts ¶ 24; Trial Tr. 30:20-22.) In response, CHRW indicated that it had received the notice and had ninety days to review the claim. (Trial Tr. 30:23-31:5.) CHRW, however, never accepted the claim or paid for the loss, and did not provide an explanation for the decision. (Trial Tr. 31:6-15; Hays Dep. Tr. 33-34.)

34. On or about September 12, 2013, nearly two months after the delivery of the damaged Cargo, CHRW issued its invoice to Toms ("the Invoice") for the transportation of the Cargo.

35. The Invoice described the Cargo as "CHR Load: 131943339" and included charges for "Line Haul" and "Fuel Surcharge." (Stipulation of Facts ¶¶ 31-32, 36, 40.)

36. The Invoice did not list or include any charges for "brokerage" or broker's commissions. (*Id.* ¶ 34.)

37. The Invoice did not indicate that any entity other than CHRW had transported the Cargo, and did not identify or refer to NRT or any third-party trucker or subcontractor. (*Id.* at ¶¶ 37, 38; Trial Ex. C (CHRW Invoice).) Toms was still unaware at this time that the loss occurred in the possession of NRT. (Pls.' Trial Br. 21.)

38. The Invoice referenced "Terms and Conditions" but no terms and conditions were printed on the invoice. (Stipulation of Facts ¶ 41; Trial Ex. C (CHRW Invoice).) Instead, the Terms and Conditions were accessible through a website link. Toms was unaware of the Terms and Conditions until after the loss. The Terms and Conditions do not identify CHRW as a "broker" or describe CHRW's services as "brokerage." (Stipulation of Facts ¶¶ 41-43.) Instead, the Terms and Conditions state that "[CHRW] shall use reasonable care in its selection of third parties or in selecting the means, route and procedure to be followed in handling, transportation, clearance and delivery of the shipment . . . ." (Trial Ex. E (CHRW's Terms and Conditions).)

39. Toms submitted a claim to its insurer, Tryg, in the amount of $124,034.31 on account of the physical damage to the Cargo. (Stipulation of Facts ¶ 29.) Tryg paid Toms $115,478, which reflects the full value of the Cargo, less Toms's deductible under the applicable policy of insurance. (*Id.* ¶ 30.)

9

40. After this litigation was initiated, CHRW represented to Toms for the first time that it is only a "broker" and therefore not liable for the loss. (Pl.'s Trial Br. 12, ECF No. 35.)

### IV. Parties's Positions

#### A. Plaintiffs's Arguments

Plaintiffs argue that Defendant is a carrier for purposes of the Carmack Amendment because Defendant was authorized to transport Plaintiffs's cargo and legally bound itself to do so. Plaintiffs argue that the Bill of Lading and Defendant's invoice indicate that Defendant acted as a carrier, and Defendant exercised a degree of control over the transportation of Plaintiffs's cargo beyond that of a broker. (Pls.' Trial Br. 9-18; Pls. Post-Trial Proposed Conclusions of Law 2-11, ECF No. 47.) Plaintiffs emphasize that CHRW represented itself as "seamless" "one-stop shipping" with responsibility for transporting Plaintiffs's Cargo, and never indicated that Defendant's only role was to secure a third party to transport the goods. (Pls.' Post-Trial Proposed Conclusions of Law 2-4.) Plaintiffs also point out that Defendant did not object to the classification of "carrier" on the Bill of Lading and did not disclose to Toms that NRT had physical custody of the Cargo at the time of the loss. (*Id.* at 7.) Finally, Plaintiffs argue that the language in Defendant's Terms and Conditions, which Toms only learned of after the loss, demonstrates that CHRW exercised significant control over the transport and is a strong indication of Carmack Amendment carrier status.[10]

---

[10] The terms and conditions state that "[CHRW] shall use reasonable care in its selection of third parties *or in selecting the means, route and procedure to be followed in handling, transportation, clearance and delivery of the shipment* . . . ." (Trial Ex. E (CHRW's Terms and Conditions), ¶ 4 (emphasis added).)

B.  **Defendant's Arguments**

Defendant argues that it acted as a broker, which is the only status for which it is registered with the Department of Transportation. (Def.'s Trial Br. 2, ECF No. 39.) CHRW argues that it designated itself as a third party logistics provider, never took possession of the Cargo, and never represented to Plaintiffs that it acts as a carrier. (*Id.*) Defendant points out that it does not own any trucks or equipment for transporting goods and argues that Plaintiffs had knowledge from prior dealings with CHRW that CHRW is only a broker. (*Id.* at 2-3.) Defendant asserts that liability should fall only on NRT and relies on the language in its agreement with NRT designating CHRW as the "broker" and NRT, an independent contractor, as the "carrier." (*Id.* at 2-4, 6, 17.) CHRW argues that it "was not under any legal obligation to advise Toms as to the identity of the carrier that it retained . . . nor [under] any obligation to provide Toms with CHRW's agreement with NRT or [] the load confirmation." (*Id.* at 10.) Defendant also argues that the listing on the Bill of Lading is not dispositive because it was prepared by Assured and NRT is the entity that actually signed the Bill of Lading as the carrier that received and transported the Cargo. (*Id.* at 5.)

V.  **Discussion – Conclusions of Law**

The crux of the dispute before the Court is whether Defendant is a "broker" or a "carrier" under the Carmack Amendment, which determines whether Defendant is liable for the loss.[11] The

---

[11] The Carmack Amendment "provides an exclusive remedy for the loss of goods transported in interstate commerce by motor carriers and freight forwarders." *Phoenix Assurance Co. v. K-Mart Corp.*, 977 F. Supp. 319, 324 (D.N.J. 1997). Liability under the Carmack Amendment extends to any carrier providing transportation or service. 49 U.S.C. § 14706(a)(1). The purpose of the Carmack Amendment is to "relieve cargo owners of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 98 (2010) (internal quotations omitted).

parties agree that if Defendant is a "carrier" liability attaches, however, if Defendant is a broker, Defendant is not liable for the loss.[12]

Under the Carmack Amendment, a "carrier" includes "a motor carrier," which is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(3), (14). The term "transportation" includes both the actual movement of property and "services related to that movement," including arranging delivery of property. 49 U.S.C. § 13102(23). On the other hand, a "broker" is "a person, other than a motor carrier [that] . . . sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2); *see also* 49 C.F.R. § 371.2. Importantly, a carrier is not a broker for purposes of the Carmack Amendment because it arranges the transportation of shipments that it is authorized to transport and that it has legally bound itself to transport. 49 C.F.R. § 371.2. In other words, "[i]f [an entity] accepted responsibility for ensuring delivery of goods, regardless of who actually transported them, then [the entity] qualifies as a carrier. If, however, [the entity] merely agreed to locate and hire a third party to transport the machines, then it was acting as a broker." *Nipponkoa Ins.*, 2011 WL 671747, at *7 (quoting *CGU Int'l Ins., PLC v. Keystone Lines Corp.*, No. 02-3751, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004)).

Courts consider various factors to determine whether a party is in fact a "motor carrier" or a "broker" under the Carmack Amendment. *See Pelletron Corp. v. C.H. Robinson Worldwide, Inc.*, No. 09-2365, 2012 WL 3104845, at *3-4 (E.D. Pa. July 31, 2012). This includes: (1) whether

---

[12] "[A]n initial common carrier is liable to the shipper for the value of goods lost in interstate commerce, without regard to the initial carrier's negligence" under the Carmack Amendment. *Phoenix Assurance Co.*, 977 F. Supp. at 324. This provision does not apply to brokers. *See generally* 49 U.S.C. § 14706(d).

the entity promised to personally perform the transport and therefore legally bound itself to transport; (2) the type of services the entity offers; (3) whether the entity held itself out to the public as the actual transporter of goods; and (4) whether the entity's *only* role was to secure a third party to ship plaintiff's goods. *Id.* To that end, the inquiry into whether Defendant is a "carrier" or "broker" is inherently fact intensive. *See Nipponkoa Ins.*, 2011 WL 671747; *AIG Europe (Netherlands)*, 765 F. Supp. 2d at 482-85.

Here, the Court finds that Defendant is a carrier for purposes of the Carmack Amendment. Although Defendant, in actuality, acts as a third-party logistics provider with only a broker's license (and no carrier license) issued by the U.S. Department of Transportation, (Def.'s Mot. for Summ. J. 2), registration status is not dispositive. *See Phoenix Assurance Co.*, 977 F. Supp. 319, 326 (D.N.J. 1997). The key inquiry is whether Defendant held itself out as a broker or a carrier. *See Lubermens Mut. Cas. Co. v. GES Exposition Servs., Inc.*, 303 F. Supp. 2d 920, 921 (N.D. Ill. 2003) (status as a broker or carrier is determined "by how [the company] holds itself out to the world and its relationship to the shipper."); *see also Pelletron Corp.*, 2012 WL 3104845; *Nipponkoa Ins.*, 2011 WL 671747, at *4-5.

In this case, in light of Defendant's actions and the weight of the evidence, the Court concludes that CHRW held itself out to Toms as a carrier. Specifically, CHRW represented itself as an entity that provided a "seamless service," without any indication of the involvement of third-parties; CHRW was listed as the carrier on the Bill of Lading that was provided to Toms, and never clarified that this was incorrect; and the only documents that identified CHRW as a "broker" were confidential and proprietary agreements with third-parties and not disclosed to Toms. (Findings of Fact, Section III, *supra*, ¶¶ 16-17, 23, 28.) The Court also finds it significant that, despite a relationship spanning several years, CHRW could not produce a single document or

communication where it identified itself as a broker to Toms. (*Id.* ¶ 15.) In fact, even after Toms submitted a claim to CHRW for the loss, CHRW did not respond that it was only a broker. Instead, it indicated that it would review the claim within a specified time. (*Id.* ¶ 33.) CHRW did not even provide its "broker" status as an explanation to Toms for denying payment on the claim.[13] (*Id.*) In fact, CHRW did not inform Toms of its "broker" status until after this litigation was initiated. (*Id.* at 37.)

Further supporting the finding of CHRW as a carrier, the Invoice for the shipment at issue characterized the Cargo as a "CHR Load" and charged Toms for "line haul" and "fuel surcharge," which are charges consistent with an entity that acts as a carrier.[14] (*Id.* at 35.) The Invoice does not contain any reference to brokerage commissions, brokerage fees, or the third-party entity that transported the goods. (*Id.* at 36.) In addition, CHRW's own Terms and Conditions provide that CHRW "shall use reasonable care in its selection of third parties or in *selecting the means, route, and procedure to be followed in handling, transportation, clearance, and delivery of shipment*[.]" (Trial Ex. E. (CHRW's Terms and Conditions).) This language suggests that Defendant's actions were not limited to brokering transport, but included transporting the goods and/or exerting control over drivers.

---

[13] Defendant relies on *Schramm v. Foster*, 341 F. Supp. 2d 536, 549 (D. Md. 2004) in support of its argument that it is not a carrier under these facts. *Schramm*, however, is distinguishable because the court concluded that the client-shipper understood the defendant's role as an intermediary, despite the defendant advertising itself as a single point of contact for all transportation needs, and nothing suggested that the defendant's client believed the defendant had accepted responsibility to ship the load itself pursuant to its motor carrier authority. *Id.*

[14] *Compare Nipponkoa Ins.*, 2011 WL 671747, at *4-5 (finding defendant's charges for line haul transportation without any mention of brokerage commissions would support a finding that the defendant acted as a carrier) *with CGU Int'l Ins*, 2004 WL 1047982, at *2 (finding that the defendant's charge of brokerage commissions evidenced that the defendant merely offered to arrange for transportation).

14

For all of these reasons, in the context of CHRW's relationship with Toms, Defendant's actions lead to the conclusion that it is a "carrier" for purposes of the Carmack Amendment.

## VI. Conclusion

For the foregoing reasons, the Court concludes that Defendant acted as a carrier under the Carmack Amendment with respect to the July 2013 transportation of the Cargo. An order consistent with this Memorandum Opinion will be entered.

/s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated: November 28th, 2017